# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

---

KENITH M. A'GARD,

               Plaintiff,

    v.

N. LOCKE,[1] *et al.*,

               Defendants.

Civil Action No.
9:14-CV-0613 (GTS/DEP)

---

APPEARANCES:            OF COUNSEL:

FOR PLAINTIFF:

KENITH M. A'GARD, *Pro Se*
10-A-3008
Shawangunk Correctional Facility
P.O. Box 700
Wallkill, NY 12589

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN    CHRISTOPHER J. HUMMEL, ESQ.
New York State Attorney General    Assistant Attorney General
The Capitol
Albany, NY 12224


DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

---

[1]    Defendant Locke was sued by plaintiff as N. Lock. *See* Dkt. No. 1 at 7. The clerk of the court will respectfully be directed to revise the docket in this matter to reflect the correct spelling of defendant Locke's name.

<u>REPORT, RECOMMENDATION AND ORDER</u>

*Pro se* plaintiff Kenith M. A'Gard, a New York State prison inmate, has commenced this action against several defendants, both named and unidentified "Doe" defendants, all of whom are corrections employees stationed at the prison facility in which plaintiff was confined at the relevant times, pursuant to 42 U.S.C. § 1983, alleging the deprivation of his civil rights. Liberally construed, plaintiff's complaint asserts claims under the Eighth Amendment for (1) failure to protect, against defendant Nathan Locke and four unnamed individuals, based on allegations that they failed to take reasonable steps to prevent plaintiff from being assaulted by a fellow inmate, and (2) deliberate medical indifference, against an unidentified nurse, based on allegations that she provided inadequate medical care following the assault on plaintiff.

Currently pending before the court are cross-motions brought by defendant Locke and the plaintiff, each seeking the entry of summary judgment in their favor. For the reasons set forth below, I recommend that plaintiff's motion be denied and defendant Locke's motion be granted. In addition, based on the record evidence adduced by defendant Locke in support of his motion, which demonstrates his knowledge as to the identities of the Sergeant John Doe and Lieutenant John Doe named as defendants

in the complaint, the previous efforts of plaintiff to identify these defendants, and my recommendation with respect to the claim asserted against defendant Locke, defense counsel will be directed to provide plaintiff with the names of these individuals.[2] Finally, in light of plaintiff's failure to take reasonable steps to identify and join the other unnamed defendants in this action during the pendency of discovery and the absence of any record evidence that would appear to support a claim against any of those defendants, I recommend that the claims asserted against the remaining three unnamed defendants be dismissed without prejudice for failure to prosecute.

I.      BACKGROUND[3]

        Plaintiff is a New York State prison inmate currently being held in the custody of the New York State Department of Corrections and Community

---

[2]     After plaintiff has been provided with the true names of Sergeant John Doe and Lieutenant John Doe, plaintiff will be granted leave to amend his complaint, after which point the court will issue a new scheduling order allowing for limited discovery relative to the Eighth Amendment claim asserted against these defendants.

[3]     In light of the procedural posture of the case, the following recitation is derived from the record now before the court. Ordinarily, when a motion for summary judgment is made, the record evidence is construed with all inferences drawn and ambiguities resolved in the non-moving party's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003). In this case, in light of the parties' cross-motions, the court draws "all factual inferences . . . against the party whose motion is under consideration." *Tindall v. Poultney High Sch. Dist.*, 414 F.3d 281, 284 (2d Cir. 2005) (quotation marks omitted). It is worth noting that, generally, the material facts underlying plaintiff's claim against defendant Locke in this matter are not in dispute.

Supervision ("DOCCS"). *See generally* [Dkt. No. 1](#). While he is now incarcerated at the Shawangunk Correctional Facility, at the times relevant to his claims in this action, plaintiff was confined in the Upstate Correctional Facility ("Upstate"), located in Malone, New York.[4] *Id.* at 6.

Plaintiff arrived at Upstate on April 19, 2013. [Dkt. No. 63 at 4](#). Upon his arrival, he was assigned to a double-occupancy cell with inmate James Heath following an assessment of his suitability and compatibility for double-cell housing.[5] *Id.*; [Dkt. No. 53-3 at 3](#), 16. Accompanied by defendants Corrections Officers Doe 1 and Doe 2, defendant Locke escorted plaintiff to his cell as instructed by his area supervisor, a sergeant. [Dkt. No. 53-2 at 2](#). Upon the group's arrival at the cell, Inmate Heath refused to allow plaintiff to enter, told defendant Locke and the other officers that he did not want plaintiff in the cell with him, and became "hostile." [Dkt. No. 1 at 15](#); [Dkt. No. 63 at 4](#); [Dkt. No. 53-1 at 11-12](#); [Dkt. No. 53-2 at 2](#). Defendant Locke then informed his sergeant by radio communication of Inmate Heath's behavior. [Dkt. No. 63 at 4](#); [Dkt. No. 53-1 at 11](#); [Dkt. No. 53-2 at 2](#).

---

[4]     Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined for twenty-three hours each day, primarily for disciplinary reasons. *Samuels v. Selsky*, No. 01-CV-8235, 2002 WL 31040370, at *4 n.11 (S.D.N.Y. Sept. 12, 2002).

[5]     Although plaintiff refers to this individual as "Scott Heath" in his complaint, *see, e.g.,* [Dkt. No. 1 at 1](#), 8, it appears the inmate who plaintiff intends to reference is "James Heath," DIN 03-B-2618. *See* [Dkt. No. 63 at 4](#).

Plaintiff was escorted back to a holding pen, and defendant Locke met with the Sergeant and Lieutenant Watch Commander to discuss the situation. Dkt. No. 63 at 4; Dkt. No. 53-1 at 13-14; Dkt. No. 53-2 at 2. According to defendant Locke, defendant Sergeant Doe "then ordered [him], along with [his] fellow officers, to escort plaintiff . . . into the cell." Dkt. No. 53-2 at 2; *see also* Dkt. No. 63 at 4-5. Defendant Locke, in the company of Sergeant John Doe and two other officers, then escorted plaintiff back to the cell. Dkt. No. 53-2, at 3.

Prior to plaintiff's entry into the cell, defendant Lieutenant Doe allegedly told plaintiff in the presence of defendant Locke that he wanted plaintiff to "kick [Inmate] Heath's ass." Dkt. No. 53-1 at 14-15; *see also* Dkt. No. 1 at 15. Once plaintiff was locked in his new cell, defendant Locke returned to his post. Dkt. No. 53-2 at 3.

Shortly after plaintiff was locked into the cell, he was assaulted by Inmate Heath. Dkt. No. 1 at 15; Dkt. No. 63 at 5-6. Defendant Locke responded to the cell and issued plaintiff a misbehavior report based on the incident. Dkt. No. 1 at 17; Dkt. No. 1-1 at 1; Dkt. No. 53-2 at 3, 6. Although the misbehavior report issued to plaintiff suggests that defendant Locke witnessed Inmate Heath and plaintiff "exchanging striking blows,"[6] plaintiff

---

[6] *See, e.g.,* Dkt. No. 1-1 at 1.

disputes this,[7] and a declaration submitted by defendant Locke in support of his motion for summary judgment is vague regarding this point. *See* Dkt. No. 53-2 at 3. In any event, defendant Locke wrote in a misbehavior report issued concerning the incident that "Inmate Agard, K Din #10A3008 did not appear to be the aggressor but was attempting to defend himself." Dkt. No. 1-1 at 1; Dkt. No. 53-2 at 6.

Following plaintiff's altercation with Inmate Heath, he was taken out of the cell and seen by medical staff. Dkt. No. 53-2 at 3. Plaintiff claims that Nurse Jane Doe, a defendant in this action, acted with deliberate indifference to his serious medical needs by failing to provide adequate medical care to address his injuries, which allegedly included "a concussion, a split-lip, a stab wound to the left side of the nose, chipped and cracked teeth, and a swelling to [his] face and skull." Dkt. No. 1, at 44.

Plaintiff contends that his "Institutional History" records reflect that he "was not suppose[d] to be in 'double-occupancy-housing' at Upstate" and that he is "'victim prone.'" Dkt. No. 1 at 19, 21. Plaintiff testified at his deposition in this matter that he informed defendant Locke, prior to being escorted into Inmate Heath's cell, that he "couldn't double bunk." Dkt. No. 53-1 at 16. In addition, plaintiff contends, and there is no evidence disputing,

---

[7]     *See* Dkt. No. 1 at 25; Dkt. No. 63 at 5.

that defendant Locke was aware that Inmate Heath had a history of violence against other prisoners while incarcerated at Upstate. Dkt. No. 1 at 24; Dkt. No. 63 at 5 & n.2. Defendant Locke maintains that he "had no authority to change the approval of plaintiff to be housed with Inmate Heath." Dkt. No. 53-2 at 3.

## II.   PROCEDURAL HISTORY

Plaintiff commenced this action on May 27, 2014, with the filing of a complaint and accompanying applications to proceed *in forma pauperis* ("IFP") and for permission to proceed in the action anonymously, utilizing a pseudonym, for safety reasons.[8] Dkt. Nos. 1-3. Named as defendants in plaintiff's complaint were Corrections Officer N. Locke, Inmate James Heath, Deputy Superintendent Rock, Inspector General Vern Fonda, Administrative Assistant Chad Powell, Nurse Doe, Corrections Officers Doe 1 and Doe 2, Corrections Sergeant Doe, and Corrections Lieutenant Doe. Dkt. No. 1 at 1, 6-10. On December 23, 2014, Chief District Judge Glenn T. Suddaby issued a decision and order pursuant to 28 U.S.C. §§ 1915(e)(2)B(ii), 1915A(b) in which he (1) granted plaintiff's IFP application; (2) denied plaintiff's request to proceed under a pseudonym in this action;

---

[8]      Plaintiff's original IFP application was denied as incomplete on June 3, 2014. Dkt. No. 6. Plaintiff thereafter filed a renewed and complete request on June 10, 2014. Dkt. No. 7.

and (3) dismissed all of plaintiff's claims, except plaintiff's Eighth Amendment failure to protect claim asserted against defendants Locke, Corrections Officers Doe 1 and 2, Corrections Lieutenant Doe, and Corrections Sergeant Doe, and plaintiff's Eighth Amendment deliberate medical indifference claim against Nurse Doe. *See generally* Dkt. No. 14.

Following the close of discovery, defendant Locke filed a motion seeking the entry of summary judgment in his favor on December 24, 2015. Dkt. No. 53. In his motion, defendant Locke argues that no reasonable factfinder could conclude he is liable for failing to protect plaintiff from Inmate Heath's attack, and, in any event, he is entitled to qualified immunity from suit. *See generally* Dkt. No. 53-5. Plaintiff filed a response to defendant Locke's motion on February 4, 2016, which he has characterized as a cross-motion for summary judgment. Dkt. No. 63. Defendant Locke subsequently filed an opposition to plaintiff's cross-motion on March 15, 2016. Dkt. No. 67.

The pending motions, which are now fully briefed and ripe for determination, have been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

III.    <u>DISCUSSION</u>

A.    <u>Plaintiff's Cross-Motion for Summary Judgment and Failure to Respond to Defendant Locke's Statement of Material Facts</u>

Although plaintiff characterizes his response to defendant Locke's motion as a "'cross-motion' for summary judgment," and "submits that plaintiff's complaint and the relief requested be granted in its entirety," Dkt. No. 63 at 1, 3, his submission fails to comply with the local rules of this court governing motion practice. In particular, Local Rule 7.1 requires a moving party to submit a "supporting affidavit," as well as a statement of material facts. N.D.N.Y. L.R. 7.1(a)(2)-(3). In this case, plaintiff has submitted only a memorandum of law in support of his cross-motion. Dkt. No. 63. Because plaintiff has not complied with the applicable local rules governing motion practice by including an affidavit and statement of material facts, I recommend that his motion be denied. *See, e.g., Riley v. Town of Bethlehem*, 5 F.Supp.2d 92, 93 (N.D.N.Y.1998) (dismissing summary judgment motion based on moving party's failure to file a properly supported Local Rule 7.1 Statement of Material Facts).

Plaintiff's failure to respond to the Local Rule 7.1(a)(3) Statement submitted by defendants in support of their motion is also significant. By its terms, Local Rule 7.1 provides, in part, that "[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that

9

the opposing party does not specifically controvert." N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely enforced a non-movant's failure to properly respond. *See, e.g., Elgamil v. Syracuse Univ.*, No. 99-CV-0611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2010) (McCurn, J.) (listing cases).[9] Undeniably, *pro se* litigants are entitled to some measure of forbearance when defending against summary judgment motions. *Jemzura v. Public Serv. Comm'n*, 961 F.Supp. 406, 415 (N.D.N.Y.1997) (McAvoy, J.). The deference owed to *pro se* litigants, however, does not extend to relieving them of the ramifications associated with the failure to comply with the court's local rules. *Robinson v. Delgado*, No. 96-CV-0169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J., *adopting report and recommendation by* Hurd, M.J.). Stated differently, "a pro se litigant is not relieved of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins*, No. 09-CV-0308, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011) (Mordue, J.).

Here, because plaintiff was warned of the consequences of failing to properly respond to defendant Locke's statement of material facts, *see* Dkt.

---

[9]    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

No. 53 at 2; Dkt. No. 54 at 2, but nonetheless has failed to do so, I recommend that the court deem the facts contained in defendant's statement as having been admitted, to the extent they are supported by accurate record citations. *See, e.g., Latouche*, 2011 WL 1103045, at *1; *see also Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir.1996). As to any facts not contained in defendant Locke's statement of material facts, in light of the procedural posture of this case, the court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of plaintiff. *Terry*, 336 F.3d 1 at 137.

### B.   Defendant Locke's Motion

#### 1.   Legal Standard Governing Motions for Summary Judgment

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at

248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment

appropriate only when "there can be but one reasonable conclusion as to the verdict").

### 2. Merits of Plaintiff's Claim Asserted Against Defendant Locke

Plaintiff asserts an Eighth Amendment failure to protect claim against Corrections Officer Locke based on allegations that he was aware of the risk of harm plaintiff faced from Inmate Heath prior to being escorted and housed in his cell. *See generally* Dkt. Nos. 1, 63. Defendant Locke contends that, even assuming plaintiff's allegations are true, he had no authority to change plaintiff's housing assignment, and, therefore, he is not responsible for violating plaintiff's constitutional rights.[10] *See generally* Dkt. No. 53-5.

The Eighth Amendment prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society[,]' or 'involve[s] the unnecessary and wanton infliction of pain[.]'" *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (quoting *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958) and *Gregg v. Georgia*, 428 U.S. 153, 169-73 (1976) (citations omitted)). While the Eighth Amendment "'does not

---

[10]     Defendant Locke also argues that he was unaware that plaintiff was a homosexual and victim-prone prior to directing plaintiff to bunk with Inmate Heath. Dkt. No. 53-5 at 8-9. Whether this is true is not relevant because plaintiff's claim is based on allegations that defendant Locke was aware that (1) plaintiff could not double-bunk, (2) defendant Sergeant Doe told plaintiff to fight Inmate Heath, (3) Inmate Heath refused to permit plaintiff to enter the cell, and (4) Inmate Heath had a history of assaulting other prisoners while at Upstate.

mandate comfortable prisons,' neither does it permit inhumane ones."

*Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)); *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013).

Law enforcement officers have a duty to intervene and prevent a cruel and unusual punishment, prohibited by the Eighth Amendment, from occurring or continuing. *Farmer*, 511 U.S. at 836 (1994); *Hayes v. N.Y. City Dep't of Corrs*, 84 F.3d 614, 620 (2d Cir. 1996); *see also Ayers v. Coughlin*, 780 F.2d 205, 209 (2d Cir. 1985) ("The failure of custodial officers to employ reasonable measures to protect an inmate from violence by other prison residents has been considered cruel and unusual punishment."). A plaintiff asserting a claim that prison officials have failed to protect him from harm must prove that the defendant actually knew of and disregarded an excessive risk of harm to his health and safety. *Hayes*, 84 F.3d at 620. This "reckless disregard" to a plaintiff's health and safety can be proven by evidence establishing "a pervasive risk of harm to inmates from other prisoners and a failure by prison officials to reasonably respond to that risk." *Knowles v. N.Y. City Dep't of Corrs.*, 904 F. Supp. 217, 222 (S.D.N.Y. 1995) (quotation marks omitted); *see also Hayes*, 84 F.3d at 620 ("[A] prison official has sufficient culpable intent if he has knowledge that an inmate

faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm."). Said differently, to establish liability on the part of a defendant under this theory, "the plaintiff must adduce evidence establishing that the officer had (1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene." *Henry v. Dinelle*, No. 10-CV-0456, 2011 WL 5975027, at *4 (N.D.N.Y. Nov. 29, 2011) (Suddaby, J.) (citing *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008)); *see also Farmer*, 511 U.S. at 842 ("[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm."); *O'Neill v. Krzeminski*, 839 F.2d 9, 11-12 (2d Cir. 1988) (finding no realistic opportunity to intervene where "three blows were struck in . . . rapid succession"); *accord*, *Henry*, 2011 WL 5975027, at *4. From a constitutional perspective, "deliberate indifference . . . requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006); *see also Farmer*, 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and

he must also draw the inference.").

In this case, plaintiff has submitted undisputed admissible record evidence establishing that defendant Locke was present when Inmate Heath told defendant Locke and the other corrections officers escorting plaintiff that he did not want plaintiff to be housed in his cell and refused to allow plaintiff entry into the cell. Dkt. No. 1 at 15; Dkt. No. 53-1 at 11; Dkt. No. 63 at 4. In addition, defendant Locke does not dispute that he learned plaintiff was not supposed to be housed in a double-bunk cell prior to placing plaintiff in Inmate Heath's cell. Dkt. No. 53-1 at 16. The undisputed record also reflects that defendant Locke was present when defendant Lieutenant Doe allegedly told plaintiff that he wanted plaintiff to "kick [Inmate Heath's] ass" once he was placed inside the cell.[11] Dkt. No. 1 at 15; Dkt. No. 53-1 at 14-15. Finally, plaintiff contends that, prior to placing plaintiff in Inmate Heath's cell, defendant Locke was aware of Inmate

---

[11]     In my view, this evidence is not hearsay and is properly relied on when analyzing defendant Locke's pending motion. Plaintiff is not relying on the statement made by defendant Lieutenant Doe for the truth of the matter asserted. Instead, plaintiff offers the lieutenant's statement to show defendant Locke's state of mind and that defendant Locke was on notice that plaintiff may be at risk of harm. Accordingly, the statement is not hearsay. *See* Fed. R. Evid. 801(c), Advisory Committee Note ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay."); *accord, United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013); *see also George v. Celotex Corp.*, 914 F.2d 26, 30 (2d Cir.1990) ("To be sure, an out of court statement offered not for the truth of the matter asserted, but merely to show that the defendant was on notice of a danger, is not hearsay.").

Heath's violent disciplinary history while at Upstate, including the issuance of three Tier III misbehavior reports involving assaults on Inmate Heath's former cellmates. Dkt. No. 63 at 4, 5 & n.2.

Although it is not disputed that defendant Locke contacted his supervisors after Inmate Heath refused plaintiff access to his cell, Dkt. No. 53-1 at 12, the accumulation of all of the record evidence gives rise to a genuine dispute of material fact as to whether defendant Locke was aware of a serious risk to plaintiff's health and safety immediately prior to ordering plaintiff to bunk with Inmate Heath, and recklessly disregarded that risk by failing to intervene and stop plaintiff from being housed with Inmate Heath. In my view, reasonable factfinders could disagree as to whether notifying his supervisor of Inmate Heath's conduct but otherwise failing to take any further action to protect plaintiff from impending harm was sufficiently reasonable on defendant Locke's part for purposes of an Eighth Amendment claim, or whether defendant Locke had a realistic opportunity to intervene and prevent the attack on the plaintiff. Accordingly, I recommend defendant Locke's request for summary judgment dismissing the claim asserted against him on the merits be denied.

### 3. Qualified Immunity

Defendant Locke also seeks dismissal of plaintiff's claim against him

based on the doctrine of qualified immunity. Dkt. No. 53-5 at 11-12.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Sudler v. City of N.Y.*, 689 F.3d 159, 174 (2d Cir. 2012). The law of qualified immunity seeks to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. Government officials are shielded from liability by qualified immunity when making "reasonable mistakes" concerning the lawfulness of their conduct. *Sudler*, 689 F.3d at 174 (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001), *abrogated on other grounds by Pearson*, 555 U.S. 223)).

Because qualified immunity is "an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), the Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in the litigation," *Pearson*, 555 U.S. at 231 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)).

The determination of whether a government official is immune from suit is informed by two factors. *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011). Specifically, the inquiry turns on whether the facts alleged, taken in a light most favorable to the plaintiff, show that the conduct at issue violated a statutory or constitutional right, and if so, whether that right "was clearly established at the time of the challenged conduct." *Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (citing *Reichle*, 132 S. Ct. at 2093). The Supreme Court has said that an officer's "conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (quotation marks and alterations omitted). "To this end, a plaintiff need not show a case 'directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Terebesi*, 764 F.3d at 230 (quoting *al-Kidd*, 131 S. Ct. at 2083). However, '[e]ven where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton*, 505 F.3d 161, 169-70 (2d Cir. 2007) (citations omitted). This

"objective reasonableness" part of the test is satisfied if "officers of reasonable competence could disagree on [the legality of the defendant's actions]." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Stated differently, a defendant has acted in an objectively unreasonable manner only "when no officer of reasonable competence could have made the same choice in similar circumstances." *Lennon v. Miller*, 66 F.3d 416, 420-21 (2d Cir.1995).

In this case, even when viewing the evidence in the light most favorable to plaintiff and drawing all inferences in his favor, it was objectively reasonable for defendant Locke to believe his acts were lawful. As was discussed above, the record establishes that defendant Locke had no authority to alter plaintiff's cell assignment, and plaintiff does not otherwise contend that defendant Locke should have acted beyond the scope of his authority. Dkt. No. 53-2 at 1. Upon being confronted with Inmate Heath's refusal to permit plaintiff to enter the cell, defendant Locke conferred with his supervisors, who then ordered that he direct plaintiff to enter the cell through the recreational pen door in order to effectuate the housing assignment. Dkt. No. 53-2 at 2; Dkt. No. 63 at 4. These actions, which are not disputed by plaintiff, were within the scope of defendant Locke's duties and approved by supervisors. Dkt. No. 53-2 at 1-3.

It was certainly reasonable for defendant Locke to believe he was not

violating plaintiff's constitutional rights by notifying his supervisor of a potential risk to plaintiff's safety. It was likewise objectively reasonable for defendant Locke to rely on his superiors' instructions in returning plaintiff to the cell with Inmate Heath because, at a minimum, officers of reasonable competence could disagree as to the legality of defendant Locke's actions in light of this directive from his superiors. *See Anthony v City of New York, et al.*, 339 F.3d 129, 138 (2d Cir. 2003) ("'Plausible instructions from a superior or fellow officer support qualified immunity where, viewed objectively in light of the surrounding circumstances, they could lead a reasonable officer to conclude that the necessary legal justification for his actions exists . . . . '" (quoting *Bilida v. McCleod*, 211 F.3d 166, 174–75 (1st Cir. 2000)); *Kraft v. City of N.Y.*, 696 F.Supp.2d 403, 420 (S.D.N.Y. 2010) (reliance on an "apparently valid" order supports finding of qualified immunity); *cf. Cuoco v. Moritsugu*, 222 F.3d 99, 111 (2d Cir. 2000) (the failure of non-doctors at a prison to intercede in the medical treatment of an inmate in not unreasonable because they lack the authority to intervene in medical decisions). For these reasons, I recommend a finding that defendant Locke is entitled to qualified immunity from suit, and that defendant Locke's motion be granted on this basis.

C.    Status of Doe Defendants

On November 30, 2015, plaintiff moved to file an amended complaint to add the names of two defendants previously identified as Sergeant John Doe and Lieutenant John Doe. Dkt. No. 47. In his motion, plaintiff provided the court with only the last name of Sergeant John Doe, and asked the court to order defense counsel to provide him with the name of the lieutenant listed on page 252 of a log book.[12] *Id.*

On December 1, 2015, I denied plaintiff's motion because, pursuant to the court's mandatory pretrial discovery and scheduling order, the deadline for joinder of parties expired on August 2, 2015, and plaintiff failed to show good cause to amend. Dkt. No. 49. Thereafter, defendant Locke filed his motion for summary judgment. Dkt. No. 53. In support of that motion, defendant Locke submitted, *inter alia*, a declaration in which he acknowledges that his "area supervisor, a Sergeant," and the "Watch Commander, a Lieutenant," discussed the situation involving plaintiff and Inmate Heath, after which point the Sergeant "ordered" defendant Locke and two of his fellow officers to escort plaintiff back to the cell occupied by Inmate Heath. Dkt. No. 53-2. Based on defendant Locke's sworn statement, there is no question that at least defendant Locke is aware of the identities

---

[12]    Although plaintiff stated in his letter motion that he had attached the relevant page of the log book, it was not received by the court with plaintiff's filing. *See* Dkt. No. 47.

of Sergeant John Doe and Lieutenant John Doe. As a result, in the interests of justice, defense counsel is directed to provide plaintiff with the names of these individuals, after which point plaintiff will be granted leave to amend his complaint to add these individuals as defendants in this action.[13] *See Valentin v. Dinkins*, 121 F.3d 72 (2d Cir. 1997).

As it relates to the other Doe Corrections Officers and Nurse Doe, plaintiff has not taken the same steps to identify these unnamed defendants that he took with respect to naming Lieutenant Doe and Sergeant Doe. Indeed, in his motion for leave to amend, he only sought to properly name Lieutenant Doe and Sergeant Doe. *See* Dkt. No. 47.

Dismissal of a claim under Rule 41(b) for failure to prosecute is appropriate "where discovery has closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe defendants" but has

---

[13] Plaintiff attempted to obtain the names of these defendants while discovery was ongoing. *See* Dkt. Nos. 31, 31-1, 47. Moreover, the undisputed record now shows that defense counsel knew, or could have known with relative ease, the names of Lieutenant Doe and Sergeant Doe. Under such circumstances, the court finds "good cause" to amend the scheduling order to allow plaintiff leave to amend the complaint. The court also does not find any bad faith or dilatory motive on the part of plaintiff in seeking to identify these defendants based on the efforts he made during discovery, nor does the court find any undue prejudice to defendants in granting plaintiff leave to amend. *See, e.g., Morales v. County of Suffolk, et al.*, 952 F. Supp.2d 433, 435-436 (E.D.N.Y. 2013) (finding the absence of undue prejudice under similar circumstances because the Doe defendant sought to be added "plainly knew" about his involvement in the actions that gave rise to the claim and the need to re-open discovery "is not, in itself, sufficient to constitute prejudice"). Because plaintiff remains within the three-year limitations period to assert claims against Lieutenant Doe and Sergeant Doe, the court need not decide whether an amendment properly naming these defendants would relate back to the original filing date of the complaint.

failed to do so. *Jones v. Rock*, No. 12-CV-0447, 2015 WL 791547, at *21 (N.D.N.Y. Feb. 24, 2015) (Mordue, J., *adopting report and recommendation by* Dancks, M.J.) (quotation marks and alteration omitted); *Le Sane v. Hall's Sec. Analyst, Inc.*, 239 F.3d 206, 209 (2d Cir. 2001) (Rule 41(b) "gives the district court authority to dismiss a plaintiff's case *sua sponte* for failure to prosecute"); *Delrosario v. City of N.Y.*, 07-cv-2027, 2010 WL 882990, at * 5 (S.D.N.Y. Mar.4, 2010) (*sua sponte* dismissing claims against John Doe Defendants for failure to prosecute "[w]here discovery was closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe Defendants"); *Coward v. Town & Vill. of Harrison*, 665 F.Supp.2d 281, 301 (S.D.N.Y. 2009) ("Where a plaintiff has had ample time to identify a John Doe defendant but gives no indication that he has made any effort to discover the defendant's name, the plaintiff simply cannot continue to maintain a suit against the John Doe defendant.").

The court's initial order reviewing plaintiff's complaint permitted plaintiff to proceed with his claims against defendants Corrections Officers Doe 1 and Doe 2, Lieutenant Doe, Sergeant Doe, and Nurse Doe, provided that plaintiff take "reasonable steps through discovery to ascertain the name of the Doe defendants so as to permit the timely amendment of the complaint and service of process on them." Dkt. No. 14 at 12, 14. That order

warned plaintiff, however, as follows: "If plaintiff fails to learn their identities, this action will be dismissed as against the Doe defendants." *Id.* at 12 n.9. The deadline for joining parties to this lawsuit passed on August 2, 2015. Dkt. No. 24 at 5. Discovery in this matter was originally scheduled to close on October 2, 2015. Dkt. No. 24 at 5. That deadline was subsequently extended until December 2, 2015, at defendant Locke's request. Dkt. Nos. 39-40.

It is now more than five months past the extended deadline for joinder of parties, yet, despite the warnings given, plaintiff does not appear to have taken any steps to ascertain the identities of the unnamed Corrections Officers or Nurse. As such, I recommend that the claims brought against these three unnamed defendants be *sua sponte* dismissed without prejudice for failure to prosecute.

IV.  SUMMARY AND RECOMMENDATION

Notwithstanding the existence of a genuine dispute of material fact with respect to whether defendant Locke acted reasonably in ordering plaintiff to bunk with Inmate Heath I find, based upon the record now before the court, that it was objectively reasonable for defendant Locke to believe he was not violating plaintiff's rights when he contacted his supervisor after learning of Inmate Heath's refusal to allow plaintiff in the cell and thereafter

followed orders from his supervisors in pursuing plaintiff's housing assignment. Accordingly, I recommend that the court find defendant Locke is entitled to qualified immunity.

With respect to Sergeant John Doe and Lieutenant John Doe identified in plaintiff's complaint, I find that the identities of these individuals is known, or can be determined with relative ease, by defense counsel, and that good cause now exists for amending the scheduling order to name these individuals as defendants in this action. As a result, defense counsel is directed to provide plaintiff with the names of these individuals, after which point plaintiff will be granted leave to amend his complaint to add these individuals as defendants in this action.

With respect to the other three Doe defendants identified in plaintiff's complaint, because discovery is now closed and plaintiff has failed to take reasonable steps to identify those individuals and join them in the action, I recommend that the claims asserted against those individuals be dismissed without prejudice for failure to prosecute.

Accordingly, it is hereby respectfully

ORDERED that, within forty-five (45) days of the filing date of this decision and order, defense counsel produce the information specified above regarding the identities of defendant Sergeant John Doe and

defendant Lieutenant John Doe. Upon receipt of defense counsel's response, the clerk shall return this file to the court for further review; and it is hereby further

ORDERED, that the clerk adjust the court's records to reflect the correct spelling of defendant's name to N. Locke; and it is hereby respectfully

RECOMMENDED that defendant Locke's motion for summary judgment (Dkt. No. 53) be GRANTED and that plaintiff's claims against defendant N. Locke be DISMISSED, and plaintiff's cross-motion for summary judgment (Dkt. No. 63) be DENIED; and it is hereby further respectfully

RECOMMENDED that plaintiff's claims against defendant Corrections Officer John Doe 1, Corrections Officer John Doe 2, and Nurse Doe be *sua sponte* DISMISSED WITHOUT PREJUDICE.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:     June 24, 2016
            Syracuse, New York

David E. Peebles
U.S. Magistrate Judge

2010 WL 882990
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Jairo DELROSARIO, Plaintiff,
v.
The CITY OF NEW YORK, et al., Defendants.

No. 07 Civ.2027(RJS).
|
March 4, 2010.

West KeySummary

**1** **Civil Rights**

👉 **Criminal Law Enforcement;Prisons**

Neither official in charge of prisoner
movement nor official in charge of security
had authority to make final policy decisions
for the city with respect to the protection
or housing of prisoners at penal institution,
as required to hold the city liable under
§ 1983 for officials' alleged unconstitutional
acts. Inmate alleged that officials deliberately
ignored a known risk to his safety from
fellow prisoners, who repeatedly threatened
and assaulted inmate for cooperating with
authorities, but the only reference to them was
prosecutor's identification of their respective
roles at institution. No information was given
with respect to what authority each had, what
guidelines and policies they were subject to,
and what oversight was in place. 42 U.S.C.A.
§ 1983.

Cases that cite this headnote

**Attorneys and Law Firms**

Robert B. Marcus, Schwartzapfel, Truhowsky, Marcus,
P.C., Jericho, N.Y., for Plaintiff.

Mark D. Zuckerman, Office of the Corporation Counsel
of the City of New York, New York, N.Y., for
Defendants.

MEMORANDUM AND ORDER

RICHARD J. SULLIVAN, District Judge.

**\*1** Plaintiff Jario Delrosario brings this action against
the City of New York ("the City"), Manhattan Assistant
District Attorney Susan Lanzatella, and ten John Doe
Defendants pursuant to 42 U.S.C. § 1983 for alleged
deprivations of his civil rights. Now before the Court is
Defendants' motion to dismiss Plaintiff's claims pursuant
to Federal Rule of Civil Procedure 12(b)(6). In the
alternative, Defendants move for summary judgment
pursuant to Rule 56(a). For the reasons set forth below,
Defendants' motion for summary judgment is granted.

I. BACKGROUND

Plaintiffs lawsuit stems from injuries inflicted by other
inmates while he was incarcerated at Riker's Island
Correctional Facility ("Riker's"), located in Bronx
County, New York and part of the New York City
Department of Corrections ("DOC"). Plaintiff alleges
that, although he was repeatedly threatened and assaulted
by other inmates for acting as a cooperating witness,
Defendants failed to take steps necessarv to protect him
from further violence. In addition, Plaintiff alleges that
Riker's personnel denied him medical care after he was
assaulted.

A. Facts

1. Plaintiff's Arrest, Attack, and Injury

Plaintiff was arrested on September 1, 2005 and charged
with various crimes under New York state law arising
out of a "sting" operation. (Defs.' 56.1 ¶ 3.) After he
was arrested, Plaintiff was taken to and detained at
Riker's. (*Id.* ¶ 4.) Defendant Lanzatella, an assistant
district attorney and chief of the Narcotics Gang Unit of
the New York City Special Narcotics Prosecutor's Office
("SNPO"), was assigned to prosecute Delrosario and his

co-defendants. (*Id.* ¶ 7.) Lanzatella was assisted by the only attorney under her supervision at that time, Nigel Farinha. (Pl.'s 56.1 ¶ 3; Defs.' 56.1 ¶ 25.)

Within two months of his arrest, Plaintiff became a cooperating witness. (Defs.' 56.1 ¶ 11.) In the course of his cooperation, Plaintiff was removed from Riker's and taken to the SNPO as many as 60 times for interviews with investigators and prosecutors. (Decl. of Robert B. Marcus ("Marcus Deck") Ex. A (Dep. Tr. of Susan Lanzatella ("Lanzatella Dep. Tr.")) at 65:25–66:2.) Throughout his cooperation, Plaintiff was repeatedly threatened by his co-defendants on account of the cooperation that they suspected he was providing to authorities. (Pl.'s 56.1 ¶ 8.) Plaintiff's attorney in the state criminal matter, Barry Weinstein, testified that he repeatedly advised both Lanzatella and Farinha of the threats against Plaintiff. (Pl.'s 56.1 ¶ 9; Marcus Decl. Ex. C (Dep. Tr. of Barry Weinstein ("Weinstein Dep. Tr.")) at 12:21–14:21.) [1]

In January 2006, Plaintiff was assaulted at Riker's. (Pl.'s 56.1 ¶ 10; Weinstein Dep. Tr. at 18:7–12.) Weinstein testified that he quickly contacted either Lanzatella or Farinha and so informed them. (*Id.* at 19:7.) It is unclear whether this attack was connected to Plaintiffs cooperation. Plaintiff testified that he did not know why he was attacked (Delrosario Dep. Tr. at 50:10–11), but he also testified that "the same people on my case" were responsible for the attack (*id.* 48:9). Lanzatella states that she was not aware of any January assault. (Supp. Lanzatella Decl. ¶ 3.)

**\*2** After the January assault, Plaintiff was moved to another Riker's building, which he describes as unit C73. (Delrosario Dep. Tr. at 52:5–7.) Plaintiff continued to be threatened in his new housing unit. (*Id.* at 53:13–56:25.) The record indicates that Plaintiff was again assaulted on March 1, 2006. (Weinstein Dep. Tr. at 15:19–20; Marcus Decl. Ex. E (Report of Arthur Elias).) [2] Weinstein testified that Plaintiff was then brought before Lanzatella on March 3, 2006 for further interviews. (Weinstein Dep. Tr. at 16:1–5.) [3] Weinstein testified that after the March 3, 2006 meeting, Lanzatella or Farinha informed Weinstein that Lanzatella was sending a letter "immediately" or "right away" to have Plaintiff moved from Riker's to another facility. (*Id.* at 17:10–13; 26:20–27:10; 27:17–25.)

Plaintiff testified that on March 8, 2009, fearing further violence, he contacted his attorney and asked to be relocated. (Delrosario Dep. Tr. at 60:4–22.) In response, prison officials prepared him to be moved and transferred him to a holding cell. (*Id.* at 60:15–22.) While awaiting transfer to another facility on March 9, 2006, Plaintiff was assaulted by another inmate and suffered serious facial injuries, including a broken jaw. (Pl.'s 56.1 ¶ 16.) Plaintiff does not know the identity of his assailant or whether the assault was related to his cooperation. (Delrosario Dep. Tr. at 61:8–62:13.)

What steps, if any, were taken by officials between the March 1 and March 9 assaults remains unclear. During discovery, Defendants produced a letter written by Lanzatella and addressed to either Captain Vasatoro, the captain in charge of prisoner movement at Riker's, or Captain Boden, the captain in charge of security at Riker's. (Lanzatella Dep. Tr. at 102:10–103:3.) [4] The letter bears the date of March 3, 2006 and states:

> I am requesting that the above-named inmate [Delrosario] be moved for security reasons from GMDC [at Riker's] where he is currently being held to BBKC [another DOC facility]. The above-named inmate, who was arrested in an armed robbery conspiracy with ten co-defendants, has been repeatedly assaulted while being held at GMDC in the past few weeks, including most recently when his jaw was broken. The inmate is needed as a witness in an ongoing investigation.

> Thank you for your assistance in this matter and please feel free to call should you have any additional questions. (Zuckerman Decl. Ex. F.) The letter is a copy retrieved from Lanzatella's computer; no originals were found. (*See* Lanzatella Dep. Tr. at 104:16–21.) It also references Plaintiff's broken jaw, which did not occur until March 9, 2006. (Pl.'s 56.1 ¶ 16.) Lanzatella speculates that she first wrote a draft on March 3, 2006, in response to an attack on Plaintiff, but did not send it because she then learned that the attack was unrelated to his cooperation. (Lanzatella Dep. Tr. at 122:24–123:24.) She then edited and sent it after the March 9, 2006 attack. (*Id.*)

**\*3** Weinstein testified, however, that Lanzatella or Farinha informed him that a letter was sent on March 3, 2006, the date appearing in the letter. (Weinstein Dep. Tr. at 17:10–13; 26:20–27:10; 27:17–25.) Further,

he testified that Farinha told him that the letter had been sent but was disregarded by officials at the DOC because of animus towards Delrosario. (Weinstein Dep. Tr. at 16:10–17:6.) Farinha denies that he made such statements. (Marcus Decl. Ex. B (Dep. Tr. of Nigel Farinha (Farinha Dep. Tr.)) at 84:4–22.) Because the final version contains information concerning the March 9, 2006 attack, and based on Farinha's representations to Weinstein that it was originally sent on March 3, Plaintiff concludes that the letter was originally sent on March 3 and was edited and resubmitted on March 15, 2006. This conclusion is partially corroborated by information taken from Lanzatella's computer, which indicates the letter was created March 3, 2006 and modified on March 15, 2006. (Marcus Decl. Ex. F.)

After spending time at Bellevue hospital and recovering from his injuries, Plaintiff was transferred to the Manhattan Detention Center, often referred to as the "Tombs." (Delrosario Dep. Tr. at 66:14–15.) After some of his co-defendants were also sent to the Tombs, Plaintiff was again transferred, this time to the Vernon C. Bain Correctional Center, or the "Boat," another City correctional facility. (*Id.* at 67:1–6.) Finally, Plaintiff was transferred to federal custody.

### 2. Procedures or Practices for Cooperating Witnesses

The DOC policies and procedures allow an "inmate [to] be placed into Close Custody Housing either by his or her own request or pursuant to the Department's determination that such housing is necessary and appropriate." (Decl. of Harry Ahl Ex. C III.C.) Close Custody Housing can be used for inmates' own protection. (*Id.* at II.A.) The procedures specifically require that anytime a staff member has reason to believe that an inmate is in danger, or anytime an inmate so requests, he must be placed in Close Custody Housing until a captain arrives. (*Id.* III.C.2.a.) The policy lays out further procedures for determining when an inmate qualifies for such housing, as well as his right to a hearing and other administrative process. (*Id.*)

Lanzatella's practice was "not to get involved with the protection of cooperating witnesses while they were in custody because NYC Department of Corrections has its own criteria for housing inmates" that the DA's office was not involved with. (Def.'s 56.1 ¶ 12.) Further, any requests

or recommendations that her office made were "non-binding and whether NYC Department of Corrections honored it was out of [Lanzatella's] hands." (*Id.* ¶ 13.) She testified that if there was a risk to any witness, however, she would inform the DOC. (*See* Lanzatella Dep. Tr. at 112:8–15.)

### B. Procedural History

Plaintiff filed this lawsuit on March 9, 2007, and it was assigned to the Honorable Kenneth M. Karas, District Judge. On September 4, 2007, the case was reassigned to the docket of the undersigned. Plaintiff filed the Amended Complaint ("AC") on May 20, 2009, after discovery had closed. On July 17, 2009, Defendants moved to dismiss the Amended Complaint or, in the alternative, for summary judgment and submitted their Local Rule 56.1 statement. Plaintiff submitted its opposition and own Rule 56.1 statement on September 8, 2009. The motion became fully submitted on September 17,2009.

**\*4** The Amended Complaint purports to contain a single claim under Section 1983. (AC ¶ 64.) Read more closely, however, the Amended Complaint actually asserts several claims against various Defendants. "Count One" alleges that Defendants acted with "deliberate indifference in failing to transfer Plaintiff to another facility and/or remove him from the general population and/or place him in protective custody." (AC ¶ 68.) It also alleges that "Defendants acted with deliberate indifference in intentionally denying and/or delaying Plaintiff's access to medical care and/or attention." (*Id.* ¶ 69.) Finally, it alleges that the Defendants were "supervisors and/or final decision makers" who acted with deliberate indifference towards Plaintiff in failing to adequately supervise, train, or discipline Defendants, "thereby causing said Defendants in this case to engage in the above-mentioned conduct." (*Id.* ¶¶ 71–72.)

Thus, the AC seeks redress from Defendants for both failing to prevent Plaintiffs injuries and for refusing or delaying medical treatment after the March 9, 2006 attack. Liberally construed, the Amended Complaint seeks to impose municipal liability on the City for DOC's failure to adequately safeguard Plaintiff, DOC's failure to timely treat Plaintiff after the March 9, 2006 attack, and Lanzatella's failure to prevent the March 9, 2006 attack. In addition, the Amended Complaint can be read to set forth

a claim against Lanzatella in her individual capacity for failing to prevent the assaults, as well as individual claims against the John Doe Defendants for both injuries.

Because Plaintiff has utterly failed to produce evidence to support many of the allegations in the Amended Complaint, the Court will, for reasons of judicial economy, treat Defendants motion as one for summary judgment.

## II. DISCUSSION

### A. Legal Standard

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, a court may not grant a motion for summary judgment unless "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Bronx Household of Faith v. Bd. of Educ. of City of N.Y.,* 492 F.3d 89, 96 (2d Cir.2007). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Anderson v. Liberty lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 122 (2d Cir.2004); *see Anderson,* 411 U.S. at 248 (holding that summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). As such, "if 'there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment.' " *Binder & Binder PC v. Barnhart,* 481 F.3d 141, 148 (2d Cir.2007) (quoting *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 59 (2d Cir.1997)) (alteration in original).

### B. Claims Against John Doe Defendants

**\*5** Plaintiff's claims against the John Doe Defendants must be dismissed for failure to prosecute. Where discovery has closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe Defendants, it is appropriate to dismiss those Defendants without prejudice. *See Coward v. Town and Village of Harrison,* 665 F.Supp.2d 281, 300–01 (S.D.N.Y.2009); *Jeanty v. County of Orange,* 379 F.Supp.2d 533, 536 n. 3 (S.D.N.Y.2005). Therefore, Plaintiff's claims against the John Doe Defendants are dismissed without prejudice.

### C. Municipal Liability for the Acts of Prison Officials

Plaintiff alleges that the City is liable for the DOC's failure to adequately transfer, segregate, or otherwise protect him while he was in custody. (AC ¶¶ 68, 71.) Similarly, Plaintiff seeks to hold the City liable for the DOC's failure to timely treat Plaintiffs injuries after the March 9, 2006 attack. (AC ¶¶ 69, 71.) These allegations attempt to state a claim against New York City for liability under *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Defendants move for summary judgment on this claim, arguing, *inter alia,* that Plaintiff has not identified a causal link between any municipal custom or policy and the alleged constitutional violations. (Defs.' Mem. at 7.) For the reasons stated below, the Court grants Defendants' motion for summary judgment with respect to these claims.

#### 1. Applicable Law

"A municipality may be held liable as a 'person' for purposes of Section 1983 when a civil rights violation results from a municipality's policy or custom." *Koulkina v. City of N.Y.,* 559 F.Supp.2d 300, 314 (S.D.N.Y.2008). "A plaintiff making a *Monell* claim against a municipality must establish three elements: '(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right.' " *Blazina v. Port Auth.,* No. 06 Civ. 481(KNF), 2008 WL 919671, at \*6 (S.D.N.Y. Apr.1, 2008) (quoting *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983)).

An official policy or custom can be demonstrated in a number of ways. First, such a policy can be shown where the agency "promulgates an official policy," or "a municipal employee with final policymaking authority"

undertakes an unconstitutional act. *Warheit v. City of N.Y.,* No. 02 Civ. 7345(PAC), 2006 WL 2381871, at *12 (S.D.R.Y. Aug. 15, 2006); *accord Pembaur v. City of Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Second, a custom or practice may be demonstrated through behavior that is " 'so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice.' " *Davis v. City of N.Y.,* 228 F.Supp.2d 327, 337 (S.D.N.Y.2002) (quoting *Silva v. Worden,* 130 F.3d 26, 31 (1st Cir.1997)). Third, an official policy can be established by a municipality's failure to adequately train or supervise its agents or employees. *See Amnesty Am.,* 361 F.3d at 127–28 & 127 n. 8. Finally, a plaintiff can state a *Monell* claim where he or she demonstrates that the municipality failed to discipline employees or agents who violate civil rights because "the persistent failure to discipline [can] give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct within the meaning of *Monell." Batista,* 702 F.3d at 397.

### 2. Analysis

#### a. Decisions by Final Policymakers

**\*6** Plaintiff alleges that Captains Boden and Vasaturo deliberately ignored Lanzatella's or Farinha's March 3, 2006 letter request to move Plaintiff. The Weinstein deposition provides the chief support for this allegation. (Weinstein Dep. Tr. at 16:10–17:6.) Undoubtedly, such an allegation would be sufficient to state a claim for relief against Boden and Vasaturo individually, if they were defendants in this action. *See Heisler v. Kralik,* 981 F.Supp. 830, 837–38 (S.D.N.Y.1997). Because Boden and Vasaturo are not defendants, however, Plaintiff must succeed in demonstrating that they are municipal policymakers on the subject of protecting inmates. *See Chin v. N.Y. City Nous. Auth.,* 575 F.Supp.2d 554, 561–62 (S.D.N.Y.2008).

Although *Monell* liability may attach for the decisions of final policymakers, "[t]he fact that a particular official —even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Pembaur,* 475 U.S. at 481. Rather, a deliberate choice must be made "from among various alternatives

by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id.* at 483. Whether or not an official is a "policy-making official" for purposes of imposing *Monell* liability is a question of state law determined by the Court. *See Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989). Plaintiff bears the burden of showing that Boden and Vasaturo are officials with final policymaking authority. *See Jeffes v. Barnes,* 208 F.3d 49, 57–58 (2d Cir.2000).

Plaintiff has failed to demonstrate that either Boden or Vasaturo make final policy decisions for the City with respect to the protection or housing of inmates. The only reference to them in the record is Lanzatella's statement that they were "in charge" of "security" and "prisoner movement," respectively. (Lanzatella Dep. Tr. at 102:14–15, 103:2–3.) Plaintiff did not, however, interview or depose any prison officials, including Boden and Vasaturo, or produce any discovery relating to the role of Boden and Vasaturo at Riker's. Plaintiff has produced no evidence as to what authority each had, what guidelines and policies they were subject to, and what oversight was in place. Accordingly, the Court cannot allow this claim to go forward on a theory that either Captain Vasaturo or Boden had final policymaking authority. *See, e.g., Cruz v. Liberatore,* 582 F.Supp.2d 508, 521 (S.D.N.Y.2008) (granting summary judgment where plaintiff failed to provide "any documentary evidence or testimony suggesting that" the named official was the defendant municipality's final policymaker); *Springle v. Metro. Transp. Auth.,* No. 06 Civ. 734(GEL), 2008 WL 331362, at *7 (S.D.N.Y. Feb.1, 2008).

#### b. Deliberate Indifference to a Widespread Practice

To the extent that Plaintiff argues that the City was aware of similar constitutional violations but failed to do anything to end the practice, Plaintiff has failed to adduce any evidence of widespread constitutional violations by DOC personnel.

**\*7** Plaintiff argues that a lawsuit by another prison inmate in this District, *Shuford v. City of N.Y.,* No. 09 Civ. 945(PKC), as well as a recent article in the *New York Times,* provide ample evidence of a policy or practice of the DOC. (*See* Pl.'s Mem. 6–7; Marcus Decl. Exs. G, H.) Neither of these documents, however,

is admissible evidence.[5] Although this Court can take judicial notice of filings in other courts, it can do so only to acknowledge the existence of the lawsuit or filing, not for the truth of matters asserted in those claims. *See Kramer v. Time Warner, Inc.,* 937 F.2d 767, 774 (2d Cir.1991); *see also Boyd v. City of Oakland,* 458 F.Supp.2d 1015, 1047–48 (N.D.Cal.2006) (declining to take notice of similar lawsuits to establish policy or practice for purposes of *Monell* claim). Newspaper articles are hearsay when introduced to prove the truth of the matter asserted, and also must not be admitted. *See Griffin v. City of N.Y.,* 287 F.Supp.2d 392, 395 n. 8 (S.D.N.Y.2003); *McAllister v. N.Y. City Police Dep't,* 49 F.Supp.2d 688, 706 n. 12 (S.D.N.Y.1999) ("Newspaper articles are hearsay, however, and therefore are not admissible evidence of New York City Police Department policy or custom.").

Similarly, Plaintiff's Rule 56.1 statement cites no evidence, admissible or otherwise, that the DOC ever denied Plaintiff medical care at any time other than on March 9, 2006, when Plaintiff alleges that his "requests for medical care and attention were ignored, and [P]laintiff was told by the corrections officers that if he sought medical care or informed anyone of his requests for care he would receive an infraction and/or be placed in solitary confinement." (Pl.'s 56.1 ¶ 20.) Such a single isolated incident, especially one involving only low-level or non-policymaking employees, is insufficient to support a *Monell* claim. *See Ricciuti v. N.Y. City Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991).

### c. Failure To Train, Supervise, and Discipline

To succeed on a theory of liability based on either failure-to-train or failure-to-supervise, a plaintiff must make three showings.

> First, to reach the jury, the plaintiff must offer evidence from which a reasonable jury could conclude that a policy-maker knows to a moral certainty that her employees will confront a given situation. Next, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that

there is a history of employees [sic] mishandling the situation. Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.

*Green v. City of N.Y.,* 465 F.3d 65, 80 (2d Cir.2006) (quotations and citations omitted); *accord Walker v. City of N.Y.,* 974 F.2d 293, 297–98 (2d Cir.1992).

Additionally, to survive summary judgment on a failure-to-train claim, a plaintiff must "identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." *Amnesty Am.,* 361 F.3d at 129; *accord Jenkins v. City of N.Y.,* 478 F.3d 76, 94 (2d Cir.2007); *Amnesty Am.,* 361 F.3d at 127 n. 8 ("[A] failure to train claim also requires evidence as to the city's training program and the way in which that program contributed to the violation."). In this case, Plaintiff has failed to conduct any discovery as to the training that prison officials undergo regarding the housing of cooperating witnesses, the provision of medical care or—for that matter—any training at the DOC in general.

**\*8** To succeed on a failure-to-supervise claim, Plaintiff "must establish [Defendant's] deliberate indifference by showing that 'the need for more or better supervision to protect against constitutional violations was obvious,' " but that the municipality "made 'no meaningful attempt' to forestall or prevent the unconstitutional conduct.' " *Amnesty Am.,* 361 F.3d at 127 (quoting *Vann v. City of N.Y.,* 72 F.3d 1040, 1049 (2d Cir.1995)). Plaintiff has failed to adduce any evidence of a causal connection between the supervision received by unnamed prison employees and the alleged failure to transfer or segregate Plaintiff or provide him with medical care on March 9, 2006. In fact, the only evidence in the record about DOC procedure is the DOC Directive entitled Restrictive Housing Due Process and its replacement, Close Custody Housing. (*See* Decl. of Harry Ahl Ex. C.) Neither references how employees are supervised. Accordingly, there is no evidence in the record that could support a claim that the City's supervision over prison employees was insufficient.

Finally, Plaintiff has failed to put forth any evidence that the City or DOC failed to adequately discipline its

personnel. The record is completely silent with respect to how the DOC responded to complaints against its personnel.

Because Plaintiff has offered no admissible evidence that will support a *Monell* claim for failure to train, supervise, or discipline, the City is entitled to summary judgment.

### D. Municipal Liability for Lanzatella

Plaintiff likewise seeks to hold the City liable for Lanzatella's alleged failure to take steps to ensure his safety. Plaintiff has produced no evidence that the City failed to adequately train, supervise, or discipline Lanzatella. Accordingly, Plaintiff can only succeed if Lanzatella herself is "responsible for establishing final government policy." *Pembaur,* 475 U.S. at 482; *accord Gronowski v. Spencer,* 424 F.3d 285, 298 (citing *Pembaur*) (2d Cir.2005) ( "Even one episode of [unconstitutional conduct] may establish municipal liability under § 1983 if ordered by a person whose edicts or acts represent official city policy."). Because Lanzatella is not a final policymaker, however, the City is entitled to summary judgment on this claim as well.

Section 177–c of the New York Judiciary Law provides authority for the district attorneys of the counties comprising large New York cities to create a plan for a special narcotics prosecuting unit. *See* N.Y. Judiciary Law § 177–c. The SNPO is one of these units and it was created by agreement among the district attorneys of the five counties that make up New York City. (*See* Decl. of Kristine Hamann (Hamann Decl.) Ex. E.) The plan calls for the appointment of one Special Assistant District Attorney, who "[u]nder the policy direction of the five District Attorneys" will "formulate policies, procedures and standards for the prosecution of cases" in that unit. (*Id.* at 3.) That Special Assistant District Attorney is Bridget Brennan. (*See* Defs.' 56.1 ¶ 29.) In addition to Brennan, an Executive Staff supervises the different bureaus and units within the SNPO. (*Id.* ¶¶ 30–31.) The Narcotics Gang Unit is one of these subunits. (*Id.*)

**\*9** Lanzatella is an ADA in the SNPO and the chief of the Narcotics Gang Unit. (Defs.' 56.1 ¶ 7.) Her duties are limited to "supervising the lawyers and staff people in the Narcotics Gang Unit, interacting with detectives, going to court and handling cases in court, interviewing

witnesses, and motion and grand jury practice ." (*Id.* ¶ 26.) At the time of the events that gave rise to Plaintiff's claim, Lanzatella supervised only one other attorney, Farinha. (*Id.* ¶ 25.)

Based on New York state law and the uncontroverted evidence in the record regarding the structure of the SNPO, Lanzatella cannot be said to have final responsibility for establishing governmental policy with respect to the handling of cooperating witnesses or ensuring inmate safety. *See Peterson v. Tomaselli,* 469 F.Supp.2d 146, 169–70 (S.D.N.Y.2007) (concluding that unit chief in same office was not a final policymaker), Plaintiff has adduced no evidence or legal authority indicating otherwise.

Accordingly, the City is entitled to summary judgment on Plaintiff's *Monell* claim for Lanzatella's conduct.

### E. Individual Claims Against Lanzatella

Plaintiff also asserts claims against Lanzatella in her individual capacity. Lanzatella argues that all claims brought against her must be dismissed under the doctrines of absolute or qualified immunity.

#### 1. Absolute Immunity

Prosecutors have absolute immunity for claims for damages arising out of duties that "are intimately associated with the judicial phase of the criminal prosecution." *Imbler v. Pachtman,* 424 U.S. 409, 430, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). Actions are not, however, immune simply because they are performed by a prosecutor. *See Buckley v. Fitzsimmons,* 509 U.S. 259, 113 S.Ct. 2606, 125 L.Ed.2d 209. 273 (1993). "[W]hen a prosecutor performs an investigative or administrative function"—functions not accorded immunity at common law—"absolute immunity is not available." *Barbera v. Smith,* 836 F.2d 96, 99 (2d Cir.1987). To determine whether absolute or qualified immunity attaches to particular conduct, courts apply a functional approach. *See Cornejo v. Bell,* 592 F.3d 121, 126 (2d Cir.2010) ("The real distinction between whether an executive employee is entitled to absolute or qualified immunity turns on the kind of function the employee is fulfilling in performing the acts complained of."). When asserting

absolute immunity, the official claiming the privilege "shoulders the burden of establishing the existence of immunity for the function in question." *Hill v. City of N. Y.,* 45 F.3d 653, 660 (2d Cir.1995).

Prosecutors are entitled to absolute immunity only for "conduct 'intimately associated with the judicial phase of the criminal process,' " *Hill,* 45 F.3d at 661 (quoting *Imbler,* 424 U.S. at 430), including the initiation of prosecutions, the presentation of evidence at trial, preparatory functions such as evaluating and organizing evidence and presenting it to a grand jury, and the decision of which criminal charges to bring, *id.* Put another way, those functions a prosecutor carries out not as an advocate, but as an investigator and administrator, are not accorded absolute immunity. *See Buckley,* 509 U.S. at 273–274 ("When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is 'neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.' " (quoting *Hampton v. Chicago,* 484 F.2d 602, 608 (7th Cir.1973))).

 **\*10** This is not to say that the functional approach draws a bright line between in-the-courtroom and out-of-the-courtroom tasks. As the Supreme Court stated in *Buckley,*

> [w]e have not retreated, however, from the principle that acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity. Those acts must include the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made.

*Buckley,* 509 U.S. at 273.

The Second Circuit has twice considered what immunities attach to a prosecutor's dealings with a cooperating witness. First, in *Barbera v. Smith,* the estate of a murdered cooperating witness brought suit against an Assistant United States Attorney for negligently disclosing the witness's cooperation and for denying the witness's requests for protection. *See Barbera,* 836 F.2d at 98–99. In rejecting absolute immunity, the court characterized the prosecutor's activity as the "supervision of and interaction with law enforcement agencies in acquiring evidence which might be used in prosecution." *Id.* at 100. The *Barbera* court noted that, at the time the cooperating witness was put at risk and killed, "the government was still seeking evidence, including testimony from witnesses such as Barbera, that would enable it to prosecute" the targets of the investigation. *Id.* at 101. The *Barbera* decision did "not foreclose the possibility in an appropriate case" of absolute immunity for such a claim; it merely concluded that on the facts before the court, the prosecutor's "activities at the time of the alleged conduct ... seem[ed] to have involved primarily" investigative functions. *Id.*

Similarly, in *Ying Jing Gan v. City of New York,* the Second Circuit found that a prosecutor's failure to protect a witness was "not integral either to a decision of whether or not to institute a prosecution or to the conduct of judicial proceedings." 996 F.2d 522, 531 (2d Cir.1993). Although the investigation was, as in *Barbera,* in its preliminary stages at the time of the witness's death, the Circuit held that the plaintiff complained of "conduct that plainly is not integral to a decision of whether or not to institute a prosecution or to the conduct of judicial proceedings," and accordingly found that it was not entitled to the protection of absolute immunity. *Id.*

As in *Barbera* and *Gan,* the record reveals that the primary role of Plaintiff's cooperation was to develop evidence, both for the prosecution of Plaintiff's co-defendants and for new prosecutions. "Lanzatella was debriefing ... Delrosario to determine whether or not he had information about other potential criminal activity. That investigation eventually led to another prosecution." (Farinha Dep. Tr. at 14:5–13.) Although Lanzatella testified that her interviews of Plaintiff were intended "to obtain information about the defendants he was arrested with and their criminal activities *and others,*" (Lanzatella Dep. Tr. at 71:13–16 (emphasis added)), she also testified that a primary purpose of Plaintiff's cooperation was to "develop additional cases about others and additional crimes" (*id.* 72:17–20). In fact, most of the cooperation sessions that Lanzatella "sat in on had to do with other people that [Delrosario] knew that were involved in criminal activity." (*Id.*

73:3–6.) Similarly, Farinha testified at his deposition that "Lanzatella is primarily responsible for conducting investigations." (Farinha Dep. Tr. at 13:9–13.) Because Lanzatella's primary purpose in signing Delrosario up as a cooperator was investigating criminal activity, both Plaintiff's own and that of others, rather than "a decision with regard to whether or not to institute a prosecution" or the "performance of [her] litigation-related duties," *Gan,* 996 F.2d at 530, her conduct is not shielded by the doctrine of absolute immunity.

### 2. Qualified Immunity

**\*11** " 'The doctrine of qualified immunity shields government employees acting in their official capacity from suits for damages under 42 U.S.C. § 1983, unless their conduct violated clearly established rights of which an objectively reasonable official would have known.' " *Peterson v. Tomaselli,* No. 02 Civ. 6325(DC), 2003 WL 22213125, at \*5 (S.D.N.Y. Sept.29, 2003) (quoting *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 568–69 (2d Cir.1996)). "Even when a plaintiff's federal rights are well-defined, a defendant may successfully claim qualified immunity 'if it was objectively reasonable for the public official to believe that his acts did not violate those rights.' " *Id.* (quoting *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991)). When an official asserts the privilege of qualified immunity, a Court should uphold that immunity "unless the 'contours of the right' were 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *Gan,* 996 F.2d at 531 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

"As a general matter, a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Gan,* 996 F.2d at 533 (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.,* 489 U.S. 189, 197, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989)); *accord Matican v. City of N.Y.,* 524 F.3d 151, 155 (2d Cir.2008). The Supreme Court has, however, recognized two exceptions to this broad principle. First, "the state or its agents may owe a constitutional obligation to the victim of private violence if the state had a 'special relationship' with the victim." *Matican,* 524 F.3d at 155. "Second, the state may owe such an obligation if its agents in some way had assisted in

creating or increasing the danger to the victim." *Matican,* 524 F.3d at 155 (quotations and citations omitted).

The *DeShaney* line of cases recognizes that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney,* 489 U.S. at 199–200 (citing *Youngberg v. Romeo,* 457 U.S. 307, 317, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)); *accord Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)) ("The [Eighth] Amendment also imposes duties on these officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–527, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). Accordingly, courts have found that liability can be imposed on prison officials where a prisoner faces an objectively serious risk of harm and the prison official acts with deliberate indifference towards the inmate's safety. *See Farmer,* 511 U.S. at 834.

At least with respect to non-custodial cooperating witnesses, however, the Second Circuit has made clear that no special relationship exists such that a prosecutor is responsible for the safety of a witness. *See Gan,* 996 F.2d at 535; *Barbera,* 836 F.2d at 102. This case thus present the question of whether Plaintiffs incarceration imposed upon Lanzatella a "clearly established" duty to take affirmative steps to ensure his safety like the one imposed upon prison officials in *Farmer.* A constitutional right is clearly established where "(1) the law is defined with reasonable clarity (2) the Supreme Court or the Second Circuit has recognized the right; and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful." *Reuland v. Hynes,* 460 F.3d 409, 420 (2d Cir.2006) (citation omitted).

**\*12** In this case, Plaintiff has cited no authority, and this Court can find none, that requires prosecutors to step into the shoes of prison officials and safeguard prisoners. *Cf. Newman v. Gonzalez,* 05 Civ. 5215(LB), 2007 WL 674698, \*2 (E.D.N.Y. Mar. 5, 2007) ("[*Barbera* ] held that a prosecutor was entitled to qualified immunity because there was no clearly established duty to protect the witness at the time of his death. *No right has since been established."* (omissions and internal citations

omitted; emphasis added)). While cognizant of the special relationship that exists between prison officials and inmates, *see Morales v. N.Y. State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1998), that relationship has not been extended to reach other state actors.

As recently as 2000, a court in this District addressed a nearly identical set of facts and found that no clearly established legal duty existed. In *Johnson v. City of New York,* the plaintiff sued the City and its officials for failing to protect him from attacks by fellow inmates against whom he had agreed to testify. *See Johnson v. City of N.Y.,* No. 00 Civ. 3626(SHS), 2000 WL 1335865, at *1 (S.D.N.Y. Sept.15, 2000). Despite allegations that an assistant district attorney had assured the plaintiff that he would be protected from fellow inmates, Judge Stein concluded that "it cannot be said that it was clearly established that [the assistant district attorney] had created or assumed a special relationship with [plaintiff] imbuing him with a constitutional duty to protect him." *Id.* at *4.

Based on the lack of case law establishing a duty of prosecutors to protect inmates from the violence of other inmates, the Court finds that Lanzataella did not have a clearly established duty to protect Plaintiff. Accordingly, she is protected from these allegations by qualified immunity.

## III. CONCLUSION

For the foregoing reasons, Defendants City of New York and Lanzatella's motion for summary judgment is granted in its entirety. The claims against the John Doe Defendants are dismissed without prejudice. The Clerk of the Court is respectfully directed to terminate the motion docketed as Doc. No. 84, to enter judgment accordingly, and to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 882990

---

Footnotes

1   Lanzatella disputes that she was informed of such threats prior to the March 9, 2006 incident. (*See* Defs.' Reply 56.1 ¶ 8.)

2   Defendants object to Weinstein's testimony on this point on hearsay grounds. Defendants object to Elias's report on the grounds that no foundation has been laid for the expert report. Because this evidence does not change the outcome, the Court need not resolve the objection.

3   Defendants also object to this testimony on hearsay grounds because Weinstein was not sure whether or not he was there himself. Because this evidence does not alter the outcome of Defendants' motion, the Court need not resolve the objection.

4   The intended recipient of the letter is unclear. While the inside address contains the name of Captain Vasataro, the greeting is addressed to Captain Boden. (Decl. of Mark D. Zuckerman (Zuckerman Decl.) Ex. F.)

5   It is true that in considering a deliberate indifference claim, including claims for failure to supervise or discipline, a Court may consider complaints made against a municipality *and its response to them to* determine whether the municipality acted with deliberate indifference. *See Fiacco v. City of Rensselaer,* 783 F.2d 319, 327–28 (2d Cir.1986). Plaintiff, however, simply cites to allegations of misconduct to support the proposition that the conduct occurred, or, in the alternative, cites to the allegations of misconduct without investigating how the City responded. Neither supports an inference of deliberate indifference.

---

**End of Document**                                                                © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2000 WL 1264122
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Lisa ELGAMIL, Plaintiff,

v.

SYRACUSE UNIVERSITY, Defendant.

No. 99-CV-611 NPMGLS.
|
Aug. 22, 2000.

**Attorneys and Law Firms**

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph
Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for
Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

**\*1** Plaintiff brings suit against defendant Syracuse
University ("University") pursuant to 20 U.S.C. §
1681 et seq. ("Title IX") claiming hostile educational
environment, and retaliation for complaints of same.
Presently before the court is the University's motion for
summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are
affected by plaintiff's failure to file a Statement of Material
Facts which complies with the clear mandate of Local
Rule 7.1(a)(3) of the Northern District of New York. This
Rule requires a motion for summary judgment to contain
a Statement of Material Facts with specific citations to
the record where those facts are established. A similar
obligation is imposed upon the non-movant who

> shall file a response to the [movant's]
> Statement of Material Facts. The non-
> movant's response shall mirror the
> movant's Statement of Material Facts

> by admitting and/or denying each of
> the movant's assertions in matching
> numbered paragraphs. Each denial
> shall set forth a specific citation to the
> record where the factual issue arises....
> *Any facts set forth in the [movant's]*
> *Statement of material Facts shall be*
> *deemed admitted unless specifically*
> *controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed
an eleven page, twenty-nine paragraph Statement of
Material Facts, replete with citations to the record in every
paragraph. Plaintiff, in opposition, filed a two page, nine
paragraph statement appended to her memorandum of
law which failed to admit or deny the specific assertions
set forth by defendant, and which failed to contain a single
citation to the record. Plaintiff has thus failed to comply
with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules
are not suggestions, but impose procedural requirements
upon parties litigating in this District." *Osier v. Broome
County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a
consequence, courts in this district have not hesitated to
enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) [1]
by deeming the facts asserted in a movant's proper
Statement of Material Facts as admitted, when, as here,
the opposing party has failed to comply with the Rule.
*See, e.g., Phipps v. New York State Dep't of Labor,* 53
F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v. Car-
Freshner Corp.,* 49 F.Supp.2d 84, 86 (N.D.N.Y.1999);
*Osier,* 47 F. Supp .2d at 317; *Nicholson v. Doe,* 185
F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy, Inc. v.
Stewart and Stevenson Operations, Inc.,* 1998 WL 903629,
at [*] 1 n. 1 (N.D.N.Y.1998); *Costello v.. Norton,* 1998 WL
743710, at [*] 1 n. 2 (N.D.N.Y.1998); *Squair v. O'Brien
& Gere Engineers, Inc.,* 1998 WL 566773, at [*] 1 n. 2
(N.D.N.Y.1998). As in the cases just cited, this court
deems as admitted all of the facts asserted in defendant's
Statement of Material Facts. The court next recites these
undisputed facts.

## BACKGROUND

**\*2** Plaintiff became a doctoral student in the University's Child and Family Studies ("CFS") department in the Spring of 1995. Successful completion of the doctoral program required a student to (1) complete 60 credit hours of course work; (2) pass written comprehensive examinations ("comp.exams") in the areas of research methods, child development, family theory and a specialty area; (3) after passing all four comp. exams, orally defend the written answers to those exams; (4) then select a dissertation topic and have the proposal for the topic approved; and (5) finally write and orally defend the dissertation. Plaintiff failed to progress beyond the first step.

Each student is assigned an advisor, though it is not uncommon for students to change advisors during the course of their studies, for a myriad of reasons. The advisor's role is to guide the student in regard to course selection and academic progress. A tenured member of the CFS department, Dr. Jaipaul Roopnarine, was assigned as plaintiff's advisor.

As a student's comp. exams near, he or she selects an examination committee, usually consisting of three faculty members, including the student's advisor. This committee writes the questions which comprise the student's comp. exams, and provides the student with guidance and assistance in preparing for the exams. Each member of the committee writes one exam; one member writes two. Two evaluators grade each exam; ordinarily the faculty member who wrote the question, and one other faculty member selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising duties, was the coordinator of exams for the entire CFS department. In this capacity, he was generally responsible for selecting the evaluators who would grade each student's comp. exam, distributing the student's answer to the evaluators for grading, collecting the evaluations, and compiling the evaluation results.

The evaluators graded an exam in one of three ways: "pass," "marginal" or "fail." A student who received a pass from each of the two graders passed that exam. A student who received two fails from the graders failed the exam. A pass and a marginal grade allowed the student to pass. A marginal and a fail grade resulted in a failure. Two marginal evaluations may result in a committee having to decide whether the student would be given a passing grade. In cases where a student was given both a pass and a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions independently of each other, and no indication of the student's identity was provided on the answer. [2] The coordinator, Roopnarine, had no discretion in compiling these grades-he simply applied the pass or fail formula described above in announcing whether a student passed or failed the comp. exams. Only after a student passed all four written exam questions would he or she be permitted to move to the oral defense of those answers.

**\*3** Plaintiff completed her required course work and took the comp. exams in October of 1996. Plaintiff passed two of the exams, family theory and specialty, but failed two, child development and research methods. On each of the exams she failed, she had one marginal grade, and one failing grade. Roopnarine, as a member of her committee, authored and graded two of her exams. She passed one of them, specialty, and failed the other, research methods. Roopnarine, incidently, gave her a pass on specialty, and a marginal on research methods. Thus it was another professor who gave her a failing grade on research methods, resulting in her failure of the exam. As to the other failed exam, child development, it is undisputed that Roopnarine neither wrote the question, nor graded the answer.

Pursuant to the University's procedures, she retook the two exams she failed in January of 1997. Despite being given the same questions, she only passed one, child development. She again failed research methods by getting marginal and fail grades from her evaluators. This time, Roopnarine was not one of the evaluators for either of her exam questions.

After this second unsuccessful attempt at passing research methods, plaintiff complained to the chair of the CFS department, Dr. Norma Burgess. She did not think that she had been properly prepared for her exam, and complained that she could no longer work with Roopnarine because he yelled at her, was rude to her, and was otherwise not responsive or helpful. She wanted a new advisor. Plaintiff gave no indication, however, that she was being sexually harassed by Roopnarine.

Though plaintiff never offered any additional explanation for her demands of a new advisor, Burgess eventually agreed to change her advisor, due to plaintiff's insistence. In March of 1997, Burgess and Roopnarine spoke, and Roopnarine understood that he would no longer be advising plaintiff. After that time period, plaintiff and Roopnarine had no further contact. By June of that year, she had been assigned a new advisor, Dr. Mellisa Clawson.

Plaintiff then met with Clawson to prepare to take her research methods exam for the third time. Despite Clawson's repeated efforts to work with plaintiff, she sought only minimal assistance; this was disturbing to Clawson, given plaintiff's past failures of the research methods exam. Eventually, Clawson was assigned to write plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual harassment was in August of 1997, soon before plaintiff made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's College of Human Development, the parent organization of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators;[3] as mentioned, Clawson, not Roopnarine, authored the exam question.

 **\*4** Plaintiff took the third research methods examination in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen for

this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

> [t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating.[4] Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of 1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and otherwise had not been responsive to her needs. She also, for the first time, complained of two other acts: 1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

**\*5** The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

## DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *Fed.R.Civ.P. 56(c).* When considering a motion for summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. See *Torres v. Pisano,* 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." *Danzer v. Norden Sys., Inc.,* 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, see *Norton v. Sam's Club,* 145 F.3d 114, 117-20 (2d Cir.), *cert. denied,* 525 U.S. 1001 (1998), "or the evidence must

be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." *Danzer,* 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

### I. Hostile Environment
Title IX provides, with certain exceptions not relevant here, that

> [n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action. See *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, ——, 118 S.Ct. 1989, 1994 (1998) (citing *Cannon v. University of Chicago,* 441 U .S. 677 (1979) and *Franklin v. Gwinnett County Pub. Sch.,* 503 U.S. 60 (1992)).

### A. Severe or Pervasive
Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment,[5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. See *Davis,* 119 S.Ct. at 1675 (citing *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986), a Title VII case). *Accord Kracunas v. Iona College,* 119 F.3d 80, 87 (2d Cir.1997); *Murray v. New York Univ. College of Dentistry,* 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by *Gebser,* 118 S.Ct. at 1999.

**\*6** In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which

is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," which the victim also "subjectively perceive[s] ... to be abusive." *Richardson v. New York State Dep't of Corr. Servs .,* 180 F.3d 426, 436 (alteration in original) (quoting *Harris,* 510 U.S. at 21-22). From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was "objectively" hostile. *See id.* Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" is beyond the purview of the law. *Harris,* 510 U.S. at 21. Thus, it is now clear that neither "the sporadic use of abusive language, gender-related jokes, and occasional teasing," nor "intersexual flirtation," accompanied by conduct "merely tinged with offensive connotations" will create an actionable environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998). Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. *See Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 77 (1998). Thus, to succeed on a claim of sexual harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex." *Id.* at 81 (alteration and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. *See Harris,* 510 U.S. at 23. These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what psychological harm, if any, resulted from the conduct. *See id.; Richardson,* 180 F.3d at 437.

Although conduct can meet this standard by being either "frequent" or "severe," *Osier,* 47 F.Supp.2d at 323, "isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn,* 159 F.3d at 767 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents "may alter the plaintiff's conditions of employment without repetition." *Id. Accord Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

**\*7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her, being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. *See, e.g., Gutierrez v. Henoch,* 998 F.Supp. 329, 335 (S.D.N.Y.1998) (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) ("there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal."). Moreover, the court notes that plaintiff has failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. *See, e.g.,* Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999), this conduct, while demeaning and inappropriate, is not sufficiently gender-based to support liability. *See Osier,* 47 F.Supp.2d at 324.

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his

sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *See id.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

**\*8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressed to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. *See Meiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get of [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us," ' are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipses in original); *Dayes v. Pace Univ.,* 2000 WL 307382, at *5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work

environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at *6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

B. Actual Knowledge / Deliberate Indifference
Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *see supra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. *See Davis,* 119 S.Ct. at 1671; *Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation." Id.* (Emphasis supplied). *Accord Davis,* 119 S.Ct. at 1671 ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d] the discrimination." *Id.* (alteration in original) (quoting *Gebser,* 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to occur *after* the appropriate school official gained actual knowledge of the harassment. *See Reese v. Jefferson Sch. Dist.,* 208 F.3d 736, 740 (9th Cir.2000); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir.1999); *Murreel v. School Dist. No. 1, Denver Colo.,* 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.,* 184 F.3d 20, 26-27 (1st Cir.1999).

There is no serious contention that plaintiff can satisfy this requirement.

**\*9** By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University.[7] *See Reese,* 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis,* the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

*II. Retaliation*
Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *See Murray,* 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced the grading of her third research methods exam.[8] In any event, the adverse action which plaintiff claims to

be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *See Murray,* 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v. Ohio State Univ.,* 71 F.Supp.2d 789, 793-94 (S.D.Ohio) ("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity"), *aff'd,* 194 F.3d 1315 (6th Cir.1999).

The undisputed evidence establishes that Roopnarine had no role in the selection of who would grade plaintiff's exam. Nor, for that matter, did he grade the exam; this was done by three other professors. Each of these professors has averred that they graded the exam without any input or influence from Roopnarine. More importantly, it is undisputed that none of the three had any knowledge that a sexual harassment complaint had been asserted by plaintiff against Roopnarine, not surprising since two of the three did not even know whose exam they were grading. Plaintiff's inability to show that her failure was causally related in any way to her complaint of harassment is fatal to her retaliation claim.[9]

CONCLUSION

**\*10** For the aforementioned reasons, Syracuse University's motion for summary judgment is GRANTED; plaintiff's claims of hostile environment and retaliation are DISMISSED.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2000 WL 1264122

Footnotes

1   Amended January 1, 1999.
2   Of course, as mentioned, because one of the evaluators may have written the question, and the question may have been specific to just that one student, one of the two or three evaluators may have known the student's identity regardless of the anonymity of the examination answer.
3   Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence

in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue of material fact exists on this question.

4    Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

5    In *Gebser,* 118 S.Ct. at 1999, and *Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, ——, 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the *respondeat superior* principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. *See, e.g., Distasio v. Perkin Elmer Corp.,* 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct, and only then consider whether this conduct is actionable. *See, e.g., Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. *See id.*

6    Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

7    As mentioned previously, *see supra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

8    As properly noted by defendant, *see* Def. Mem. of Law at 28 n. 14, plaintiff's complaint alleges that a number of individuals retaliated against her, but in her deposition she essentially conceded that she has no basis for making a claim against anyone other than Roopnarine and those who graded her third exam. *See* Pl.'s Dep. at 347-53.

9    Plaintiff's claim also fails to the extent that the school's refusal to let her take the research methods exam for a fourth time was the retaliatory act she relies upon. It is undisputed that the University's policies for CFS department students only allow a comp. exam to be given three times. *See* Gaal Aff. Ex. 53. Plaintiff cannot claim that the University's refusal to depart from its own policies was retaliation without some concrete showing that its refusal to do so was out of the ordinary, i.e., that it had allowed other students to take the exam a fourth time without a remedial course, when these other students had not engaged in some protected activity. *See Murray,* 57 F.3d at 251 (there is "no allegation either that NYU selectively enforced its academic standards, or that the decision in [plaintiff's] case was inconsistent with these standards.").

---

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 5975027
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jonathan HENRY, Plaintiff,
v.
James F. DINELLE, Corrections Officer; Russell
E. Duckett, Corrections Officer; Alfred J. Deluca,
Corrections Officer; Donald L. Broekema,
Sergeant; and Jean Norton, Nurse, Defendants.

No. 9:10–CV–0456 (GTS/DEP).
|
Nov. 29, 2011.

**Attorneys and Law Firms**

Sivin & Miller, LLP, Edward Sivin, Esq., of Counsel, New
York, NY, for Plaintiff.

Hon. Eric T. Schneiderman, Attorney General for
the State of New York, Timothy P. Mulvey, Esq.,
Assistant Attorney General, of Counsel, Albany, NY, for
Defendants.

*MEMORANDUM–DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

 *1 Currently before the Court, in this prisoner civil
rights action filed by Jonathan Henry ("Plaintiff")
against the five above-captioned employees of the New
York State Department of Corrections and Community
Supervision ("Defendants"), is Defendants' motion for
partial summary judgment. (Dkt. No. 24.) For the reasons
set forth below, Defendants' motion is granted in part and
denied in part.

# I. RELEVANT BACKGROUND

## A. Plaintiff's Claims

Generally, liberally construed, Plaintiff's Complaint
alleges that, between approximately January 29, 2009,
and January 31, 2009, at Ulster Correctional Facility
in Napanoch, New York, Defendants violated Plaintiff's
following rights in the following manner: (1) Defendants
Nurse Jean Norton, Corrections Officer James F.

Dinelle, Corrections Officer Russell E. Duckett and
Corrections Officer Alfred J. DeLuca violated Plaintiff's
rights under the First Amendment by filing retaliatory
false misbehavior reports against him, and subsequently
providing false testimony against him at administrative
disciplinary hearings, which resulted in his spending time
in the Special Housing Unit ("SHU"); (2) Defendant
Dinelle violated Plaintiff's rights under the Eighth
Amendment by assaulting him on two occasions, and
Defendants DeLuca and Duckett violated Plaintiff's
rights under the Eighth Amendment by assaulting him
once; (3) Defendant Sergeant Donald L. Broekema
violated Plaintiff's rights under the Eighth Amendment
by failing to intervene to prevent one of these assaults
from occurring; (4) Defendant Norton violated Plaintiff's
rights under the Eighth Amendment by harassing him
almost immediately before he was subjected to the
above-described assaults; and (5) Defendants Norton,
Dinelle, Duckett and DeLuca violated Plaintiff's rights
under the Fourteenth Amendment by performing the
aforementioned acts, which constituted atypical and
significant hardships in relation to the ordinary incidents
of prison life. (*See generally* Dkt. No. 1 [Plf.'s Compl.].)
Familiarity with the factual allegations supporting these
claims in Plaintiff's Complaint is assumed in this Decision
and Order, which is intended primarily for review by the
parties. (*Id.*)

## B. Undisputed Material Facts

At all times relevant to Plaintiff's Complaint, Plaintiff
was an inmate and Defendants were employees of the
New York Department of Corrections and Community
Supervision at Ulster Correctional Facility. On January
30, 2009, Defendant Dinelle took Plaintiff to the medical
ward, because Plaintiff was experiencing a foul odor and
oozing from a wound on his leg. After Defendant Norton
treated Plaintiff, she filed an inmate misbehavior report
against Plaintiff based on (1) Plaintiff's harassing behavior
toward Defendant Norton and Defendant Dinelle, and (2)
Plaintiff's disobedience of a direct order to be quiet. The
misbehavior report was signed by Defendant Dinelle as an
employee witness.

At his deposition, Plaintiff testified, while leaving the
infirmary, he was punched and kicked by Defendant
Dinelle and two unknown prison officials. Plaintiff was
then taken to the SHU, where he waited with Defendants
Dinelle and Duckett, and up to three more individuals,
for a sergeant to arrive. When Defendant Broekema (a

sergeant) arrived at the SHU, Plaintiff was taken to a frisk room, where a frisk was conducted. During the frisk, Defendants Dinelle, Duckett and (Plaintiff suspected) DeLuca used force to bring Plaintiff to the ground. Plaintiff testified that, during the use of force, he was simultaneously punched in the nose by two officers while their supervisor watched.

**\*2** After the use of force, Plaintiff stated to Defendants Dinelle, Broekema and Duckette, "I will be contacting my attorney," or "I will be calling a lawyer." [1] Plaintiff never used the term "grievance" when addressing Defendants Dinelle, Broekema and Duckette (or Defendant Norton). [2] Subsequently, Defendant Duckett filed an inmate misbehavior report against Plaintiff based on his disobedience of frisk procedures and a direct order. Defendant DeLuca signed this report as a witness to the events.

Familiarity with the remaining undisputed material facts of this action, as well as the disputed material facts, as set forth in the parties' Rule 7.1 Statement and Rule 7.1 Response, is assumed in this Decision and Order, which (again) is intended primarily for review by the parties. (*Id.*)

### C. Defendants' Motion

Generally, in support of their motion for partial summary judgment, Defendants argue as follows: (1) Plaintiff's claim that Defendants issued false misbehavior reports should be dismissed because Plaintiff has no constitutional right to be free of false misbehavior reports; (2) Plaintiff's First Amendment retaliation claim should be dismissed because he has failed to adduce admissible record evidence from which a rational factfinder could conclude that he (a) engaged in protected activity, or (b) suffered adverse action as a result of engaging in protected activity; (3) Plaintiff's Fourteenth Amendment substantive due process claim should be dismissed because he has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendants deprived Plaintiff of his liberty rights; (4) Plaintiff's Eighth Amendment excessive-force claim against Defendant Norton should be dismissed because Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that she (a) used force against Plaintiff, or (b) was in a position to prevent the use of force from occurring, yet failed to do so; (5) Plaintiff's Eighth Amendment excessive-force claim

against Defendant DeLuca should be dismissed because Plaintiff's identification of Defendant DeLuca is "very tentative"; (6) Plaintiff's Eighth Amendment failure-to-intervene claim against Defendant Broekema should be dismissed because Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Broekema had a realistic opportunity to intervene to prevent or stop the assault, yet failed to do so; and (7) Defendants are protected from liability, as a matter of law, by the doctrine of qualified immunity, under the circumstances. (*See generally* Dkt. No. 24, Attach. 10 [Defs.' Memo. of Law].). [3]

In Plaintiff's response to Defendants' motion for partial summary judgment, he argues as follows: (1) his retaliation claims should not be dismissed because there are triable issues of fact as to whether Defendants retaliated against him for stating that he would be contacting an attorney; (2) his failure-to-intervene claim against Defendant Broekema should not be dismissed because there are triable issues of fact as to whether Defendant Broekema failed to prevent excessive force from being used against him; (3) his excessive-force claim against Defendant DeLuca should not be dismissed because there are triable issues of fact as to whether Defendant DeLuca used excessive force against him; and (4) Defendants are not protected from liability, as a matter of law, by the doctrine of qualified immunity, under the circumstances. (*See generally* Dkt. No. 27, Attach. 5 [Plf.'s Response Memo. of Law].) [4]

**\*3** In their reply, Defendants essentially reiterate their previously advanced arguments. (*See generally* Dkt. No. 29, Attach. 1 [Defs .' Reply Memo. of Law].)

## II. RELEVANT LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the legal standard governing motions for summary judgment, the Court will not recite that well-known legal standard in this Decision and Order, but will direct the reader to the Court's decision in *Pitts v. Onondaga Cnty. Sheriff's Dep't,* 04–CV–0828, 2009 WL 3165551, at \*2–3 (N.D.N.Y. Sept.29, 2009) (Suddaby, J.), which accurately recites that legal standard.

## B. Legal Standards Governing Plaintiff's Claims

### 1. First Amendment Retaliation Claim

Claims of retaliation like those asserted by Plaintiff find their roots in the First Amendment. *See Gill v. Pidlypchak, 389 F.3d 379, 380–81 (2d Cir.2004).* Central to such claims is the notion that, in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of his First Amendment rights. *See Gill, 389 F.3d at 381–383.* Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir.1983).* As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker, 239 F.3d 489, 491 (2d Cir.2001), overruled on other grounds, Swierkewicz v. Sorema N.A., 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).*

To prevail on a First Amendment claim under 42 U.S.C. § 1983, a plaintiff must prove by the preponderance of the evidence that (1) the speech or conduct at issue was "protected", (2) the defendants took "adverse action" against the plaintiff—namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights, and (3) there was a causal connection between the protected speech and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff.

*Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); Gill, 389 F.3d at 380* (citing *Dawes v. Walker, 239 F.3d 489, 492* [2d Cir.2001] ). Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson, 89 F.3d 75, 79 (2d Cir.1996).*

**\*4** In determining whether an inmate has established a prima facie case of a causal connection between his protected activity and a prison official's adverse action, a number of factors may be considered, including the following: (1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation. *Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir.1996); Baskerville v. Blot, 224 F.Supp.2d 723, 732 (S.D.N.Y.2002).* Even where the inmate has established such a prima facie case, the prison official may be entitled to judgment as a matter of law on the inmate's retaliation claim where the prison official has satisfied his burden of establishing that the adverse action would have been taken on proper grounds alone. *Lowrance v. Achtyl, 20 F.3d 529, 535 (2d Cir.1994); Jordan v. Garvin, 01–CV–4393, 2004 WL 302361, at \*6 (S.D.N.Y. Feb.17, 2004).*

### 2. Eighth Amendment Claims of Excessive–Force and Failure–to–Intervene

To establish a claim of excessive-force under the Eighth Amendment, a plaintiff must satisfy two components: "one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord, 554 F.3d 255, 268 (2d Cir.2009).* In consideration of the subjective element, a plaintiff must allege facts which, if true, would establish that the defendant's actions were wanton " 'in light of the particular circumstances surrounding the challenged conduct.' " *Id.* (quoting *Blyden v. Mancusi, 186 F.3d 252, 262* [2d Cir.1999] ). The objective component asks whether the punishment was sufficiently harmful to establish a violation "in light of 'contemporary standards of decency.' " *Wright, 554 F.3d at 268* (quoting *Hudson v. McMillian, 503 U.S. 1, 8* [1992] ).

Generally, officers have a duty to intervene and prevent such cruel and unusual punishment from occurring or continuing. *Curley v. Village of Suffern, 268 F.3d 65, 72*

(2d Cir.2001); *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). "It is well-established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by other officers." *Cicio v. Lamora,* 08–CV–0431, 2010 WL 1063875, at *8 (N.D.N.Y. Feb.24, 2010) (Peebles, M.J.). A corrections officer who does not participate in, but is present when an assault on an inmate occurs may still be liable for any resulting constitutional deprivation. *Id.* at *8. To establish a claim of failure-to-intervene, the plaintiff must adduce evidence establishing that the officer had (1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene. *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008). Generally, officers cannot be held liable for failure to intervene in incidents that happen in a "matter of seconds." *Parker v. Fogg,* 85–CV–177, 1994 WL 49696 at *8 (N.D.N.Y. Feb.17, 1994) (McCurn, J.).

**3. Fourteenth Amendment Substantive Due Process Claims**

***5** The Due Process Clause of the Fourteenth Amendment contains both a substantive component and a procedural component. *Zinernon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). The substantive component "bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Zinernon,* 494 U.S. at 125 [internal quotations marks omitted]. The procedural component bars "the deprivation by state action of a constitutionally protected interest in life, liberty, or property ... *without due process of law.*" *Id.* at 125–126 [internal quotations marks and citations omitted; emphasis in original]. One of the differences between the two claims is that a substantive due process violation "is complete when the wrongful action is taken," while a procedural due process violation "is not complete unless and until the State fails to provide due process" (which may occur *after* the wrongful action in question). *Id.*

"Substantive due process protects individuals against government action that is arbitrary, ... conscience-shocking, ... or oppressive in a constitutional sense, ... but not against constitutional action that is incorrect or ill-advised." *Lowrence v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) [internal quotations marks and citations

omitted], *aff'g,* 91–CV–1196, Memorandum–Decision and Order (N.D.N.Y. filed Jan. 26, 1993) (DiBianco, M.J.) (granting summary judgment to defendants in inmate's civil rights action).

"An inmate has a liberty interest in remaining free from a confinement or restraint where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes 'an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Whitaker v. Super,* 08–CV–0449, 2009 WL 5033939, at *5 (N.D.N.Y. Dec.14, 2009) (Kahn, J. adopting Report–Recommendation by Lowe, M.J.) (quoting *Sandin v. Conner,* 515 U.S. 472, 484 [1995] ). Regarding the first prong of this test, "[i]t is undisputed ... that New York state law creates a liberty interest in not being confined to the SHU." *Palmer v. Richards,* 364 F.3d 60, 64 n. 2 (2d Cir.2004). When evaluating whether an inmate's confinement in SHU violates his substantive due process rights, the issue, then, is whether his keeplock confinement imposed "an atypical and significant hardship on [him] in relation to the ordinary incidents of prison life." *Id.* at 64.

"In the Second Circuit, determining whether a disciplinary confinement constituted an 'atypical and significant hardship' requires examining 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation compared to discretionary confinement.' " *Whitaker,* 2009 WL 5033939, at *5 (quoting *Palmer,* 364 F.3d at 64). "Where a prisoner has served less than 101 days in disciplinary segregation, the confinement constitutes an 'atypical and significant hardship' only if 'the conditions were more severe than the normal SHU conditions.' " *Id.* (quoting *Palmer,* 364 F.3d at 65). [5]

**4. Qualified Immunity Defenses**

***6** The qualified immunity defense is available to only those government officials performing discretionary functions, as opposed to ministerial functions. *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991). "Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would

have known.' " *Williams v. Smith,* 781 F.2d 319, 322 (2d Cir.1986) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). As a result, a qualified immunity inquiry in a civil rights case generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff establish a constitutional violation"; and (2) "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Sira v. Morton,* 380 F.3d 57, 68–69 (2d Cir.2004), *accord, Higazy v. Templeton,* 505 F.3d 161, 169, n. 8 (2d Cir.2007).

In determining the second issue (i.e., whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted), courts in this circuit consider three factors:

> (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992). [6] "As the third part of the test provides, even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton,* 505 F.3d 161, 169–70 (2d Cir.2007). [7] This "objective reasonableness" part of the test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). [8] As the Supreme Court has explained,

> [T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable

competence could disagree on this issue, immunity should be recognized.

*Malley,* 475 U.S. at 341. [9]

## III. ANALYSIS

### A. Plaintiff's Retaliation Claim Under the First Amendment

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of this claim because Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that he (1) engaged in protected activity, or (2) suffered adverse action as a result of engaging in protected activity. More specifically, Defendants argue that the claim should be dismissed because (1) the statement of an inmate's intent to contact an attorney is not protected conduct, (2) Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Norton knew of Plaintiff's intention to contact an attorney, and (3) Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendants' actions were retaliatory. (Dkt. No. 24, Attach.10.) [10]

**\*7** After carefully considering the admissible record evidence adduced in this case, and carefully reviewing the relevant case law, the Court has trouble finding that an inmate's one-time making of an oral statement (immediately after the use of force against him) that he would be "contacting [his] attorney," or "calling a lawyer" at some unidentified point in the future constitutes engagement in activity that is protected by the First Amendment—especially where, as here, the inmate did not reference the prison grievance process in his statement.

Representation by a lawyer is certainly not necessary to file an inmate grievance in the New York State Department of Corrections and Community Supervision, nor does such representation necessarily result in the filing of a grievance. Rather, such representation is most typically associated with the filing of a civil rights action in federal court (as is clear from the motions for appointment of counsel typically filed in federal court actions). As a result, the statement in question does not reasonably imply that Plaintiff would be filing a grievance as much as it implies that he was going to consult an attorney as to whether or not to file a civil rights action in federal court.

Here, such a statement is problematic. This is because, generally, the filing of the prisoner civil rights action in federal court in New York State must be preceded by the prisoner's exhaustion of his available administrative remedies (or his acquisition of a valid excuse for failing to exhaust those remedies). Any filing without such prior exhaustion (or acquisition of a valid excuse), under the circumstances, would be so wholly without merit as to be frivolous. Of course, filing a court action that is frivolous is not constitutionally protected activity. [11]

Moreover, to the extent that Plaintiff's statement could be construed as reasonably implying that he was going to consult an attorney as to whether or not to file a grievance, the Court has trouble finding that such a vague statement is constitutionally protected. [12] As one district court has stated, "[h]oping to engage in constitutionally protected activity is not itself constitutionally protected activity." [13] The Court notes that a contrary rule would enable a prisoner who has committed conduct giving rise to a misbehavior report to create a genuine issue of material fact (and thus reach a jury) on a retaliation claim (alleging adverse action based on the issuance of that misbehavior report) simply by uttering the words, "I'm calling a lawyer," after he commits the conduct in question but before the misbehavior report is issued.

In any event, even assuming, for the sake of argument, that Plaintiff's statement was constitutionally protected, the Court finds, based on the current record, that Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that his statement to Defendants Dinelle, Duckett, and Broekema that he would be contacting an attorney was a substantial or motivating factor for the issuance of the misbehavior report by Defendant Norton (which was signed by Defendant Dinelle as a witness), and the misbehavior report by Defendant Duckett (which was signed by Defendant DeLuca as a witness). The Court makes this finding for two alternate reasons.

**\*8** First, with regard to the misbehavior report issued by Defendant Norton, Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that she was aware Plaintiff would be contacting an attorney. In addition, with regard to the report made by Defendant Duckett (which was signed by Defendant DeLuca as a witness), although there

is record evidence that Defendant Duckett had knowledge of Plaintiff's statement that he would contact an attorney, Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Duckett had reason to believe, at the time the misbehavior report was issued, Plaintiff would actually follow through with his one-time oral statement, made on the heals of a heated incident.

Second, even assuming that Defendant Duckett or Defendant Norton had reason to believe Plaintiff would contact an attorney, Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Duckett or Defendant Norton would not have issued the misbehavior report anyway, based on Plaintiff's actions. Indeed, at Plaintiff's disciplinary hearings, evidence was adduced that he in fact committed most of the misconduct alleged in the misbehavior reports, which resulted in the hearing officer finding multiple violations and sentencing Plaintiff to SHU. [14] Furthermore, those convictions were never subsequently reversed on administrative appeal. [15] As a result, no admissible record evidence exists from which a rational factfinder could conclude that Plaintiff has established the third element of a retaliation claim—the existence of a causal connection between the protected speech and the adverse action.

For each of these alternative reasons, Plaintiff's retaliation claim under the First Amendment is dismissed.

## B. Plaintiff's Claims Under the Eighth Amendment

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of Plaintiff's Eighth Amendment claims because (1) Plaintiff has failed to adduce any admissible evidence from which a rational factfinder could conclude that Defendant Norton used any force against Plaintiff, or was in a position to intervene to prevent the use of force against Plaintiff, yet failed to do so, (2) Plaintiff has failed to adduce any admissible evidence from which a rational factfinder could conclude that Defendant Broekema had a reasonable opportunity to intervene and prevent the alleged assault by Defendants Dinelle, DeLuca and Duckett, yet failed to do so, and (3) Plaintiff's identification of Defendant DeLuca is "very tentative."

As an initial matter, because Plaintiff did not oppose Defendants' argument that his excessive-force claim against Defendant Norton should be dismissed, Defendants' burden with regard to this claim "is lightened such that, in order to succeed, they need only show the facial merit of their request, which has appropriately been characterized as a 'modest' burden." *Xu–Shen Zhou v. S.U.N.Y. Inst. of Tech.,* 08–CV–0444, 2011 WL 4344025, at *11 (N.D.N.Y. Sept.14, 2011) (Suddaby, J.). After carefully considering the matter, the Court finds that Defendants have met this modest burden, for the reasons stated by them in their memoranda of law. The Court would add only that, based on its own independent review of the record, the Court can find no record evidence to support the claim that Defendant Norton used force against Plaintiff, or was in a position to intervene to prevent the use of force against Plaintiff, yet failed to do so. As a result, Plaintiff's Eighth Amendment claim against Defendant Norton is dismissed.

**\*9** Turning to Plaintiff's failure-to-intervene claim against Defendant Broekema, it is undisputed that it was Defendants Duckett, Dinelle and DeLuca who used force against Plaintiff. Plaintiff testified that, while Defendant Broekema was in the room at the time, Defendant Broekema was standing behind Defendant Dinelle on his "immediate right." In addition, Plaintiff testified that Defendant Duckett's threat of physical force against Plaintiff was conditioned on Plaintiff's continued failure to comply with (what Plaintiff perceived to be) conflicting instructions from Defendants Duckett and Dinelle during the frisk. (Dkt. No. 24, Attach. 4, at 97–99.) Furthermore, Plaintiff testified that it was only after he failed to put his hands in his pockets (rather soon after being warned by Defendant Duckett) that either Defendant Duckett or Defendant Dinelle punched him *one time* with a "closed fist" in the side of his nose, causing him to immediately fall to the ground. (*Id.* at 98–99.) Finally, Plaintiff testified that the kicks that he suffered soon after falling to the ground were limited in nature, having occurred only "a couple of times," and indeed having only *possibly* occurred. (*Id.* at 99.)

While the Court in no way condones the conduct alleged in this action, the Court is simply unable to find, based on the current record, that Plaintiff has adduced sufficient admissible record evidence to reach a jury on his Eighth Amendment claim against Defendant Broekema. Rather, based on the evidence presented, a rational factfinder could only conclude that the use of force was simply too uncertain for a reasonable person in Defendant Broekema's position to expect; and it was too brief in nature to give Defendant Broekema a realistic opportunity to intervene in it, so as prevent the one punch and possibly few kicks that Plaintiff presumably experienced. [16]

Finally, based on the current record, the Court rejects Defendants' third argument (i.e., that Plaintiff's excessive-force claim against Defendant DeLuca should be dismissed because Plaintiff's identification of Defendant DeLuca is "very tentative"). Defendants argue that Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant DeLuca was present during the use of force against Plaintiff (let alone that Defendant DeLuca used force against Plaintiff). This is because Plaintiff's basis for bringing his excessive-force claim against Defendant DeLuca is that he remembered being assaulted by three individuals, including Defendants Dinelle and Duckett, whose last names began with the letter "D." While this fact is undisputed, it is also undisputed that Defendant DeLuca was interviewed by the Inspector General's Office regarding his involvement in the incidents giving rise to Plaintiff's claims, [17] and that both Defendant Broekema's use-of-force report, and Defendant Broekema's Facility Memorandum, state that Defendant DeLuca participated in the use of force against Plaintiff. [18] Based on this evidence, a rational factfinder could conclude that Defendant DeLuca violated Plaintiff's Eighth Amendment rights. As a result, Plaintiff's Eighth Amendment excessive-force claim against Defendant DeLuca survives Defendants' motion for summary judgment. The Court would add only that, although it does not construe Plaintiff's Complaint as alleging that Defendant DeLuca failed to intervene in the use of force against Plaintiff, assuming, (based on Plaintiff's motion papers) that Plaintiff has sufficiently alleged this claim, the claim is dismissed because the entirety of the record evidence as it pertains to Defendant DeLuca establishes that he used force against Plaintiff.

## C. Plaintiff's Claim Under the Fourteenth Amendment

**\*10** As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of this claim because Defendants did not deprive Plaintiff of his liberty rights. As stated above in note 2 of this Decision and Order,

Plaintiff failed to address Defendants' argument that his substantive due process claim should be dismissed. As a result, as stated above in Part III.B. of this Decision and Order, Defendants' burden with regard to this claim "is lightened such that, in order to succeed, they need only show the facial merit of their request, which has appropriately been characterized as a 'modest' burden." *Xu–Shen Zhou,* 2011 WL 4344025, at *11.

After carefully considering the matter, the Court finds that Defendants have met this modest burden, for the reasons stated by them in their memoranda of law. The Court would add only that, based on its own independent review of the record, although the record evidence establishes that Plaintiff was confined in SHU for 150 days as a result of the misbehavior reports issued by Defendants Norton and Duckett, Plaintiff has failed to adduced admissible record evidence from which a rational factfinder could conclude that the conditions of his confinement during this 150–day period were more severe than normal SHU conditions. [19] As a result, Plaintiff's substantive due process claim is dismissed.

## D. Defendants' Defense of Qualified Immunity

As stated above in Part I.C. of this Decision and Order, Defendants seek dismissal of Plaintiff's claims on the alternative ground that they are protected from liability, as a matter of law, by the doctrine of qualified immunity, under the circumstances.

## 1. Retaliation

The doctrine of qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 [1982] ). Here, even assuming that Plaintiff's statement that he would contact an attorney regarding the use of force he experienced constitutes engagement in protected activity, and even also assuming that the only reason Defendant Norton and/or Duckett issued Plaintiff a misbehavior report was because he made this statement, these Defendants are, under the circumstances, entitled to qualified immunity. This is because the Court finds that the right to make this statement (without experiencing any resulting adverse action) was not a clearly established during the time in

question (January 2009), based on a review of the relevant case law. *See, supra,* notes 12 and 13 of this Decision and Order.

As a result, Plaintiff's retaliation claim is dismissed on the alternate ground of qualified immunity.

## 2. Excessive Force

There is no doubt that the right to be free from the use of excessive force was "clearly established" at the time of the incidents giving rise to Plaintiff's claims. *See, e.g., Hudson v. McMillian,* 503 U.S. 1, 9–10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). Moreover, with regard to whether it was objectively reasonable for Defendants to use the alleged amount of force that they used, the Second Circuit has made clear that, "[w]here the circumstances are in dispute, and contrasting accounts present factual issues as to the degree of force actually employed and its reasonableness, a defendant is not entitled to judgment as a matter of law on a defense of qualified immunity." *Mickle v. Morin,* 297 F.3d 114, 122 (2d Cir.2002) [internal quotation marks omitted].

 **\*11** Here, after carefully reviewing the record, and construing it in the light most favorable to Plaintiff, the Court finds that, even if Defendants Dinelle, DeLuca and Duckett genuinely feared being assaulted by Plaintiff, and even if those three Defendants genuinely perceived Plaintiff's words and movements to constitute an attempt to resist a frisk, admissible record evidence exists from which a rational jury could conclude that those perceptions were not objectively reasonable under the circumstances. As the Second Circuit has observed, it is impossible to "determine whether [Defendants] reasonably believed that [their] force was not excessive when several material facts [are] still in dispute, [and therefore,] summary judgment on the basis of qualified immunity [is] precluded." *Thomas v. Roach,* 165 F.3d 137, 144 (2d Cir.1999). [20] For these reasons, the Court rejects Defendants' argument that Plaintiff's excessive-force claim should be dismissed on the ground of qualified immunity as it relates to Defendants Dinelle, DeLuca and Duckett.

However, the Court reaches a different conclusion with regard to Plaintiff's failure-to-intervene claim against Defendant Broekema: the Court finds that, at the very least, officers of reasonable competence could disagree on

the legality of Defendant Broekema's actions, based on the current record. As a result, Plaintiff's failure-to-intervene claim against Defendant Broekema is dismissed on this alternative ground.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion for partial summary judgment (Dkt. No. 24) is *GRANTED* in part and *DENIED* in part in the following respects:

(1) Defendants' motion for summary judgment on Plaintiff's First Amendment claim is *GRANTED;*

(2) Defendants' motion for summary judgment on Plaintiff's Fourteenth Amendment substantive due process claim is *GRANTED;*

(3) Defendants' motion for summary judgment on Plaintiff's Eighth Amendment excessive-force claim against Defendant Norton is *GRANTED;*

(4) Defendants' motion for summary judgment on Plaintiff's Eighth Amendment failure-to-intervene claim against Defendant Broekema is *GRANTED;* and

(5) Defendants' motion for summary judgment on Plaintiff's Eighth Amendment excessive-force claim against Defendant DeLuca is *DENIED;* and it is further

**ORDERED** that the following claims are *DISMISSED* **with prejudice** from this action:

(1) Plaintiff's First Amendment claim;

(2) Plaintiff's Fourteenth Amendment substantive due process claim;

(3) Plaintiff's Eighth Amendment excessive-force claim against Defendant Norton; and

(4) Plaintiff's Eighth Amendment failure-to-intervene claim against Defendant Broekema; and it is further

**ORDERED** that Defendants Norton and Broekema are *DISMISSED* from this action; and it is further

**ORDERED** that, following this Decision and Order, the following claims remain pending in this action: Plaintiff's Eighth Amendment excessive-force claim against Defendants DeLuca, Dinnelle and Duckett; and it is further

**\*12 ORDERED** that counsel are directed to appear on **JANUARY 4, 2012 at 2:00 p.m.** in chambers in Syracuse, N.Y. for a pretrial conference, at which counsel are directed to appear with settlement authority, and in the event that the case does not settle, trial will be scheduled at that time. Plaintiff is further directed to forward a written settlement demand to defendants no later than **DECEMBER 16, 2011,** and the parties are directed to engage in meaningful settlement negotiations prior to the 1/4/12 conference.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 5975027

Footnotes

1    (*Compare* Dkt. No. 24, Attach. 9, at ¶ 17 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 27, Attach. 3, at ¶ 17 [Plf.'s Rule 7 .1 Response]; *see also* Dkt. No. 24, Attach. 4, at 100, 102–03 [attaching pages 216, 218 and 219 of Trans. of Plf.'s Depo.]; Dkt. No. 33, at 2–3 [attaching pages 228 and 229 of Trans. of Plf.'s Depo .].)

2    (*Compare* Dkt. No. 24, Attach. 9, at ¶ 17 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 27, Attach. 3, at ¶ 17 [Plf.'s Rule 7 .1 Response]; *see also* Dkt. No. 24, Attach. 4, at 59–60, 100, 102–03 [attaching pages 175, 176, 216, 218 and 219 of Trans. of Plf.'s Depo.]; Dkt. No. 33, at 2–3 [attaching pages 228 and 229 of Trans. of Plf.'s Depo.].)

3    In their motion, Defendants do not challenge the evidentiary sufficiency of Plaintiff's Eighth Amendment excessive-force claim against Defendants Dinelle or Duckett. (*See generally* Dkt. No. 24, Attach. 10 [Defs.' Memo. of Law].)

4    Plaintiff does not oppose Defendants' arguments that (1) Plaintiff's excessive-force claim against Defendant Norton should be dismissed, and (2) Plaintiff's substantive due process claim should be dismissed. (*See generally* Dkt. No. 27, Attach. 5 [Plf.'s Response Memo. of Law].)

5    Generally, " '[n]ormal' SHU conditions include being kept in solitary confinement for 23 hours per day, provided one hour of exercise in the prison yard per day, and permitted two showers per week." *Whitaker,* 2009 WL 5033939, at *5 n. 27 (citing *Ortiz v. McBride,* 380 F.3d 649, 655 [2d Cir.2004] ).

6    *See also* *Pena v. DePrisco,* 432 F.3d 98, 115 (2d Cir.2005); *Clue v. Johnson,* 179 F.3d 57, 61 (2d Cir.1999); *McEvoy v. Spencer,* 124 F.3d 92, 97 (2d Cir.1997); *Shechter v. Comptroller of City of New York,* 79 F.3d 265, 271 (2d Cir.1996); *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995); *Prue v. City of Syracuse,* 26 F.3d 14, 17–18 (2d Cir.1994); *Calhoun v. New York State Div. of Parole,* 999 F.2d 647, 654 (2d Cir.1993).

7    *See also* *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' "); *Davis v. Scherer,* 468 U.S. 183, 190, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984) ("Even defendants who violate [clearly established] constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard."); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

8    *See also* *Malsh v. Corr. Oficer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) [citing cases]; *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996).

9    *See also* *Hunter v. Bryant,* 502 U.S. 224, 299, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) ("The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.") [internal quotation marks omitted].

10    Defendants also argue that Plaintiff's First Amendment claim should be dismissed to the extent that it is based solely on the fact that misbehavior reports against him were *false* (as opposed to being false *and retaliatory* ). The Court agrees that Plaintiff has no general constitutional right to be free from false misbehavior reports. *See* *Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir.1997). As a result, to the extent that the Plaintiff's Complaint may be construed as asserting a claim based solely on the issuance of false behavior reports, that claim is dismissed.

11    *See* *Wade–Bey v. Fluery,* 07–CV–117, 2008 WL 2714450 at *6 (W.D.Mich. July 8, 2010) ("Although it is well established that prisoners have a constitutional right of access to the courts ..., the filing of a frivolous lawsuit would not be protected activity.") [citation omitted].

12    The Court notes that numerous cases exist for the point of law that even *expressly threatening* to file a *grievance* does not constitutes protected activity. *See, e.g.,* *Bridges v. Gilbert,* 557 F.3d 541, 554–55 (7th Cir.2009) ("[I]t seems implausible that a *threat* to file a grievance would itself constitute a First Amendment-protected grievance.") [emphasis in original]; *Brown v. Darnold,* 09–CV–0240, 2011 WL 4336724, at *4 (S.D.Ill. Sept.14, 2011) ("Plaintiff cannot establish that his threat to file a grievance against Defendant Darnold is a constitutionally protected activity."); *Koster v. Jelinek,* 10–CV–3003, 2011 WL 3349831, at *3, n. 2 (C.D.Ill. Aug.3, 2011) ("The plaintiff does not seem to be asserting that he had a First Amendment right to threaten the facilitators with lawsuits and grievances, nor does the Court believe that he has such a right."); *Ingram v. SCI Camp Hill,* 08–CV–0023, 2010 WL 4973302, at *15 (M.D.Pa. Dec.1, 2010) ("Stating an intention to file a grievance is not a constitutionally protected activity."), *aff'd,* No. 11–1025, 2011 WL 4907821 (3d Cir. Oct.17, 2011); *Lamon v. Junious,* 09–CV–0484, 2009 WL 3248173, at *3 (E.D.Cal. Oct.8, 2009) ("A mere threat to file suit does not rise to the level of a protected activity...."); *Miller v. Blanchard,* 04–CV–0235, 2004 WL 1354368, at *6 (W.D.Wis. June 14, 2004) ("Plaintiff alleges that defendants retaliated against him after he threatened to file a lawsuit against them. Inmates do not have a First Amendment right to make threats.").

13    *McKinnie v. Heisz,* 09–CV–0188, 2009 WL 1455489, at *11 (W.D.Wis. May 7, 2009) ("Hoping to engage in constitutionally protected activity is not itself constitutionally protected activity. At most, petitioner's actions could be construed as a 'threat' to assert his rights but that is not enough.").

14    *See* *Hynes v. Squillance,* 143 F.3d 653, 657 (2d Cir.1998) (holding that defendants met their burden of showing that they would have taken disciplinary action on valid basis alone where the evidence demonstrated that plaintiff had committed "the most serious, if not all, of the prohibited conduct"); *Jermosen v. Coughlin,* 86–CV–0208, 2002 WL 73804, at *2 (N.D.N.Y. Jan.11, 2002) (Munson, J.) (concluding, as a matter of law, that defendants showed by a preponderance of the evidence that they would have issued a misbehavior report against plaintiff even in the absence of his complaints against correctional department personnel, because they established that the misbehavior report resulted in a disciplinary conviction, "demonstrat[ing] that plaintiff in fact committed the prohibited conduct charged in the misbehavior report.").

15    For these reasons, the Court finds to be inapposite the case that Plaintiff cites for the proposition that the Court must accept as true his sworn denial that he committed any of the violations alleged in the misbehavior reports issued against him. *See* *Samuels v. Mockry,* 142 F.3d 134, 135–36 (2d Cir.1998) (addressing a situation in which a prisoner was placed in a prison's "Limited Privileges Program," upon a finding rendered by the prison's Program Committee, that he had refused to accept a mandatory work assignment, *"without a hearing or a misbehavior report"* ) [emphasis added]. The

Court would add only that, even if it were to accept Plaintiff's sworn denial as true, the Court would still find that he has failed to establish that Defendants Duckett and Norton would not have issued the misbehavior reports against him anyway, based on their subjective belief that he was acting in a disturbing, interfering, harassing and disobedient manner at the time in question (as evident from, *inter alia,* their misbehavior reports, the disciplinary hearing testimony of three of the Defendants, and admissions made by Plaintiff during his deposition regarding the "confusion" and "misunderstanding" that occurred during his examination by Defendant Norton, his persistent assertions about his prescribed frequency of visits, and his unsolicited comments about his proper course of treatment).

16   See *O'Neill v. Krzeminski,* 839 F.2d 9, 11–12 (2d Cir.1988) (noting that "three blows [that occurred] in such rapid succession ... [is] not an episode of sufficient duration to support a conclusion that an officer who stood by without trying to assist the victim became a tacit collaborator"); *Blake v. Base,* 90–CV–0008, 1998 WL 642621, at *13 (N.D.N.Y. Sept.14, 1998) (McCurn, J.) (dismissing failure-to-intervene claim against police officer based on finding that the punch to the face and few body blows that plaintiff allegedly suffered "transpired so quickly ... that even if defendant ... should have intervened, he simply did not have enough time to prevent plaintiff from being struck"); *Parker v. Fogg,* 85–CV–0177, 1994 WL 49696, at *8 (N.D.N.Y. Feb.17, 1994) (McCurn, J.) (holding that an officer is not liable for failure-to-intervene if there "was no 'realistic opportunity' to prevent [an] attack [that ends] in a matter of seconds"); *see also Murray–Ruhl v. Passinault,* 246 F. App'x 338, 347 (6th Cir.2007) (holding that there was no reasonable opportunity for an officer to intervene when one officer stood by while another fired twelve shots in rapid succession); *Ontha v. Rutherford Cnty., Tennessee,* 222 F. App'x 498, 506 (6th Cir.2007) ("[C]ourts have been unwilling to impose a duty to intervene where ... an entire incident unfolds 'in a matter of seconds.' "); *Miller v. Smith,* 220 F.3d 491, 295 (7th Cir.2000) (noting that a prisoner may only recover for a correction's officer's failure to intervene when that officer "ignored a realistic opportunity to intervene").

17   (Dkt. No. 27, Attach. 2, at 19–20.)

18   (Dkt. No. 27, Attach. 2, at 10, 14.)

19   See *Spence v. Senkowski,* 91–CV–0955, 1998 WL 214719, at *3 (N.D.N.Y. Apr.17, 1998) (McCurn, J.) (finding that 180 days that plaintiff spent in SHU, where he was subjected to numerous conditions of confinement that were more restrictive than those in general population, did not constitute atypical and significant hardship in relation to ordinary incidents of prison life); *accord, Husbands v. McClellan,* 990 F.Supp. 214, 217–19 (W.D.N.Y.1998) (180 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Warren v. Irvin,* 985 F.Supp. 350, 353–56 (W.D.N.Y.1997) (161 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Ruiz v. Selsky,* 96–CV–2003, 1997 WL 137448, at *4–6 (S.D.N.Y.1997) (192 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Horne v. Coughlin,* 949 F.Supp. 112, 116–17 (N.D.N.Y.1996) (Smith, M.J.) (180 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Nogueras v. Coughlin,* 94–CV–4094, 1996 WL 487951, at *4–5 (S.D.N.Y. Aug.27, 1996) (210 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Carter v. Carriero,* 905 F.Supp. 99, 103–04 (W.D.N.Y.1995) (270 days in SHU under numerous conditions of confinement that were more restrictive than those in general population).

20   See also *Robison v. Via,* 821 F.2d 913, 924 (2d Cir.1987) ( "[T]he parties have provided conflicting accounts as to [who] initiated the use of force, how much force was used by each, and whether [the arrestee] was reaching toward [a weapon]. Resolution of credibility conflicts and the choice between these conflicting versions are matters for the jury and [should not be] decided by the district court on summary judgment.").

**End of Document**      © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 791547
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Eugene JONES, Plaintiff,

v.

ROCK, Superintendent, Upstate Correctional
Facility; J. Marinelli, MHU Counselor, Upstate
Correctional Facility; John Doe # 3, Mental Health
Doctor, Upstate Correctional Facility; Michael
Hogan, Mental Health Commissioner; J. Healy,
Co., Upstate Correctional Facility; John Doe #
2, Co., Upstate Correctional Facility; John Doe
# 3, Co., Upstate Correctional Facility; Laveen,
C .O., Upstate Correctional Facility; Dwyer, C.O.,
Upstate Correctional Facility; John Doe # 4,
Lt., Upstate Correctional Facility; S. Santamore,
Sgt., Upstate Correctional Facility; Burgess, Co.,
Upstate Correctional Facility; John Doe # 5, Co.,
Upstate Correctional Facility; John Doe # 6, CO.,
Upstate Correctional Facility; Jerry Miller, Dental
Doctor, Upstate Correctional Facility, Defendants.

No. 9:12–cv–0447 (NAM/TWD).
|
Signed Feb. 24, 2015.

**Attorneys and Law Firms**

Eugene Jones, Dannemora, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State
of New York, Colleen Galligan, Esq, Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

### *ORDER*

NORMAN A. MORDUE, Senior District Judge.

**\*1** The above matter comes to me following a Report–
Recommendation by Magistrate Judge Therese Wiley
Dancks, duly filed on the 31st day of January 2015.
Following fourteen (14) days from the service thereof, the
Clerk has sent me the file, including any and all objections
filed by the parties herein.

After careful review of all of the papers herein, including
the Magistrate Judge's Report–Recommendation, and no
objections submitted thereto, it is

ORDERED that:

1. The Report–Recommendation is hereby adopted in its
entirety.

2. The defendants' motion for summary judgment (Dkt.
No. 46) is granted in its entirety.

3. The plaintiff's claims against John Doe defendants # 1–
6 are dismissed without prejudice from this action due to
plaintiffs failure to prosecute.

4. The Clerk of the Court shall serve a copy of this Order
upon all parties and the Magistrate Judge assigned to this
case.

**IT IS SO ORDERED.**

### *ORDER AND REPORT–RECOMMENDATION*

THÉRÈSE WILEY DANCKS, United States Magistrate
Judge.

### I. INTRODUCTION

Plaintiff Eugene Jones commenced this *pro se* civil rights
action under 42 U.S.C. § 1983 for the violation of his
Eighth Amendment right to be free from cruel and
unusual punishment while he was confined in the Upstate
Correctional Facility ("Upstate"). (Dkt. No. 1.) Plaintiff
asserted claims in his Complaint for: (1) deliberate
indifference to his serious mental health needs against
Defendants Upstate Superintendent Rock ("Rock"),
Upstate Mental Health Unit ("MHU") Psychologist 2,
J. Marinelli, incorrectly sued as Marienelli ("Marinelli"),
MHU Unit Chief T. Kemp ("Kemp"), Mental Health
Doctor John Doe # 1, and Mental Health Commissioner
Michael Hogan ("Hogan"), *id.* at ¶ 72; (2) excessive
force and deliberate indifference to Plaintiff's serious
mental health and medical needs against Defendants
Corrections Officer Healy ("Healy"), and Corrections
Officers John Doe # 2 and John Doe # 3, *id.* at ¶ 73;
(3) conditions of confinement against Defendant Rock;
*id.* at ¶ 74; (4) sexual harassment, assault, and excessive
force against Defendants Lt. John Doe # 4, Sgt. S.

Santamore ("Santamore"), Corrections Officer Lavigne, incorrectly sued as Laveen ("Lavigne"), and Corrections Officer Dyer, incorrectly sued as Dwyer ("Dyer"), *id.* at ¶ 75; and (5) deliberate indifference to Plaintiff's serious dental needs against Defendants Corrections Officer John Doe # 6, Doctor Jerry Miller ("Dr. Miller" or "Miller").

Defendants moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure after filing an Answer to the Complaint. (Dkt. No. 23.) Plaintiff opposed the motion. (Dkt. No. 27.) The Hon. Norman A. Mordue, Senior D.J., adopting the Report and Recommendation of this Court (Dkt. No. 30), granted Defendants motion in part and denied it in part. (Dkt. No. 31). Dismissed on the motion were: (1) all of Plaintiffs claims seeking money damages against all Defendants in their official capacity with prejudice on Eleventh Amendment grounds; (2) claim for deliberate indifference to Plaintiff's serious mental health needs as against Defendant Hogan only; (3) claim for conditions of confinement against Defendant Rock; (4) claims for sexual harassment, assault and excessive force against Defendants Lavigne, Dyer, and Santamore; and (5) claim for deliberate indifference to Plaintiff's serious dental needs as against Defendants Burgess and Santamore. [1]

**\*2** Defendants Marinelli, Kemp, Healy, Dyer, and Miller have now moved for summary judgment on Plaintiff's remaining Eighth Amendment claims: (1) Count # 1 for deliberate indifference to Plaintiff's serious medical (mental health) needs against Defendants Marinelli and Kemp; (2) Count # 2 for deliberate indifference to Plaintiff's serious medical (mental health) needs and excessive force against Defendant Healy; and (3) Count # 5 for deliberate indifference to Plaintiff's serious medical (dental) needs against Defendants Miller and Dyer. (Dkt.Nos.46, 46–2.)

The grounds for summary judgment asserted by Defendants are: (1) Plaintiff's failure to exhaust administrative remedies as to Counts # 1 and # 2 against Marinelli, Kemp, and Healy; (2) Plaintiff's inability to state a prima facie claim of deliberate indifference with regard to medical (mental health) care against Defendants Kemp or Marinelli and medical (dental) care against Defendants Miller and Dyer; (3) Defendants Kemp and Miller's lack of personal involvement in the alleged violation of Plaintiffs Eighth Amendment rights; and (4)

Defendants Kemp, Marinelli, Dyer, and Miller's right to qualified immunity. (Dkt. No. 46–2 at 2–3.) [2]

Plaintiff has not opposed Defendants' summary judgment motion. For the reasons that follow, the Court recommends that Defendants' motion (Dkt. No. 46) be **GRANTED** in its entirety and further recommends the *sua sponte* dismissal of the action against Defendants John Does # 1–6 for failure to prosecute.

## II. STANDARD OF REVIEW

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Under those standards, the party seeking summary judgment bears the initial burden of showing, through the submission of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). A dispute is "genuine" if the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin,* 467 F.3d at 272–73. The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact. *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008). Where a party is proceeding *pro se,* the court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994); *see also Ruotolo v.*

*IRS,* 28 F.3d 6, 8 (2d Cir.1994) (district court "should have afforded [*pro se* litigants] special solicitude before granting the ... motion for summary judgment"). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz,* No. 93 Civ. 5981(WHP) JCF, 1999 WL 983876 at *3, U.S. Dist. LEXIS 16767 at *8 (S.D.N.Y. Oct. 28, 1999)[3] (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

**\*3** Plaintiff's failure to oppose Defendants' summary judgment motion does not mean that the motion is to be granted automatically. An unopposed motion for summary judgment may be granted "only if the facts as to which there is no genuine dispute show that the moving party is entitled to judgment as a matter of law."[4] *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996) (citations and internal quotation marks omitted); *see also Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d. Cir.2004) (where "the non-moving party 'chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submissions to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.' ") (quoting *Amaker v. Foley,* 274 F.3d 677, 681 (2d Cir.2001)).

Recently, in *Jackson v. Federal Exp.,* 766 F.3d 189, 198 (2d Cir.2014), the Second Circuit made clear that "[i]n the case of a *pro se,* the district court should examine every claim or defense with a view to determining whether summary judgment is legally and factually appropriate." In doing so, "the court may rely on other evidence in the record, even if uncited." *Id.* at 194 (citing Fed.R.Civ.P. 56(c)(3)). "A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist ...." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (internal citations omitted).[5]

This Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute where a non-movant willfully fails to respond to a properly filed summary judgment motion. *Amnesty Am. v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002).[6] For this reason, courts in this district have routinely enforced L.R. 7.1(a)(3)[7] in cases in which the non-movant

has failed to respond to the movant's Rule 7.1 Statement of Material Facts by deeming the facts to have been admitted where: (1) the facts are supported by evidence in the record;[8] and (2) the nonmovant, if proceeding *pro se,* has been specifically advised of the possible consequences of failing to respond to the motion.[9] *See Champion,* 76 F.3d at 486; *see also Jackson,* 766 F.3d at 194 (a non-movant who fails to respond to a summary judgment motion "runs the risk of unresponded-to-statements of undisputed facts proffered by the movant being deemed admitted.") While *pro se* litigants are undeniably "entitled to some measure of forbearance when defending against summary judgment motions, the deference owed to *pro se* litigants ... does not extend to relieving them of the ramifications associated with the failure to comply with the courts local rules." *Literati v. Gravelle,* No. 9:12–CV–00795 (MAD/DEP), 2013 WL 5372872, at *6, 2013 U.S. Dist. LEXIS 137826, at *8 (N.D.N.Y. Sept.24, 2013) (internal citations and punctuation omitted).

**\*4** In light of Plaintiff's failure to oppose Defendants' summary judgment motion, the facts set forth in Defendants' Statement Pursuant to Rule 7.1(a)(3) (Dkt. No. 46–1) that are, as shown below, supported by record evidence and are uncontroverted by nonconclusory factual allegations in Plaintiffs verified Complaint, are accepted as true. *See McAllister v. Call,* No. 9:10–CV–610, 2014 WL 5475293 (FJS/CFH), at *3, 2014 U.S. Dist. LEXIS 154422, at *3 (N.D.N.Y. Oct. 29, 2014) (finding allegations in plaintiff's verified complaint sufficient to controvert properly supported facts set forth in a L.R. 7.1(a)(3) statement of material facts where plaintiff did not oppose defendant's motion for summary judgment); *Douglas v. Perrara,* No. 9:11–CV–1353 (GTS/RFT), 2013 WL 5437617, at *3, 2013 U.S. Dist. LEXIS 14125, at *6 (N.D.N.Y. Sept.27, 2013) ("Because Plaintiff[, who filed no opposition,] has failed to raise any question of material fact, the Court will accept the facts as set forth in Defendants' Statement Pursuant to Rule 7.1(a)(3) ..., supplemented by Plaintiff's verified Complaint ..., as true."). As to any facts not contained in Defendants' Statement Pursuant to Rule 7.1, in light of the procedural posture of this case, the Court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of Plaintiff. *Literati,* 2013 WL 5372872, at *7 (quoting *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003)).

## III. BACKGROUND

### A. Plaintiff's Mental Health Issues

Plaintiff has been incarcerated in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") since the fall of 1995. (Dkt. Nos. 46–1 at ¶ 1; 47 at ¶ 6.)[10] Because Plaintiff had received psychiatric services while in the Niagara County Jail, he was seen by a psychiatrist when he entered the DOCCS system and placed on the New York State Office of Mental Hygiene ("OMH") service. (Dkt. Nos. 46–1 at ¶ 2; 47 at ¶ 7; 47–1 at 13.) He has received mental health services from OMH off and on since his incarceration. (Dkt. Nos. 46–1 at ¶ 3; 47 at ¶ 8; 47–1 at 12–21.)

During his incarceration, Plaintiff's "Mental Health Level" has fluctuated from Level 1 to Level 6 on a scale of 1 to 6. (Dkt. Nos. 46–1 at ¶ 4; 47 at ¶ 9.) The Treatment Needs Service Level UCR Policy defines Level 1 as the most serious and includes major mental illnesses such as schizophrenia and psychotic disorders requiring active treatment, and not having six months of psychiatric stability; those with documented psychotic or bipolar illness who are on certain drugs; and those with psychiatric hospitalizations within the past three years, significant or repeated suicide attempts and/or self-abuse history within the past three years, or suicide attempts resulting in in-patient hospitalization within the last six months. (Dkt. Nos. 46–1 at ¶ 5; 47 at ¶ 10; 47–1 at 9.)

Level 6 is defined as "Mental health assessment completed does not require mental health services." (Dkt. Nos. 46–1 at ¶ 6; 47–1 at 9.) Although Plaintiff's mental health status improved between 2005 and 2010, in August of 2009, while he was in the Special Housing Unit ("SHU") at Great Meadow Correctional Facility ("Great Meadow"), his mental health level was downgraded to Level 3, defined as "Needs/may need short term chemotherapy for disorders such as anxiety, moderate depression, or adjustment disorders OR suffer from a mental disorder which is currently in remission and can function in a dormitory facility which has part-time Mental Health staff." (Dkt. Nos. 46–1 at ¶ 8; 47–1 at ¶¶ 12–13; 47–1 at 1, 10.) While Plaintiff was confined at Great Meadow, Psychiatrist Kalyana Battau prescribed Topamax for his psychiatric symptoms. (Dkt. Nos. 46–1 at ¶ 9; 47 at ¶ 14; 47–1 at 63.)

**\*5** Plaintiff was transferred from Great Meadow to Upstate on September 17, 2009, and arrived with a diagnosis of Antisocial Personality Disorder ("ASPD"), and a prescription for Topamax. (Dkt. Nos. 46–1 at ¶ 11; 47 at ¶¶ 15–16; 47–1 at 8, 9, 44.) The Transfer Progress Notes prepared by a Great Meadow's Social Worker state that Plaintiffs mental status was "Alert, oriented. No evidence of thought disorder. Mood generally neutral, stable." (Dkt. Nos. 46–1 at ¶ 11; 47–1 at 44.)

According to Plaintiff, Upstate is a maximum security prison in which seventy-five percent of the inmates are housed in SHU. (Dkt. No. 1 at ¶ 14.) Plaintiff was confined in SHU in a single cell in A–Block in 11–Building where mentally ill inmates were housed together. *Id.* at ¶¶ 15, 26. Defendant Marinelli, employed by OMH as a Psychologist 2 at the Central New York Psychiatric Center ("CNYPC") satellite unit at Upstate, first saw Plaintiff on September 21, 2009. (Dkt. Nos. 1 at ¶ 15; 46–1 at ¶ 12; 48 at ¶ 8; 48–1 at 46–47.) Plaintiff has alleged in his Complaint that he told Marinelli he had a long history of mental illness and treatment both before and during his incarceration. (Dkt. No. 1 at ¶ 16.) Marinelli observed no concerns or issues at that time. (Dkt. Nos. 46–1 at ¶ 12; 48 at ¶ 8; 48–1 at 46–47.) He placed Plaintiff on "active status" so he would continue to receive OMH services. (Dkt. No. 48 at 46–47.)

On September 23, 2009, Marinelli prepared a Mental Health Treatment Plan ("Plan") for Plaintiff based upon his mental health history, diagnosis of ASPD, and current mental status. (Dkt. Nos. 46–1 at ¶ 13; 48 at ¶ 9; 48–1 at 23–34.) The Plan included Plaintiff being placed on Marinelli's service so that he would be seen regularly at his cell, monthly call-outs for private mental health interviews, and continuation of his prescribed medication Topamax. *Id.* The Plan was approved by OMH Staff Psychiatrist Bezalel Wurzberger ("Dr.Wurzberger") on October 2, 2009. (Dkt. Nos. 46–1 at ¶ ; 48 at ¶ 12.)

When Marinelli saw Plaintiff for a cell-side visit on September 29, 2009, Plaintiff was doing well and had no current health concerns. (Dkt. Nos. 46–1 at ¶ 14; 48, at ¶ 11; 48–1 at 48.) When he met with Plaintiff for a private therapy session on October 7, 2009, Marinelli observed no active mental illness and Plaintiff had no health complaints. (Dkt. Nos. 46–1 at ¶ 15; 48 at ¶¶ 11; 48–1 at 49.)

Plaintiff saw Dr. Wurzberger for an evaluation on October 9, 2009. (Dkt. Nos. 1 at ¶ 17; 23 at ¶ 14; 46–1 at ¶ 18; 47–1 at 30.) Wurzberger's Psychiatric Progress Note states in part:

**COMPLAINTS/CURRENT ISSUES:**

Inmate recently transferred to this facility; gives a history of "ups and downs and anxiety"; says that he was treated with multiple medications in the past; reports "doing alright now", rates himself "in the middle" on the 0–10 moods scale; sleep and appetite are adequate; has no complaints.

**\*6** The record indicates an extensive history of behavioral problems, characterologically driven, for which he was referred twice to the [Behavioral Health Unit] BHU.

**MENTAL STATUS EXAMINATION AND CHANGES:**

Is alert, oriented, coherent and relevant; mood and affect are appropriate; there are no signs of abnormal psychomotor activity; denies hallucinations; denies self harm thoughts or intent; cognitive functions adequate.

**SUICIDE RISK ASSESSMENT:**

No current warning signs of suicidality.

**PLAN:**

Discussed treatment options, including risks and benefits involved; he is psychiatrically stable, with no objective evidence of a mood disorder or a thought disorder; discussed with him the fact that Topamax has no psychiatric indications, is non-formulary, and is not indicated for his clinical presentation; I suggested a trial of an SSRI for the anxiety symptoms he described; he told me "thank you, but no thank you", and refused to consider other alternatives; we'll monitor for changes and reassess treatment options as needed.

(Dkt. Nos. 46–1 at ¶ 18; 47–1 at 30.) Dr. Wurzberger discontinued Plaintiffs Topamax on October 9, 2009. (Dkt. Nos. 46–1 at ¶ 19; 48 at ¶ 15.) Marinelli and Kemp did not make the decision to discontinue the Topamax. (Dkt. Nos. 46–1 at ¶¶ 43–44; 47 at ¶ 40; 48 at ¶ 48; 48–1 at 64.) According to Kemp, the discontinuance was proper because there is no psychiatric indication for the use of Topamax. (Dkt. Nos. 46–1 at 46; 47 at ¶ 50; 48–1 at 30.)

When Marinelli saw Plaintiff for his weekly cell-side visits on October 13, 2009, October 23, 2009, and November 9, 2009, after discontinuance of the Topamax, Plaintiff denied mental health issues or concerns, and Marinelli observed no evidence of mental illness or ongoing mental health issues or concerns. (Dkt. Nos. 46–1 at ¶¶ 20–22; 48 at ¶¶ 16–18; 48–1 at 50–53.) At a private therapy session with Marinelli on November 13, 2009, Plaintiff discussed efforts to make positive changes in his life, his relationship with his family, and how his early experiences affected how he related to authority figures. (Dkt. Nos. 46–1 at ¶ 23; 48 at ¶ 19; 48–1 at 50.)

The reports from Marinelli's cell-side visits with Plaintiff on November 25, 2009, and December 16 and 31, 2009, and his private mental health interview with Plaintiff on December 15, 2009, all reflect Marinelli's observation that Plaintiff had no current mental health issues. (Dkt. Nos. 46–1 at ¶¶ 24–26; 48 at ¶¶ 20–23; 48–1 at 53–55.) On November 25, 2009, Plaintiff reported he was happy that he had been moved to the PIMS [11] gallery, which was a quieter gallery, and on December 31, 2009, reported that he liked his new "hood." (Dkt. Nos. 46–1 at ¶ 24; 48 at ¶¶ 20 and 23 .) Plaintiff had also told Marinelli he liked his current housing situation at a private mental health interview on December 15, 2009. (Dkt. Nos. 46–1 at ¶ 25; 48 at ¶ 29; 48–1 at 53.)

**\*7** However, in a January 13, 2010, letter to Defendant Kemp, a Licensed Clinical Social Worker employed by the NYS OMH as Unit Chief for the CNYPC mental health unit at Upstate, Plaintiff complained of being taken off the medication he was on when he arrived at Upstate, and that despite really trying, he was having a lot of symptoms of mental illness and couldn't keep living like that. Plaintiff claimed that he tried to talk to Marinelli, "but he thinks it's a game or something." Plaintiff asked Kemp to change his therapist to someone who would treat his mental health issues rather than treating them like a joke. (Dkt. Nos. 1 at ¶ 20; 27–1 at 10.) Plaintiff claims to have received no reply from Kemp, and Defendants have not referenced the letter in their statement of material facts. (Dkt. Nos. 1 at ¶ 20; 46.) According to Plaintiff, every time he wrote to Kemp, Marinelli would appear at his cell door and warn him against writing the complaints and telling him "not to go over his head." (Dkt. No. 1 at ¶ 20.)

On January 25, 2010, Plaintiff refused to attend his private interview with Marinelli, and Marinelli noted that termination of Plaintiff's mental health services should be considered based upon his stability and lack of reported or observed mental health concerns. (Dkt. Nos. 46–1 at ¶ 28; 48 at ¶ 24; 48–1 at 55.) Marinelli thereafter had a cell-side meeting with Plaintiff on January 29, 2010, and noted that no mental health concerns were reported or observed. (Dkt. Nos. 46–1 at ¶ 29; 48 at ¶ 25; 48–1 at 56.) Marinelli and Plaintiff discussed whether mental health treatment should be discontinued, and according to Marinelli, Plaintiff wanted to wait a month before discontinuing services. *Id.* Marinelli had cell-side visits with Plaintiff on February 18, 2010, February 25, 2010, March 16, 2010, and March 30, 2010. (Dkt. Nos. 46–1 at ¶¶ 31–34; 48 at ¶¶ 27–30; 48–1 at 58–61.) According to Marinelli, Plaintiff denied any mental health issues, and Marinelli did not observe any mental health concerns. *Id.*

On March 30, 2010, Marinelli prepared Termination Transfer Notes recommending that Plaintiff be terminated from OMH service and a Treatment Needs/ Service Level Designation recommending that Plaintiff's Mental Health Level be changed to Level 6. (Dkt. Nos. 46–1 at ¶¶ 35–36; 48 at ¶¶ 31–32; 48–1 at 11, 62.) Kemp reviewed the recommendation and Plaintiff's mental health records and approved the change in Mental Health Level and Plaintiff's removal from OMH services. (Dkt. Nos. 46–1 at ¶ 37; 47 at ¶ 42; 47–1 at 11.) Even after Plaintiff's termination from the OMH caseload, he continued to receive regular mental health evaluations by OMH staff every ninety days due to his SHU placement. (Dkt. Nos. 46–1 at ¶ 42; 48 at ¶ 39; 48–1 at 3–6.)

On March 22, 2010, prior to the termination, Plaintiff had written to Kemp, identifying the subject of the letter as "I want to know why you are trying to ruin my life worse than it already is." (Dkt. Nos. 1 at ¶ 22; 27–1 at 9.) In the letter, Plaintiff asked why every time he wrote to Kemp complaining about Marinelli, Marinelli would show up bragging that Kemp had given him a copy of the letter. (Dkt. No. 27–1 at 9.) He asked Kemp why he couldn't help him to see a doctor so he could get some medication to stop the voices in his head and told him that when he talked to Marinelli about seeing a doctor, he laughed in his face. *Id.* Again, according to Plaintiff, he received no reply or visit from Kemp regarding the letter. (Dkt. No. 1 at ¶ 20.) The letter is not referenced in Defendants' statement of material facts. (Dkt. No. 46–1.)

*8 On May 3, 2010, Plaintiff wrote to NYS Commissioner of Mental Health Michael Hogan ("Commissioner Hogan" or "Hogan") explaining that the only reason he was bothering him was that Kemp either wouldn't reply to his letters or would keep sending Marinelli to his cell to harass him about writing to Kemp. (Dkt. Nos. 1 at ¶ 21; 27–1 at 8.) Plaintiff explained to Hogan that he had a long history of mental health problems and taking medication. Plaintiff told Hogan that his medication had been taken away, and he felt himself slipping back into mental illness. Plaintiff also complained of hearing people talking and not knowing if the voices were real or in his head. (Dkt. No. 27–1 at 8.) Hogan did not reply. (Dkt. No. 1 at ¶ 21.) The letter is not referenced in Defendants' statement of material facts. (Dkt. No. 46–1.)

Marinelli conducted a SHU 90–day mental health examination of Plaintiff on June 3, 2010, which confirmed that his Mental Health Level was 6, and that he did not require mental health services at that time. (Dkt. Nos. 46–1 at ¶ 38; 48 at ¶ 34; 48–1 at 3–4.) On June 17, 2010, Plaintiff wrote a second letter to Kemp informing Kemp that he had written to his boss about the conditions in SHU and the fact that Kemp and Marinelli had refused to treat mentally ill inmates or let them see mental health doctors. (Dkt. Nos. 1 at ¶ 20; 27–1 at 13.) Kemp did not reply. (Dkt. No. 1 at ¶ 20.) The letter is not addressed in Defendants' statement of material facts. (Dkt. No. 46–1.)

Plaintiff claims that on August 30, 2010, he used a piece of metal to cut his arms, and when Plaintiff showed Marinelli, he said "they don't look that bad," and told Plaintiff to run some water on the cuts and he would be fine. (Dkt. No. 1 at ¶ 22.) Plaintiff claims that he started screaming and Marinelli just walked away. *Id.* Plaintiff wrote to Kemp the same day. In the letter, Plaintiff told Kemp that he had attempted suicide by cutting his arms open, and Marinelli laughed when he showed him. (Dkt. Nos. 1 at ¶ 20; 27–1 at 13.) Plaintiff asked Kemp to arrange for him to talk to someone other than Marinelli and informed Kemp that the next time he tried suicide, he would not just cut himself but would hang himself and make no mistakes. *Id.* Kemp did not respond. (Dkt. No. 1 at ¶ 20.) The letter is not referenced in Defendants' statement of material facts. (Dkt. No. 46.) Marinelli denies the incident occurred and claims that if it had, he would not have responded in the manner Plaintiff has alleged.

(Dkt. Nos. 46–1 at ¶ 36; 48 at ¶ 36.) Plaintiff's mental health records, which have been submitted by Defendants, include no reference to the suicide attempt Plaintiff claims to have made. (*See* Dkt. Nos. 47–1 and 48–1.)

On September 10, 2010, Marinelli conducted another SHU 90–day mental health evaluation of Plaintiff, which confirmed that Plaintiff's Mental Health Level remained at Level 6 and did not require any mental health treatment at that time. (Dkt. Nos. 46–1 at ¶ 39; 48 at ¶ 35; 47–1 at 5–6.) On September 21, 2010, Plaintiff wrote a second letter to Hogan. (Dkt. Nos. 1 at ¶ 21; 27–1 at 7.) In the letter, Plaintiff asked Hogan to come visit Upstate to see what was going on and to help him. According to Plaintiff, the inmates on the mental health caseload were off their medications and were screaming, banging, and throwing things. Plaintiff claimed to be unable to sleep, or eat, and told Hogan that when the mental health staff came around, including Marinelli, they just laughed at everyone and didn't try to talk or do anything about the situation. *Id.* Hogan did not respond. (Dkt. No. 1 at ¶ 21.) There is no reference to the letter in Defendants' statement of material facts. (Dkt. No. 46–1.)

**\*9** Plaintiff wrote to Kemp again on October 14, 2010. (Dkt. Nos. 1 at ¶ 20; 27–1 at 12.) In the letter, Plaintiff told Kemp that he had been reading and found out that Kemp and his friends had been violating the law by not treating people for their mental illnesses, and that he planned to sue him. Plaintiff wrote that he could not understand how people could look at a person like him as the scum of the earth but see Kemp as a good guy that he would never treat people the way Kemp did. (Dkt. No. 27–1 at 12.) Kemp did not reply. (Dkt. No. 1 at ¶ 20.) There is no reference to the letter in Defendants' statement of material facts. (Dkt. No. 46–1.)

On November 8, 2010, Plaintiff sent a formal complaint against Marinelli to Hogan "as outlined in NYCRR § 701.2(A), (C), (E)," and requested that Hogan follow the regular procedure of the Grievance Committee. (Dkt. Nos. 1 at ¶ 21; 27–1 at 5.) In the letter, Plaintiff referenced his previous complaints to Hogan of May 3 and September 21, 2010, and Hogan's failure to take action. (Dkt. No. 27–1 at 5.) The gist of Plaintiff's complaint against Marinelli was that Plaintiff disclosed his long history of mental illness and that the parole board had informed him he needed to take a mental health unit program before he could be released. *Id.* Marinelli said

he had reviewed Plaintiffs file and would help him. *Id.* Instead, Plaintiff was taken off his medication and received no treatment at all. *Id.* Plaintiff described the single cell SHU section where he was housed as being filled with mentally ill inmates who were not being treated by the mental health staff and were banging and screaming all night, cutting themselves, smearing feces, and refusing to eat. *Id.* Plaintiff informed Hogan of the letters he had sent to Kemp with no response, and that Marinelli had done nothing to improve the situation. *Id.* Hogan did not respond. (Dkt. No. 1 at ¶ 21.) The formal complaint is not referenced in Defendants' statement of material facts. (Dkt. No. 46–1.)

Plaintiff was transferred from Upstate to Clinton Correctional Facility on November 15, 2010. (Dkt. Nos. 46–1 at ¶ 40; 48 at ¶ 37.) At that time, Plaintiff's Mental Health Level was still 6, and he did not require any mental health services. *Id.;* Dkt. No. 48–1 at 1.

**B. Healy** [12]
According to Plaintiff, in the early morning of October 21, 2010, he made a rope from his sheets and hanged himself in the shower. (Dkt. No. 1 at ¶ 23.) In his Complaint, Plaintiff alleged that Healy and two other corrections officers entered Plaintiff's cell and cut him down and then began beating him with their hands and feet. *Id.* Plaintiff begged them to stop. *Id.* Healy and the other two officers made Plaintiff promise not to hang himself again and left his cell. *Id.* Healy warned Plaintiff that if he tried writing up the incident he would really wish he were dead. *Id.* Later in the day, Plaintiff cut his wrist and showed Healy, who again did not obtain help for Plaintiff from the mental health or medical staffs. *Id.* at ¶ 24.

**C. Plaintiff's Alleged Lack of Proper and Adequate Dental Care**
**\*10** On August 29, 2010, while eating breakfast, one of Plaintiffs teeth cracked and lost its filling, which left Plaintiff in pain and unable to eat on one side of his mouth. (Dkt. No. 1 at ¶ 48.) Plaintiff claims that he thereafter submitted a number of sick call slips to the dental department requesting assistance and sent letters to Defendant Miller, a dentist at Upstate, asking for help on September 6 and 14, 2010. [13] *Id.* at ¶ 29.

On October 5, 2010, Plaintiff submitted Grievance No. UST 44009–10, in which he complained that he had been in pain for over a month because of a lost filling and had written to the dental department several times but had not been called out. (Dkt. Nos. 46–1 at ¶ 74; 49–2 at 4.) In his Declaration, Dr. Miller has stated that he investigated the claim and determined that no dental call out slips had been received from Plaintiff during that time period, as Plaintiff has claimed (*see* Dkt. No. 1 at ¶ 49), but made no mention of Plaintiff's September 6 and 14, 2010, letters. [14] (Dkt. Nos. 46–1 at ¶ 75; 49 at ¶ 19.)

Prior to filing the grievance, Plaintiff had gone to a dental appointment on September 29, 2010. (Dkt. Nos. 1 at ¶ 50; 46–1 at ¶ 51; 49 at 3.) When he arrived for the appointment, he learned from the hygienist that he was there for a cleaning, not to treat his lost filling and cracked tooth. (Dkt. No. 1 at ¶ 50.) Plaintiff's dental records confirm his claim that he informed the dental hygienist of the lost filling at the September 29th appointment, and Miller acknowledges that Plaintiff's dental records reflect that he informed the hygienist about the lost filling, and states that Plaintiff was scheduled for a follow-up appointment on November 3, 2010, to address the lost filling concern. (Dkt. Nos. 46–1 at ¶¶ 51, 53–54; 49 at ¶¶ 10–13; 49–1 at 3.) The hygienist's note did not indicate that Plaintiff complained of pain from the lost filling, and Dr. Miller has opined that a lost filling without significant pain is not emergent and does not require immediate dental treatment. (Dkt. Nos. 46–1 at ¶¶ 78–79; 49 at ¶¶ 22–23.)

On November 3, 2010, Dyer and Corrections Officer Burgess escorted Plaintiff from his cell for an Alcohol and Substance Abuse Treatment Program ("ASAT") evaluation and a dental call-out. (Dkt. Nos. 46–1 at ¶¶ 55–56; 51–2 at ¶¶ 6–7.) The ASAT evaluation was to be conducted in the room next to the block dental office. *Id.* Plaintiff claims that he told Dyer he wanted to refuse the ASAT call out because he was really in pain and couldn't eat or sleep and really needed to see the dentist. (Dkt. No. 1 at ¶ 55.) Dyer is alleged to have told Plaintiff that he made the rules, and the rules were that if Plaintiff refused one call out, he refused both. (Dkt. No. 1 at ¶ 56.) Dyer denies that Plaintiff ever told him he was in pain or that he wanted to skip the ASAT evaluation in order to see the dentist sooner. (Dkt. Nos. 46–1 at ¶ 57; 51–2 at ¶ 8.)

**\*11** Plaintiff was placed in a holding pen, and while he was waiting to see the dentist, Dyer escorted him to the ASAT evaluation. (Dkt. Nos. 46–1 at ¶¶ 58–59; 51–2 at ¶ 10.) After the ASAT evaluation, Plaintiff was returned to the holding pen to wait for the dentist. (Dkt. Nos. 46–1 at ¶ 60; 51–2 at ¶ 11.) According to Dyer, while Plaintiff was waiting in the holding pen, he began yelling at the dental escort that he was going to be seen next by the dentist. (Dkt. No. 46–1 at ¶ 61; 51–2 at ¶ 12.) Plaintiff claims that when a corrections officer tried to take Plaintiff to see the dentist, Dyer waived him away and told Plaintiff if he made it into the dentist at all he would be last, and he might not get in there at all. (Dkt. No. 1 at ¶ 57.) Dyer contends that he did not threaten Plaintiff in any way, and the only thing he said to him was "Jones, stop causing a disturbance," when Plaintiff was yelling at the dental escort. (Dkt. Nos. 46–1 at ¶¶ 62–63; 51–2 at ¶ 13.)

According to Dyer, Santamore spoke to the dentist, who said he had priority cases ahead of Plaintiff. (Dkt. Nos. 46–1 at ¶ 64; 51–2 at ¶ 14.) Plaintiff was told to quiet down or he would be returned to his cell, and when he continued to yell and create a disturbance, Santamore ordered Plaintiff returned to his cell. (Dkt. Nos. 46–1 at 65–66; 51–2 at ¶ 16.) Dyer claims he had no interest or intent in interfering with Plaintiff's dental care and was only complying with Santamore's order in taking Plaintiff back to his cell. (Dkt. Nos. 46–1 at ¶¶ 67–68; 51–2 at ¶¶ 17–19.) Dyer does not address Plaintiff's execution of a Refusal of Medical Examination And/Or Treatment with regard to the dental work he was supposed to have done on November 3, 2010, or the notation by Plaintiff "I've been waiting & staff refuse to let me see dental staff. I can see a number of inmates going in but corrections staff refuse to let me see dental staff." (Dkt. Nos. 46–1 at ¶ 70; 49–1 at 6.) Plaintiff claims that it was dismissed Defendant Burgess who demanded Plaintiff sign the dental form and go back to his cell or he would be seeing more than the dentist with a visit to the facility hospital. (Dkt. No. 1 at ¶ 59.) According to Dr. Miller, he did not see Plaintiff on November 3, 2010, and was not involved in obtaining the refusal signed by Plaintiff. (Dkt. Nos. 46–1 at ¶ 72; 49 at ¶ 16.)

Plaintiff's tooth was not fixed before he left Upstate, but according to Plaintiff, he was seen by dental approximately a week after being transferred to Clinton and received a temporary filling. (Dkt. No. 1 at ¶ 63.)

## IV. ANALYSIS

### A. Exhaustion of Administrative Remedies with Regard to Claims Against Defendants Healy, Marinelli, and Kemp

Defendants Healy, Marinelli, and Kemp seek summary judgment dismissing Plaintiffs' Eighth Amendment claims against them on the ground that Plaintiff failed to exhaust his administrative remedies. (Dkt. Nos. 46–2 at 4–7; 46–4 at ¶¶ 11–12.) The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, and expressly requires that no action shall be brought with respect to prison conditions under § 1983, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted. "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution in which they are confined. *Jones v. Bock,* 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) (citing *Woodford v. Ngo,* 548 U.S. 81, 88, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)).

### 1. *DOCCS Internal Grievance Program*

 **\*12** In New York State prisons, DOCCS has a well-established three-step Internal Grievance Program ("IGP"). *See* N.Y. Comp.Codes R. & Regs. ("NYCRR") tit. 7, Part 701 (2013); (Dkt. Nos. 46–1 at ¶¶ 82–84; 46–4 at ¶¶ 4–6.) The first step requires an inmate to file a grievance complaint with the facility's IGP clerk within twenty-one days. *Id.* at § 701.5(a). If there is no informal resolution, the Inmate Grievance Resolution Committee ("IGRC") holds a hearing. *Id.* at § 701.5(b)(2). If the grievance is denied by written decision of the IGRC, *id.* at § 701.5(b)(3), the grievant may appeal the IGRC's decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. *Id.* at 701.5(c) (1). The appeal of a grievance involving an institutional issue is decided by the superintendent of the facility. *Id.* at § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to the Central Review Committee ("CORC") for a decision under the process applicable to the third step. *Id.* at 701.5(c) (3)(i). The third step is an appeal to CORC, *id.* at 701.5(d) (1)(i), which issues a written decision. *Id.* at 701.5(d)(3) (ii).

If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford,* 548 U.S. at 93. Because failure to exhaust is an affirmative defense, defendants bear the burden of showing by a preponderance of the evidence that a plaintiff has failed to exhaust his available administrative remedies. *See Murray v. Palmer,* No. 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, at *4, 2010 U.S. Dist. LEXIS 32014, at *16 (N.D.N.Y. Mar.31, 2010); *Bailey v. Fortier,* No. 09–CV–0742 (GLS/DEP), 2012 WL 6935254, at *6, 2012 U.S. Dist. LEXIS 185178, at *14–15 (N.D.N.Y. Oct.4, 2012) (the party asserting failure to exhaust bears the burden of proving its elements by a preponderance of the evidence).

An exhaustion review does not end when defendants are found to have met the burden of establishing a plaintiff's failure to exhaust. "Once a defendant has adduced reliable evidence that administrative remedies were available to Plaintiff and that Plaintiff nevertheless failed to exhaust those administrative remedies, Plaintiff must then 'counter' Defendants' assertion by showing exhaustion unavailability, estoppel, or 'special circumstances' [under *Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004) ]." *Murray,* 2010 WL 1235591, at *4. *Hemphill* sets forth a three-part inquiry for district courts. First, courts must determine if administrative remedies were in fact available to plaintiff.

Second, courts must determine if the defendants are estopped from presenting non-exhaustion as an affirmative defense because they prevented the plaintiff inmate from exhausting his administrative remedies by "beating him, threatening him, denying him grievance forms and writing implements, and transferring him to another correctional facility." *Hemphill,* 380 F.3d at 688 (citing *Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004)). Generally, defendants cannot be estopped from asserting a non-exhaustion affirmative defense based upon the actions or inaction of other individuals. *Murray,* 2010 WL 1235591, at *5 & n. 26 (collecting cases).

 **\*13** Third, the Second Circuit explained in *Hemphill* that there are certain "special circumstances" in which even

though administrative remedies may have been available and the defendants may not be estopped from asserting a non-exhaustion defense, the inmate's failure to exhaust may be justified. [15] *Hemphill,* 380 F.3d at 686. "Special circumstances" have been found to include an incorrect but reasonable interpretation of DOCCS' regulations or failing to file a grievance in the precise manner prescribed by DOCCS as a result of threats. *See, e.g., Giano v. Goord,* 380 F.3d 670, 675–76 (2d Cir.2004) (failure to exhaust was justified where plaintiff inmate's interpretation of regulations was reasonable and prison official threatened inmate).

### 2. *Exhaustion as to Healy*

Plaintiff's allegations with respect to his Eighth Amendment deliberate indifference and excessive force claims are set forth in paragraphs 23 and 24 of his Complaint. (Dkt. No. 1 at ¶¶ 23–24.) Plaintiff has alleged in his Complaint that he "used the prisoner grievance procedure available at Upstate on 1/13/10 to exhaust all remedies all remedies were exhausted on 10/14/10 for issues in paragraph # 23 and # 24." (Dkt. No. 1 at ¶ 66.) The dates provided by Plaintiff make no sense given that Plaintiffs claims against Healy arise out of an incident that allegedly occurred on October 21, 2010. *Id.* at ¶¶ 23–24. Furthermore, as discussed below, the documentary evidence in the summary judgment record establishes that Plaintiff never appealed a grievance arising out of that incident to CORC. (Dkt. Nos. 46–1 at ¶ 88; 46–4 at ¶ 12 and 4.)

Jeffrey Hale (Hale"), Assistant Director of the IGP, is the custodian of records maintained by CORC, which renders the final administrative decisions under the DOCSS IGP. (Dkt. No. 46–4 at ¶ 2.) According to Hale, the issues alleged in Plaintiffs Complaint are proper subjects for grievances under the DOCCS IGP. (Dkt. Nos. 46–1 at ¶ 86; 46–4 at ¶¶ 8–9.) DOCCS Directive # 4040 stipulates that when an inmate appeals a grievance to CORC, it is DOCCS' policy to maintain grievance files for the current year and four prior years. (Dkt. Nos. 46–1 at ¶ 85; 46–4 at ¶ 7.) CORC maintains records in accordance with that policy and, in fact, the CORC computer database contains records of all appeals of grievances received from the IGP Supervisor, as well as those reviewed under the expedited procedure at § 701.8, since 1990. *Id.* Hale conducted a diligent search for appeals filed by Plaintiff based on grievances filed at the facility level and has submitted true

and correct copies of records maintained by CORC which show that Plaintiff did not appeal any grievance filed under §§ 701.5 or 701.8 claiming he was denied adequate mental health treatment or subjected to excessive force by Healy while he was confined at Upstate. [16] (Dkt. Nos. 46 at ¶ 87; 46–4 at ¶ 11 and 4.) Inasmuch as Plaintiff has failed to complete all of the steps of the DOCCS IGP with regard to his Eighth Amendment claim against Healy for deliberate indifference to his serious mental health needs and excessive force, he has failed to exhaust his administrative remedies. *See Woodford,* 548 U.S. at 90 (PLRA requires a plaintiff to complete all of the steps of the applicable IGP and to do so properly to exhaust administrative remedies).

**\*14** Plaintiff fairs no better under the three-part *Hemphill* inquiry. As to the first question, New York's IGP is "recognized as an 'available' remedy for purposes of the PLRA." *Taylor v. Chalom,* No. 9:10 CV 1494 (NAM/ DEP), 2011 WL 6942891, at \*4, 2011 U .S. Dist. LEXIS 150512, at \*12 (N.D.N.Y. Dec.13, 2011). That the grievance procedure was made available to, and actually used by, Plaintiff during his incarceration, is clear from his history of grievances revealed by Hale, and the grievance Plaintiff filed regarding his lost filling. (Dkt. Nos. 46–1 at ¶¶ 74, 82–85; 46–4 at 6–77; 49–2 at 4.)

Furthermore, there is no evidence in the record that Healy interfered in any way with efforts by Plaintiff to file a grievance against him under the IGP and, therefore, no basis for an estoppel. Third, the record is devoid of evidence of "special circumstances" excusing Plaintiff's failure to exhaust. To the contrary, Plaintiff has alleged in conclusory fashion in his Complaint that he did exhaust. *See Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) (conclusory assertions are not enough to avoid summary judgment when the movant has set out a documentary case).

Therefore, the Court finds that Plaintiff has failed to exhaust his administrative remedies with regard to his Eighth Amendment claims against Defendant Healy and recommends that Healy be granted summary judgment on that ground.

### 3. *Exhaustion as to Marinelli and Kemp*

In his Complaint, Plaintiff has alleged that he filed complaints regarding his claims against Marinelli and

Kemp with the OMH all the way up the chain to the OMH Commissioner. (Dkt. No. 1 at ¶ 65.) Although Plaintiff alleged that he also filed a grievance with Upstate, presumably under the IGP, and appealed the results to be sure exhaustion was complete, Hale's search of CORC records revealed no appeal by Plaintiff of a grievance complaining of his mental health treatment by Marinelli and Kemp. (Dkt. Nos. 1 at ¶ 65; 46–1 at ¶ 87; 46–4 at ¶ 11 and 4.) Therefore, the Court finds that Plaintiff did not exhaust his claims against Marinelli and Kemp under the IGP. *See* Woodford, 548 U.S. at 90.

That, however, does not end the Court's inquiry on the exhaustion because issues remain as to whether administrative remedies were in fact available to Plaintiff under the IGP with respect to his claims against Marinelli and Kemp [17] and whether there were special circumstances excusing exhaustion. *See* Hemphill, 380 F.3d at 686.

Plaintiff was questioned at his deposition [18] as to whether he filed a grievance against Marinelli:

> Q. Did you file any grievances against Mr. Marienelli (sic)?
>
> A. I think I did, yes.
>
> Q. Okay.
>
> A. I'm pretty sure I did. Or—because also, when you're dealing with M.H.U., you can't really grieve them. You have to write a complaint through—
>
> Q. To the medical—.
>
> A. —to the mental health department.
>
> Q. Right. Right. So the mental health issues go to mental health and the medical issues go to the medical director.
>
> **\*15** A. Go to medical, right.
>
> Q. Yes, okay.
>
> A. So even though you could write it, but its not going to get anywhere. So you have to they tell you

> Q. That's why you wrote to Kemp?
>
> A. Kemp, exactly.
>
> Q. Yup. Okay.
>
> A. That's the whole reason why, because you know, even they they're not even allowed to discuss your mental health file with the grievance people because of confidentiality. So that's kind of like a catch twenty-two.
>
> Q. So you complained to Kemp because, as you understood it, that's the proper process?
>
> A. Right.

(Dkt. No. 46–3 at 35–36.)

In determining whether administrative remedies are available to a particular inmate, a court should "be careful to look at the applicable set of grievance procedures, whether city, state, or federal." Abney v. McGinnis, 380 F.3d 663, 668 (2d Cir.2004) (citation and internal quotation marks omitted). Administrative remedies are not available "where the relevant administrative procedure lacks authority to provide any relief or to take any action whatsoever in response to a complaint." Booth v. Churner, 532 U.S. 731, 736, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001).

Hale has described Plaintiff's Eighth Amendment claims against Marinelli and Kemp as the "proper subject for DOCCS grievance procedures as outlined under 7 NYCRR § 701.1 et seq." (Dkt. No. 46–4 at ¶ 9.) However, both Marinelli and Kemp are OMH, not DOCCS employees, and § 701.3(f) provides:

> (f) Outside agencies excluded.
>
> Any policy, regulation or rule of an outside agency (e.g., the division of parole, immigration and customs enforcement, the office of mental health, etc.) or action taken by an entity not under the supervision of the commissioner is not within the jurisdiction of the IGP.

7 NYCRR, § 701.3(f).

Grievances involving actions taken by OMH have in at least some instances been determined by DOCCS to be outside the jurisdiction of the DOCCS IGP based upon § 701.3(f). *See, e.g.,* Westmoreland v. Conway, No. 07–

CV–104(Sr.), 2009 WL 2991817, at * 3–4, 2009 U.S. Dist. LEXIS 83993, at * 9–10 (W.D.N.Y. Sept.15, 2009) (plaintiff's allegation that his grievance was dismissed because the IGRC lacked authority over the OMH found to comport with 7 NYCRR § 701.3(f)); *Christian v. Goord,* No. 9:03–CV–901 (FJS/GJD), 2006 WL 1459805, at * 5, 2006 U.S. Dist. LEXIS 32143 (N.D.N.Y. May 22, 2006) (both the IGRC and Superintendent on appeal concluding that the OMH is outside the purview of DOCCS and the IGP).

Given the foregoing, the Court cannot conclude that administrative remedies under the IGP were available to Plaintiff with regard to his claims against OMH employees Marinelli and Kemp, or that Plaintiff's understanding that the IGP did not apply to OMH employees did not constitute a special circumstance excusing failure to exhaust, and recommends that Marinelli and Kemp be denied summary judgment on exhaustion grounds.

## B. Merits of Plaintiff's Eighth Amendment Claim Against Marinelli and Kemp

**\*16** Defendants Marinelli and Kemp also seek summary judgment on the merits. Claims that prison officials have intentionally disregarded an inmate's serious medical needs fall under the Eighth Amendment umbrella of protection from the imposition of cruel and unusual punishments. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Prison officials must ensure, among other things, that inmates receive adequate medical care. *Id.* (citing *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). The requirement extends to adequate mental health care. *See Langley v. Coughlin,* 888 F.2d 252, 254 (2d Cir.1989) ("We think it plain that from the legal standpoint psychiatric or mental health care is an integral part of medical care. It thus falls within the requirement of *Estelle v. Gamble,* [429 U.S. 97, 104 (1976) ], that it must be provided to prisoners."); *Guarneri v. Hazzard,* No. 9:06–CV–985 (NAM/DRH), 2010 WL 1064330, at 16, 2010 U.S. Dist. LEXIS 26966, at *52 (N.D.N.Y. Mar.22, 2010) (the denial of mental health care may constitute a violation of the Eighth Amendment).

To state a claim for denial of medical or mental health care, a prisoner must demonstrate (1) a serious medical (mental) condition, and (2) deliberate indifference. *Farmer,* 511 U.S. at 834–35; *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) ("*Hathaway I*" ). The first prong is an objective standard and considers whether the medical condition is sufficiently serious. *See Caiozzo v. Foreman,* 581 F.3d 63, 72 (2d Cir.2009) (citation and punctuation omitted). A "serious medical condition" has been described as "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations omitted), *accord Hathaway I,* 37 F.3d at 66; *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical or mental health condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702–03.

The second prong is a subjective standard. Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Id.* at 703 (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)) ("*Hathaway II*" ). "Deliberate indifference requires more than negligence but less than conduct undertaken for the very purpose of causing harm." *Hathaway I,* 37 F.3d at 66. To establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer,* 511 U.S. at 835. An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle,* 429 U.S. at 105–06. Moreover, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." *Id.* at 106. Stated another way, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.; see also Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) ( "Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation.")

**\*17** The record evidence does not support Plaintiffs claim that he suffered from a serious mental illness during his time at Upstate. [19] Furthermore, even though Plaintiff was deemed to have some degree of mental illness during at least a part of his time at Upstate, given the evidence of the mental health treatment Plaintiff received from OMH during his time there, no reasonable jury could find that either Marinelli or Kemp had been deliberately indifferent to Plaintiff's mental health issues and treatment needs. [20] See *Selevan v. N. Y. Thruway Auth., 711 F.3d 253, 256 (2d Cir.2013)* (finding summary judgment appropriate where the nonmovant fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim") (internal quotation marks omitted).

Plaintiff arrived at Upstate with a diagnosis of ASPD, a prescription for Topamax, a Mental Health Level of 3, and a Transfer Progress note from Great Meadow stating his mental status was alert and oriented, with no evidence of a thought disorder, and a generally neutral and stable mood. (Dkt. Nos. 46–1 at ¶¶ 2–11; 47–1 at ¶¶ 5–16.) When Plaintiff was seen by Marinelli for a mental health assessment less than a week after his arrival at Upstate in September of 2009, Marinelli observed no mental health concerns or issues. (Dkt. Nos. 46–1 at ¶ 12; 48 at ¶ 12.)

Marinelli nonetheless placed Plaintiff on "active status" so he would continue to received OMH services and continued to see Plaintiff either cell-side or for a private therapy session on a regular basis until he was terminated from service on March 30, 2010, with Kemp's approval, after Plaintiff had denied the need for services and his Mental Health Level had been upgraded to a Level 6. (Dkt. Nos. 46–1 at ¶¶ 13–17, 19–36; 47–1 at 1; 48 at ¶¶ 30–33.) During that time, Plaintiff generally reported no mental health issues or concerns, and Marinelli reported that he observed no evidence of mental health issues. *Id.* Marinelli's notes are largely in accord with Dr. Wurzberger's positive assessment of Plaintiff's mental status on October 9, 2009, when he, not Marinelli or Kemp as Plaintiff claims, took Plaintiff off Topamax. (Dkt. Nos. 46–1 at ¶¶ 18–19, 43–44.)

Even after Plaintiff's OMH services were terminated, Marinelli continued to do SHU 90–day mental health evaluations, which confirmed that Plaintiff's Mental Health Level remained at Level 6 from March 30, 2010,

until his transfer to Clinton on November 15, 2010. (Dkt. No. 46–1 at ¶¶ 38–40; 47–1 at 1; 48 at ¶¶ 34–35, 37.)

While Plaintiff claims that Marinelli responded to his attempt at suicide by cutting his arms with a piece of metal by telling him it did not look too bad and to run water on the cuts (Dkt. No. 1 at ¶ 22), Marinelli denies the incident ever occurred, and there is no evidence of such an incident in Plaintiff's mental health records. (Dkt. Nos. 46–1 at ¶ 36; 48–1 at 1–118.) Even assuming, *arguendo,* that the incident did occur, Plaintiff has failed to present evidence that the cuts he inflicted were severe enough to cause serious injury or constitute what could reasonably have been construed by Marinelli as a serious attempt at suicide, and that Marinelli showed deliberate indifference.

**\*18** In light of the foregoing, the Court recommends that Defendants Marinelli and Kemp be granted summary judgment on the merits on Plaintiffs Eighth Amendment medical indifference claim.

**C. Eighth Amendment Claim Against Dyer**
Plaintiff claims that Defendant Dyer, a corrections officer, showed deliberate indifference to his serious dental needs by preventing him from seeing the dentist for his lost filling on November 3, 2010. (Dkt. No. 1 at ¶¶ 55–58.) Although medical deliberate indifference claims are most-often asserted against medical personnel, non-medical personnel may also be held liable for deliberate indifference to medical needs, in this case dental needs, when a plaintiff proves that "prison personnel intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problem known to the attendant prison personnel." *Hodge v. Coughlin,* No. 92 Civ. 0622(LAP), 1994 WL 519902, at \* 11, 1994 U.S. Dist. LEXIS 13409, at \* 31 (S.D.N.Y. Sept.22, 1994) (citations and internal quotation marks omitted), *aff'd,* 52 F.3d 310 (2d Cir.1995) (table); *Baumann v. Walsh,* 36 F.Supp.2d 508, 512 (N.D.N.Y.1999) (same).

The record evidence shows that on November 3, 2010, Dyer was tasked with escorting Plaintiff to an ASAT evaluation and an appointment with the dentist to have his lost filling addressed. (Dkt. Nos. 1 at ¶ 55; 46–1 at ¶¶ 55–56; 51–2 at ¶¶ 22–23.) Dyer took Plaintiff to his ASAT evaluation while Plaintiff was waiting to see the dentist, and after the evaluation returned Plaintiff to the holding pen to wait to see the dentist. (Dkt. No. 46–1 at ¶¶ 58–

60; 51–2 at ¶¶ 10–11.) There is no evidence in the record indicating that Plaintiff would have seen the dentist any sooner had he not gone to the ASAT evaluation.

According to Dyer, while waiting to see the dentist, Plaintiff created a disturbance by yelling at the dental escort that he was going to be seen next by the dentist and was told to quiet down or he would be returned to his cell. (Dkt. Nos. 46–1 at ¶¶ 61–63; 51–2 at ¶¶ 12, 16.) At his deposition, Plaintiff admitted that he had started complaining and had called out to the dentist that he needed to see him. (Dkt. No. 46–3 at 53.) Dyer told Plaintiff to "stop causing a disturbance." (Dkt. Nos. 46–1 at ¶¶ 62–63; 51–2 at ¶ 13.)

Corrections Sergeant Santamore spoke to the dentist and was told there were priority cases ahead of Plaintiff. (Dkt. Nos. 46–1 at ¶ 64; 51–2 at ¶ 14.) Plaintiff continued to yell and create a disturbance, and Santamore ordered Dyer to take Plaintiff back to his cell. (Dkt. No. 46–1 at ¶¶ 65–66; 51–2 at ¶ 16.) Dyer followed the order and returned Plaintiff to his cell. (Dkt. No. 46–1 at ¶¶ 67–68; 51–2 at ¶¶ 17–19.)

Even if Dyer was aware that Plaintiff was "really in pain," as Plaintiff has alleged and Dyer has denied (Dkt. Nos. 1 at ¶ 55; 46–1 at 46–1 at ¶ 57; 51–2 at ¶ 8), there is no evidence in the record supporting Plaintiff's claim that Dyer intentionally delayed his access to dental care, or that Dyer was responsible for Plaintiff missing his dental appointment on November 3, 2010. Therefore, the Court recommends that Dyer be granted summary judgment on Plaintiff's Eighth Amendment claim for deliberate indifference to his serious dental needs.

**D. Eighth Amendment Claim Against Miller**

**\*19** Plaintiff claims that Dr. Miller was deliberately indifferent to his serious dental needs in violation of the Eighth Amendment by his failing to attend to a lost filling in a timely manner. (Dkt. Nos. 1 at ¶¶ 49, 76.) Plaintiff must, as with his claim for indifference to his serious mental health needs, show that he had a serious dental condition and that it was met with deliberate indifference from Miller. *See Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000); *Chance,* 143 F.3d at 702. A serious medical, or in this case dental condition, exists where "the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain .' " *Chance,* 143 F.3d at 702 (citing

*Gutierrez v. Peters,* 111 F.3d 1364, 1373 (7th Cir.1997). Specifically, "[a] cognizable claim regarding inadequate dental care ... can be based on various factors, such as the pain suffered by the plaintiff ... the deterioration of the teeth due to a lack of treatment ... or the inability to engage in normal activities." *Chance,* 143 F.3d at 703 (citations omitted); *see also Berry v. Wright,* No. 04–CV–0074(Sr.), 2011 WL 231626, at \*5, 2011 U.S. Dist LEXIS 6347, at \* 12–13 (W.D.N.Y. Jan.24, 2011) ("[a]lthough delay in providing a prisoner with dental treatment, standing alone, does not constitute an eighth amendment violation, ... a prisoner can state a claim of deliberate medical indifference under section 1983 if 'the delay was deliberate and that it caused him to suffer unnecessary and wanton infliction of pain.' ") (quoting *Hunt v. Dental Dep't,* 865 F.2d 198, 200 (9th Cir.1989)).

"When the basis of a prisoner's Eighth Amendment claim is a temporary delay ... in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged delay ... in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious' to support an Eighth Amendment claim." *Washington v. Farooki,* No. 9:11–CV–1137 (TJM), 2013 WL 3328240, at \*6, 2013 U.S. Dist. LEXIS 92623, at \*16 (N.D.N.Y. July 2, 2013) (quoting *Brunskill v. Cnty. of Suffolk,* No. 11–CV–586 (SJF)(ETB), 2012 WL 2921180, at \*3, 2012 U.S. Dist. LEXIS (E.D.N.Y. July 11, 2012)).

Dr. Miller has opined that "the loss of a filling without significant pain is not an emergent situation and does not require immediate dental treatment." (Dkt. Nos. 46–1 at ¶ 79; 49 at ¶ 23.) In this case, however, Plaintiff claims that the lost filling caused him a great deal of pain, left him unable to eat out of one side of his mouth, and prevented him from sleeping. (Dkt. Nos. 1 at ¶ 48; 27–1 at 31–32; 49–2 at 4.) There is no evidence to the contrary in the summary judgment record. Plaintiff lost the filling on August 29, 2010, was not scheduled to have the lost filling addressed by the dentist until November 3, 2010, more than two months later, and ultimately did not have the lost filling taken care of until shortly after he was transferred to Clinton on November 15, 2010. (Dkt. Nos. 1 at ¶¶ 48, 63; 46–1 at ¶¶ 54, 72.) Even assuming without deciding that the great pain and problems with eating and sleeping Plaintiff claims resulted from the lost filling, when considered with the delay in treatment, constituted a serious dental condition, Dr. Miller is entitled to summary

judgment because the record evidence does not show deliberate indifference on his part. *See Hunt,* 865 F.2d at 200 (deliberate indifference where the delay was deliberate and caused plaintiff to suffer unnecessary and wanton infliction of pain).

**\*20** The note in Plaintiff's dental records from his September 29, 2010, cleaning, which Miller acknowledged seeing noted only that Plaintiff had complained of a lost filling and said nothing about being in pain as a result. (Dkt. Nos. 46–1 at ¶ 51; 49–1 at 3.) Because in Miller's opinion, absent a report of significant pain, the lost filling was not emergent (Dkt. Nos. 46–1 at 79; 49 at ¶ 23), failure to schedule an appointment to fix the tooth until November 3, 2010, does not show culpable recklessness on his part. *See Hathaway II,* 99 F.3d at 553.

While Plaintiff claims to have submitted a number of sick call slips to the Dental Department requesting assistance, Miller investigated Plaintiff's chart in response to an October 5, 2010, grievance filed by Plaintiff and determined that no call-out slips from Plaintiff had been received by the Dental Department during the relevant time period. (Dkt. Nos. 46–1 at ¶ 75; 49 at ¶ 19.) Moreover, while Plaintiff also claims to have sent letters of September 6 and September 14, 2010, to Miller advising him of his great pain and requesting assistance regarding the lost filling (Dkt. Nos. 1 at ¶¶ 49; 27–1 at 31–32), Dr. Miller has stated in his Declaration that he was not aware of any request by Plaintiff for dental treatment in the fall of 2010 that he ignored. (Dkt. Nos. 46–1 at ¶ 80; 49 at ¶ 24.) There is no evidence in the record refuting that statement, no evidence that Dr. Miller ever saw the dental slips Plaintiff claims to have submitted or the letters Plaintiff claims to have sent to him. Given Plaintiff's failure to respond to Defendants' L.R. 7.1 Statement of Material Facts, he is deemed to have admitted that Miller's investigation revealed no call-out slips regarding Plaintiff's lost filling, and Miller was not aware of any request by Plaintiff for dental treatment in the fall of 2010 that was ignored. (Dkt. Nos. 46–1 at ¶¶ 75, 80; 49 at ¶¶ 19, 24.)

Finally, the evidence shows that an appointment was scheduled for November 3, 2010, for Plaintiff's lost filling to be addressed, and Miller had no part in Plaintiff being returned to his cell before seeing him, or in the execution of the Refusal of Medical Examination and/or Treatment form. (Dkt. Nos. 46–1 at ¶¶ 67, 72; 49 at ¶ 16; 51–2 at ¶ 17.) Plaintiff was transferred to Clinton shortly thereafter

where his tooth was fixed. (Dkt. No. 46–1 at ¶ 73; 49 at ¶ 17.)

In light of the foregoing, the Court recommends that Miller be granted summary judgment on Plaintiff's Eighth Amendment deliberate indifference claim against him.

### E. Qualified Immunity

Defendants contend that if the Court were to find that their actions violated Plaintiff's rights, they are entitled to qualified immunity. (Dkt. No. 46–2 at 15–18.) Inasmuch as the Court is recommending that Defendants be granted summary judgment on other grounds, it finds it unnecessary to reach the qualified immunity argument.

### F. John Doe Defendants # 1–6

**\*21** Plaintiff has asserted claims against John Doe Defendants # 1–6 in this action. There is nothing in the record showing that any of the John Doe Defendants have been identified and served in this lawsuit which was commenced nearly three years ago. (Dkt. No. 1.) The discovery completion deadline in the case was January 18, 2014, more than a year ago. (Dkt. No. 32.) The Court finds that Plaintiff has had ample time and opportunity to discover the identity of the John Doe Defendants and serve them. Given Plaintiff's failure to do so, the Court recommends the *sua sponte* dismissal of John Doe # 1–6 from the action for failure to prosecute. *See Delrosario v. City of N.Y,* No. 07 Civ.2027(RJS), 2010 WL 882990, at \* 5, 2010 U.S. Dist. LEXIS 20923, at \* 12 (S.D.N.Y. Mar.4, 2010) (*sua sponte* dismissing claims against John Doe Defendants for failure to prosecute "[w]here discovery was closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe Defendants ."); *Coward v. Town & Vill. of Harrison,* 665 F.Supp.2d 281, 301 (S.D.N.Y.2009) ("Where a plaintiff has had ample time to identify a John Doe defendant but gives no indication that he has made any effort to discover the defendant's name, the plaintiff simply cannot continue to maintain a suit against the John Doe defendant.") (citation and internal quotation marks and punctuation omitted).

**ACCORDINGLY,** it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 46) be **GRANTED IN ITS ENTIRETY;** and it is further

RECOMMENDED that Plaintiff's claims against John Doe Defendants # 1–6 be DISMISSED WITHOUT PREJUDICE from this action due to Plaintiff's failure to prosecute; and it is hereby

ORDERED, that the Clerk provide Plaintiff with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision m *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72.

Dated: January 30, 2015.

**All Citations**

Slip Copy, 2015 WL 791547

Footnotes

1   Although with the exception of the claims dismissed on Eleventh Amendment grounds, Plaintiff was granted leave to amend, no amended complaint has been filed.

2   References to page numbers in citations to documents filed with the Clerk refer to the page numbers assigned by the Court's electronic filing system.

3   Plaintiff will be provided with copies of unpublished decisions cited herein in accordance with *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2008) (per curiam).

4   N.D.N.Y. L.R. ("L.R.") 7.1(b)(3) provides that '[w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown."

5   Plaintiff's Complaint in this case was properly verified under 28 U.S.C. § 1746. (Dkt. No. 1 at 17–18.) *See LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham,* 185 F.3d 61, 65–66 (2d Cir.1999) (use of the language "under penalty of perjury" substantially complies with § 1746).

6   *See also Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1030–31 (9th Cir.2001) (holding it unfair to the district court, other litigants, and the movant to impose a duty on the district court to "search and sift the factual record for the benefit of a defaulting party.")

7   The Second Circuit has recognized that district courts "have the authority to institute local rules governing summary judgment submissions, and have affirmed summary judgment rulings that enforce such rules. Rules governing summary judgment practice are essential tools for district courts permitting them to efficiently decide summary judgment motions by relieving them of the onerous task of hunting through voluminous records without guidance from the parties ." *N.Y. State Teamsters Confer, Pension and Ret. Fund v. Express Servs., Inc.,* 426 F.3d 640, 647 (2d Cir.2005) (citation and internal punctuation and quotation marks omitted).

   L.R. 7.1(a)(3) provides that on a summary judgment motion movants submit a "Statement of Material Facts" setting forth in numbered paragraphs, each material fact about which the moving party contends there is no genuine issue. Each fact shall set forth a specific citation to the record where the fact is established .... The moving party shall also advise pro se litigants about the consequences of their failure to respond to a motion for summary judgment .... The opposing party shall file a response to the Statement of Material Facts .... *The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."*

8   *See Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d. Cir.2004) ("[I]n determining whether the moving party has met its burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts]. It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

9   Defendants have complied with L.R. 7.1(a)(3) and L.R. 56.2 by providing Plaintiff with the requisite notice of the consequences of his failure to respond to their summary judgment motion. (Dkt. No. 46.)

10  Where a fact has been included in Defendants' Statement Pursuant to Rule 7.1(a)(3) (Dkt. No. 46–1), docket references are made herein to both the Statement and the record evidence cited in support of the fact.

11    According to Marinelli, PIMS stands for "Progressive Inmate Movement System," established for the standardization of a system of progressive advancements for SHU inmates based upon behavioral adjustment. (Dkt. No. 48 at ¶ 20 n. 3.)

12    Defendant Healy seeks summary judgment solely on failure to exhaust grounds and has submitted no factual evidence with regard to Plaintiff's Eighth Amendment claim against him. (*see* Dkt. No. 46–1 at ¶¶ 82–86, 88.) The background facts included herein are from Plaintiff's verified Complaint.

13    Copies of the letters, which were identified as exhibits in the Complaint were submitted by Plaintiff in opposition to Defendants' earlier motion to dismiss and are considered herein as a part of Plaintiff s Complaint. (Dkt. Nos. 1 at ¶ 49; 27–1 at 31–32.)

14    In its denial of Plaintiff's grievance, the Internal Grievance Resolution Committee wrote "Grievant should write to the Dental Dept. and address his concerns and to be scheduled. writing to the IGRC isn't the proper procedure to obtain an appt." (Dkt. No. 49–2 at 3.) The Committee appears to have made no reference to the September 6 and 14, 2010, letters Plaintiff claims to have sent to Miller. *Id.;* Dkt No. 27–1 at 31–32.

15    Subsequent to *Hemphill,* the Supreme Court decided *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). The question addressed in *Woodford* was whether "a prisoner can satisfy the [PLRA's] exhaustion requirement by filing an untimely or otherwise procedurally defective administrative grievance or appeal." *Id.* at 83–84. The Supreme Court resolved the question in the negative, explaining that the PLRA requires "proper exhaustion" "using all steps that the agency holds out, and doing so properly (so that the agency addressed the issues on the merits)." *Id.* at 90 (citation omitted). Although the Second Circuit has acknowledged that there is some question as to whether the estoppel and special circumstances inquiries in *Hemphill* survived *Woodford,* the Court has as yet found it unnecessary to decide the issue and appears to still be considering all three *Hemphill* inquiries in exhaustion cases. *See, e.g., Amador v. Andrews,* 655 F.3d 89, 102–03 (2d Cir.2011) (finding it unnecessary to decide whether *Hemphill* is still good law because plaintiff had failed to establish that defendants were estopped from raising non-exhaustion as an affirmative defense).

16    Defendants have submitted the grievance files on the grievances listed as having been appealed to CORC by Plaintiff (Dkt. No. 46–4 at 4) so that the Court has been able to ascertain that none of them involved Plaintiff's claims against Healy. *Id.* at 8–77.

17    As noted above, Defendants have the burden of showing that the administrative remedy was actually "available" to Plaintiff. *See Murray,* 2010 WL 1235591, at *4.

18    Defendants submitted Plaintiff's deposition transcript in support of their summary judgment motion. (Dkt. No. 46–3.)

19    Plaintiff's letters to Kemp and Hogan regarding his mental health problems and alleged lack of proper care, with the exception of his complaints about Marinelli's reaction to his alleged suicide attempt discussed below, were far too general and conclusory to create an issue of material fact as to the seriousness of his mental health issues in light of the mental health records submitted by Defendants. (Dkt. No. 27–1 at 5–13.)

20    A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference. *Chance v. Armstrong,* 143 F.3d at 703. Nor does the fact that an inmate feels that he did not get the level of medical attention he deserved, or that he might prefer an alternative treatment support a constitutional claim. *Sonds v. St. Barnabas Hosp. Correc. Health Services,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001) (citing *Dean v. Coughlin,* 804 F.2d 207 (2d Cir.1986).

---

**End of Document**                                              © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 1103045
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Valery LATOUCHE, Plaintiff,

v.

Michael C. TOMPKINS, C.O., Clinton Correctional
Facility; Dean E. Laclair, C.O., Clinton Correctional
Facility; Jeffrey R. Ludwig, C.O ., Clinton
Correctional Facility; Michael B. King, Sgt.,
Clinton Correctional Facility; D. Mason, C.O.,
Clinton Correctional Facility; B. Malark, C.O.,
Clinton Correctional Facility; John Reyell, C.O.,
Clinton Correctional Facility; Bob Fitzgerald, R.N.,
Clinton Correctional Facility; John Doe, C.O. (C.O.
Gallery Officer Company Upper F–6); John Doe,
C.O. (Mess Hall Supervising C.O.), Defendants.

No. 9:09–CV–308 (NAM/RFT).
|
March 23, 2011.

**Attorneys and Law Firms**

Valery LaTouche, Ossining, NY, pro se.

Eric T. Schneiderman, Attorney General for the State
of New York, Krista A. Rock, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**

NORMAN A. MORDUE, Chief Judge.

**INTRODUCTION**

**\*1** In this *pro se* action under 42 U.S.C. § 1983,
plaintiff, an inmate in the custody of the New York State
Department of Correctional Services ("DOCS"), claims
that defendants violated his Eighth Amendment rights as
a result of a physical altercation. Defendants moved for
summary judgment pursuant to Rule 56 of the Federal
Rules of Civil Procedure (Dkt. No. 46) and plaintiff
opposed the motion. (Dkt. No. 53). The motions were
referred to United States Magistrate Judge Randolph F.

Treece for a Report and Recommendation pursuant to 28
U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c).

Magistrate Judge Treece issued a Report and
Recommendation (Dkt. No. 60) recommending that
defendants' motion be granted in part and denied in
part. Specifically, Magistrate Judge Treece recommended
awarding summary judgment dismissing the following:
(1) plaintiff's claims for monetary relief against all
defendants in their official capacity; (2) plaintiff's claims of
medical indifference against defendant Fitzgerald; and (3)
plaintiff's allegations of verbal harassment by defendant
Mason. Magistrate Judge Treece also recommended
denying defendants' motion for summary judgment
on plaintiff's excessive force claims against defendants
Tompkins, LaClair, Mason, Malark and Reyell and
plaintiff's failure to protect claims against defendants
Ludwig and King.

Defendants filed specific objections to portions of the
Report and Recommendation arguing: (1) that the
Magistrate Judge erred in "overlooking" plaintiff's failure
to comply with Local Rule 7.1(a) (3); (2) that
the Magistrate Judge erred when he failed to apply the
*Jeffreys* exception as plaintiff's testimony was incredible
as a matter of law; and (3) plaintiff's excessive force claims
against defendant Reyell are subject to dismissal for lack
of personal involvement. (Dkt. No. 61). Plaintiff does not
object to the Report and Recommendation. (Dkt. No. 62).

In view of defendants' objections, pursuant to 28 U.S.C.
§ 636(b) (1)(c), this Court conducts a *de novo* review of
these issues. The Court reviews the remaining portions of
the Report–Recommendation for clear error or manifest
injustice. *See Brown v. Peters,* 1997 WL 599355, *2–3
(N.D.N.Y.), af'd without op., 175 F.3d 1007 (2d Cir.1999);
see also Batista v. Walker,* 1995 WL 453299, at *1
(S.D.N.Y.1995) (when a party makes no objection to a
portion of the report-recommendation, the Court reviews
that portion for clear error or manifest injustice). Failure
to object to any portion of a report and recommendation
waives further judicial review of the matters therein. *See
Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993).

**DISCUSSION**

**I. Local Rule 7.1(a)(3)**

The submissions of *pro se* litigants are to be liberally construed. *Nealy v. U.S. Surgical Corp.,* 587 F.Supp.2d 579, 583 (S.D.N.Y.2008). However, a *pro se* litigant is not relieved of the duty to meet the requirements necessary to defeat a motion for summary judgment. *Id.* (citing *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 50 (2d Cir.2003)). Where a plaintiff has failed to respond to a defendant's statement of material facts, the facts as set forth in defendant's Rule 7.1 statement will be accepted as true to the extent that (1) those facts are supported by the evidence in the record, and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment. *Littman v. Senkowski,* 2008 WL 420011, at *2 (N.D.N.Y.2008) (citing *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996)).[1]

**\*2** The record herein contains few undisputed facts. Plaintiff and defendants disagree on many of the events that transpired and provide conflicting accounts of the circumstances surrounding the incident. In support of the motion, defendants properly filed a Statement of Material Facts pursuant to Local Rule 7.1 and notified plaintiff about the consequences of his failure to respond to the motion for summary judgment. Plaintiff does not dispute that he received such notification from defendants. Plaintiff responded with a handwritten "Statement of Facts", without citations to the record, and failed to specifically admit or deny defendants' factual statements as required by Local Rule 7.1. However, plaintiff also annexed a copy of his deposition transcript. In the deposition, upon questioning from defense counsel, plaintiff testified as follows:

Q. ... Have you read the complaint?

A. Yes, ma'am.

Q. So, you are aware of its contents?

A. Yes, ma'am.

Q. Did anyone help you prepare the complaint?

A. No, ma'am.

Q. Are there any statements contained in the complaint that you now wish to change or modify?

A. I'm not sure.

Q. Well, let me ask you this: So, do you adopt this document under oath as true to the best of your knowledge?

A. Yes, ma'am.

Transcript of Plaintiff's Deposition at 13.

A verified complaint may be treated as an affidavit for the purposes of a summary judgment motion and may be considered in determining whether a genuine issue of material fact exists. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (the plaintiff verified his complaint by attesting under penalty of perjury that the statements in the complaint were true to the best of his knowledge). Based upon the aforementioned colloquy, the Court deems plaintiff's complaint to be "verified" and as such, will treat the complaint as an affidavit. *See Torres v. Caron,* 2009 WL 5216956, at *3 (N.D.N.Y.2009). While plaintiff has not formally and technically complied with the requirements of Local Rule 7.1(a)(3), his opposition to defendants' motion contains sworn testimony. In light of his *pro se* status and the preference to resolve disputes on the merits rather than "procedural shortcomings", to the extent that plaintiff's "Statement of Facts" and assertions in the complaint do not contradict his deposition testimony, the Court will consider those facts in the context of the within motion. *See Mack v. U.S.,* 814 F.2d 120, 124 (2d Cir.1987); *see also Liggins v. Parker,* 2007 WL 2815630, at *8 (N.D.N.Y.2007) (citing *Lucas v. Miles,* 84 F.3d 532, 535 (2d Cir.1996)). The Court has reviewed plaintiff's complaint and compared the allegations with the testimony presented at his deposition and adopts Magistrate Judge Treece's summary of the "facts" as presented by both parties.[2]

## II. *Jeffreys* Exception

Defendants argue that the Court should apply *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) and award summary judgment dismissing all claims of excessive force based upon plaintiff's implausible and contradictory claims.

**\*3** "It is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment' ". *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006)

(citing *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997) (unfavorable assessments of a plaintiff's credibility are not "within the province of the court on a motion for summary judgment")). A narrow exception to this general rule was created by the Second Circuit in *Jeffreys:*

> While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether "the jury could reasonably find for the plaintiff," and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account. Under these circumstances, the moving party still must meet the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor.

*Id.* at 554 (internal citations and citations omitted).

Here, while plaintiff relies exclusively on his own testimony, for *Jeffreys* to apply, the testimony must also be "contradictory and incomplete". In this regard, defendants argue that plaintiff's allegations are contradicted by his prior accounts of the incident. Defendants cite to the record and argue that plaintiff told Fitzgerald that, "I hit the officer first" and that "I was hurt when I was subdued". Moreover, defendants point out that these statements were documented in an Inmate Injury Report executed by plaintiff.

Plaintiff does not deny making the aforementioned statements. However, in his deposition, plaintiff explained those discrepancies and testified:

> Q. —did Nurse Fitzgerald ask you any questions while he was examining you?
>
> A. I think he asked me how am I feeling, how did this happen?
>
> Q. And what did you say?
>
> A. I told him I was nervous and that [sic] whatever officer D. Mason told me to tell him.
>
> Q. What did you say?

> A. I told him I was nervous and whatever officer D. Mason told me to tell him, which was that I got hurt being subdued—
>
> Q. Which was—
>
> A. —and that I started this.
>
> Q. And is that the truth?
>
> A. No.
>
> Q. Why did you tell the nurse that?
>
> A. Because I was being forced to.
>
> Q. Forced to how?
>
> A. By the officers that [sic] was there.
>
> Q. Did you sign a form admitting that you hit the officer first and you were hurt when you were subdued?
>
> A. Yes, ma'am.
>
> Q. Why did you do that?
>
> A. Because the [sic] officer D. Mason kept smacking me for me to do that.

Transcript of Plaintiff's Deposition at 53–54.

**\*4** In the Report and Recommendation, Magistrate Judge Treece concluded that plaintiff's "fear of retribution" was a plausible explanation for the discrepancies in his testimony. This Court agrees and adopts the Magistrate Judge's conclusions. *See Langman Fabrics v. Graff Californiawear, Inc.,* 160 F.3d 106, 112–13 (2d Cir.1998); *see also Cruz v. Church,* 2008 WL 4891165, at \*5 (N.D.N.Y.2008) ("[t]he Court notes that ... it would be have difficulty concluding that [the][p]laintiff's statement of June 5, 2005, and his statement of June 16, 2005, are wholly irreconcilable, given his proffered explanation that he made the statement of June 5, 2005, out of fear of retribution by [the] [d]efendants).

Defendants also argue that plaintiff cannot identify which individuals participated in the attack; that plaintiff's injuries are consistent with the brief use of force as described by defendants to subdue plaintiff; and that plaintiff's version is contradicted by defendants' affidavits. Magistrate Judge Treece found that plaintiff was able

to identify some individuals involved in the assault which, "stands in stark contrast to the plaintiff in *Jeffreys* who was unable to identify any of the officers involved in the alleged assault". Upon review of the record, as it presently exists, the Court agrees and finds that plaintiff's testimony is not wholly conclusory or entirely inconsistent to warrant application of the *Jeffreys* exception. *See Percinthe v. Julien,* 2009 WL 2223070, at \*7 (S.D.N.Y.2009) (the court rejected the defendants' argument that the plaintiff's claims were subject to dismissal for implausibility as his injuries did not reflect the attack that he described and his description of the incident changed over time holding that the plaintiff's testimony, "[did] not reach the level of inconsistency and lack of substantiation that would permit the Court to dismiss on these grounds").

Magistrate Judge Treece provided an extensive summary of the record and applicable law and found that the evidence did not support deviating from the established rule that issues of credibility are not be resolved on summary judgment. On review, the Court agrees with the Magistrate's recommendations and concludes that the *Jeffreys* exception does not apply. Accordingly, the Court accepts and adopts the Report and Recommendation on this issue.

### III. Reyell's Personal Involvement

Defendants argue that the Magistrate Judge erred when he failed to dismiss the complaint against Reyell on the grounds that he was not personally involved in the attack. Defendants claim that the "RRO erroneously cites plaintiff's declaration as stating that 'it was defendant Reyell and another officer who removed the shirt' ". Defendants claim that the declaration and complaint clearly state that, "Officer Rock orchestrated the removal of plaintiff's shirt" . [3] Defendants argue that the assertions in plaintiff's declaration (submitted in response to the motion for summary judgment) and complaint are contradicted by plaintiff's deposition testimony. Defendants claim that plaintiff testified that Reyell tried to cover up the incident by removing the shirt he was wearing.

**\*5** The Court has reviewed plaintiff's complaint, declaration and deposition transcript and finds defendants' summary of plaintiff's assertions to be

inaccurate. In plaintiff's complaint, on page 8, plaintiff alleges:

> Feeling extremely weak the claimant responded with a shake of his head. Once this performance was over with Correctional Officer R. Rock, the individual who held on to the photograph camera and who is responsible for capturing the claimant's injuries [sic] photos pointed to the claimant's bloody [sic] stain kitchen white colored uniform [ ] as co-workers....

> Correctional Officer D. Mason then roughly removed the article of clothing and with the help of on[e] other they discarded the item of clothings [sic].

In Paragraph 22 of plaintiff's declaration, he states:

> Officer Rock, the individual who held the photograph camera and was responsible for capturing LaTouche injuries pointed to LaTouche [sic] bloody kitchen white colored uniform to his coworker asking them to remove the article of clothing before he take [sic] any pictures. Mason then roughly removed the clothing and with the help of an other [sic] officer they discarded the items of clothing.

In his deposition, plaintiff testified:

Q. What about Defendant Reyell, why are you suing Reyell?

A. Because defendant Reyell, that's the officer that was holding the camera and he tried to cover up the incident.

Q. How so?

A. That's when him and the other officer that was there, when they was searching me, strip searching me they took my shirt and they kept screaming something about let's remove this bloodstained shirt, let's remove this bloodstained shirt, we can't have this for the camera.

\* \* \*

Q. Reyell and another officer took your shirt off?

A. Yes, ma'am.

Q. Do you remember the other officer's name?

A. No, ma'am.

Transcript of Plaintiff's Deposition at 63–64.

Here, the Magistrate Judge stated that any inconsistency or discrepancy [in plaintiff's testimony], "go[es] to the weight ... accorded to plaintiff's testimony". The Court agrees. Any discrepancies or inconsistencies in plaintiff's testimony are for a jury to assess. In the Second Circuit case of *Fischl v. Armitage,* the plaintiff/inmate alleged that he was assaulted in his cell by other inmates. *Fischl,* 128 F.3d at 54. The district court dismissed the plaintiff's complaint as against one defendant based upon "inconsistent statements". *Id.* The Second Circuit vacated the judgment of the district court holding:

> [T]he district court apparently questioned whether there had been an attack on Fischl at all, principally because of inconsistencies in his accounts of the event, his failure to report such an attack to prison workers in the area on that morning, and the failure of those workers to notice any indications that he had been beaten. That skepticism, however, rests on both a negative assessment of Fischl's credibility and the drawing of inferences adverse to Fischl.

> **\*6** Likewise, inconsistent statements by Fischl as to, for example, whether it was five, six, or seven inmates who attacked him, and as to what he observed or overheard just prior to the attack, go to Fischl's credibility. While inconsistencies of this sort provide ammunition for cross-examination, and they may ultimately lead a jury to reject his testimony, they are

not a proper basis for dismissal of his claim as a matter of law. The jury might well infer, for example, that while Fischl was under siege he was understandably unable to take an accurate census of the number of inmates holding him and kicking him in the face.

*Fischl,* 128 F.3d at 56.

In this matter, without a credibility assessment of plaintiff, the record does not warrant an award of summary judgment. Accordingly, the Court adopts the Magistrate's recommendation and denies summary judgment on this issue.

## CONCLUSION

It is therefore

**ORDERED** that the Report and Recommendation of United States Magistrate Judge Randolph F. Treece (Dkt. No. 60) is adopted; and it is further

**ORDERED** that for the reasons set forth in the Memorandum–Decision and Order herein, defendants' motion for summary judgment is granted in part and denied in part; and it is further

**ORDERED** that the Clerk provide copies of this Order to all parties.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1103045

Footnotes

1   Local Rule 7.1(a)(3) provides:
    Summary Judgment Motions
    Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits. It does not, however, include attorney's affidavits. *Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.*
    The moving party shall also advise *pro se* litigants about the consequences of their failure to respond to a motion for summary judgment. See also L.R. 56.2.

> The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs. *The Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.*

Local Rule 7.1(a)(3) (emphasis in original).

2    While the Court adopts Magistrate Judge Treece's recitation of defendants' and plaintiff's versions of the facts, the Court does not adopt the reasoning set forth in the Footnote 2 of the Report and Recommendation.

3    Officer Rock is not a defendant herein.

---

**End of Document**                                                   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Robinson v. Delgado, Not Reported in F.Supp. (1998)

1998 WL 278264

1998 WL 278264
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Anthony ROBINSON, Plaintiff,

v.

Jane DELGADO, Hearing Officer and
Lieutenant; and Donald Selsky, Director of
Inmate Special Housing Program, Defendants.

No. 96–CV–169 (RSP/DNH).
|
May 22, 1998.

**Attorneys and Law Firms**

Anthony Robinson, Veterans Shelter, Brooklyn, for
Plaintiff, Pro Se.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Attorney for Defendants, Albany, Ellen Lacy
Messina, Esq., Assistant Attorney General, of Counsel.

ORDER

POOLER, D.J.

**\*1** Anthony Robinson, a former inmate incarcerated
by the New York State Department of Corrections
("DOCS"), sued two DOCS employees, alleging that
they violated his right to due process in the course
of a disciplinary proceeding and subsequent appeal.
On September 9, 1997, defendants moved for summary
judgment. Defendants argued that plaintiff failed to
demonstrate that the fifty days of keeplock confinement
that he received as a result of the hearing deprived
him of a liberty interest within the meaning of the Due
Process Clause. Plaintiff did not oppose the summary
judgment motion, and Magistrate Judge David N. Hurd
recommended that I grant it in a report-recommendation
filed April 16, 1998. Plaintiff did not file objections.

Because plaintiff did not file objections, I "need only
satisfy [myself] that there is no clear error on the face
of the record in order to accept the recommendation."
Fed.R.Civ.P. 72(b) advisory committee's note. After
reviewing the record, I conclude that there is no clear
error on the face of the record. After being warned

by defendants' motion that he must offer proof in
admissible form that his disciplinary confinement imposed
an "atypical and significant hardship on the inmate
in relation to the ordinary incidents of prison life,"
Robinson failed to offer any such proof. *Sandin v. Conner,*
515 U.S. 472, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418
(1995). Consequently, he cannot maintain a due process
challenge. *Id.* Therefore, it is

ORDERED that the report-recommendation is
approved; and it is further

ORDERED that defendants' motion for summary
judgment is granted and the complaint dismissed; and it
is further

ORDERED that the Clerk of the Court serve a copy of
this order on the parties by ordinary mail.

HURD, Magistrate J.

REPORT—RECOMMENDATION

The above civil rights action has been referred to the
undersigned for Report and Recommendation by the
Honorable Rosemary S. Pooler, pursuant to the local
rules of the Northern District of New York. The plaintiff
commenced the above action pursuant to 42 U.S.C. § 1983
claiming that the defendants violated his Fifth, Eighth,
and Fourteenth Amendment rights under the United
States Constitution. The plaintiff seeks compensatory and
punitive damages.

Presently before the court is defendants' motion for
summary judgment pursuant to Fed. R. Civ. P. 56.
However:

> When a motion for summary
> judgment is made and supported as
> provided in this rule, an adverse
> party may not rest upon the mere
> allegations or denials of the adverse
> party's pleading, but the adverse
> party's response, by affidavits or
> as otherwise provided in this rule,
> must set forth specific facts showing
> that there is a genuine issue for
> trial. If the adverse party does not
> so respond, summary judgment, if

Robinson v. Delgado, Not Reported in F.Supp. (1998)

1998 WL 278264

appropriate, shall be entered against the adverse party.

Fed. R. Civ. P 56(e).

In addition, "[f]ailure to file any papers as required by this rule shall, unless for good cause shown, be deemed by the court as consent to the granting or denial of the motion, as the case may be." L.R. 7.1(b)(3).

**\*2** The defendants filed their motion on September 9, 1997. The response to the motion was due on October 23, 1997. It is now five months beyond the date when the plaintiff's response was due, and he has failed to file any papers in opposition to defendants' motion.

Therefore, after careful consideration of the notice of motion, affirmation of Ellen Lacy Messina, Esq., with exhibits attached, and the memorandum of law; and there being no opposition to the motion; it is

RECOMMENDED that the motion for summary judgment be GRANTED and the complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(l), the parties have ten days within which to file written objections to the foregoing report. *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696(1992). Such objections shall be filed with the Clerk of the Court with a copy to be mailed to the chambers of the undersigned at 10 Broad Street, Utica, New York 13501. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(l); Fed.R.Civ.P. 72, 6(a), 6(e); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of HHS,* 892 F.2d 15, 16 (2d Cir.1989); and it is

ORDERED, that the Clerk of the Court serve a copy of this Order and Report–Recommendation, by regular mail, upon the parties to this action.

**All Citations**

Not Reported in F.Supp., 1998 WL 278264

---

2002 WL 31040370
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Maurice SAMUELS, Plaintiff,

v.

Donald SELSKY, Glenn Goord, Paul Cecilia, Javier
Iurrue, G. Schwartzman, Dennis Bliden, Jeffery
McCoy, and Christopher P. Artuz, Defendants.

No. 01CIV.8235(AGS).
|
Sept. 12, 2002.

OPINION & ORDER

SCHWARTZ, District J.

I. Introduction

 **\*1**  Maurice Samuels alleges that while incarcerated at
the Green Haven Correctional Facility, [1] prison officials
searched his cell and confiscated a number of documents
which were deemed to be "subversive" and contraband.
Samuels claims that the materials, including theological
textbook excerpts, were of a Christian nature and were
used in a course he taught in the prison through the New
York Theological Seminary. Samuels' alleged possession
of these documents led to a misbehavior report and a
subsequent disciplinary hearing, for which Samuels was
sentenced to 180 days in keeplock and 180 days' loss
of packages, commissary privileges, and telephone use.
Samuels also alleges that instead of being punished as
per his disciplinary hearing, he was sentenced to a more
severe punishment, 180 days in a special housing unit
which entailed Samuels' being locked in his cell for twenty-
three hours per day. On the basis of the allegedly unlawful
sanctions to which he was subjected, Samuels has filed
the instant action pursuant to 42 U.S.C. § 1983 alleging
violations of, *inter alia,* his First Amendment and due
process rights, and seeks equitable relief and damages.
Defendants have filed a motion to dismiss the action
pursuant to FED. R. CIV. P. 12(b)(1) and (6), and argue
that they enjoy qualified immunity barring this suit. For
the reasons set forth below, defendants' motion is granted
in part and denied in part.

II. Factual Background [2]

Maurice Samuels is currently an inmate at the Sullivan
Correctional Facility. Since being incarcerated, Samuels
has taken a keen interest in religion. He identifies himself
as a member of the Five Percent Nation of Gods
and Earths. [3]  While confined at Sing Sing, he received
a degree of Master of Professional Studies in Prison
Ministry through the New York Theological Seminary
("NYTS"). *See* Complaint Pursuant to U.S.C.A. Section
1983 ("Complaint"), at 4; Exhibit ("Ex.") A. Upon
completion of his studies with the NYTS, Samuels was
transferred to the Green Haven Correctional Facility. [4] At
Green Haven, Samuels was assigned a clerk's position in
therapeutic "Reality and Pain Program." He subsequently
redesigned the program, creating the "Reality and Pain
Therapeutic Counseling Program." *See* Complaint, at 4.
During this period he also served as a volunteer inmate
instructor in the Black Studies program, and was later
assigned as a clerk in Green Haven's Senior Counselor's
Office, where he helped create a program for sex offenders.
*See id.* at 4.

The NYTS later began a certificate program in Christian
Ministry in conjunction with Marist College at Green
Haven. Samuels was invited to teach several courses
for the program, including a course entitled "World
Views and Values" and another entitled "Introduction to
Theology and Methods." *See* Complaint, at 4; Ex. E, at
12. Samuels is listed on the "Faculty and Administration"
page of the Certificate in Ministry Program brochure. *See*
Ex. E, at 10. In designing his theology course, Samuels,
in conjunction with Professor Mar Peter-Raoul (currently
the Chair of the Department of Philosophy and Religious
Studies at Marist College), prepared a syllabus which
included the following:

 **\*2**  a. This is an introductory approach to contemporary
Christian Theology, there will be a broad range of material
provided for the student so that they [sic] may see
the evolution of Christian Theology and Contemporary
Theologies, active in the world today.

b. The course is divided into different sessions (1) What is
Theology; (2) Philosophy & Theology; (3) Contemporary
Theology; (4) Political and Liberation Theology; (5)
Feminist/Womanist Theology; and (6) Black & Third
World Theology.

c. This is done so that the student can examine the evolution of Christian Theology and Contemporary Theologies, and arrive at the next step in the process, i.e. explore the [sic] how to do theology.

d. This introduction to theology course will be taught from a [sic] interdisciplinary and non-traditional approach.

Complaint, at 5. This syllabus was approved by the appropriate authorities from NYTS, Marist College, and the Department of Corrections ("DOCS"). *See id.* at 5.

The central issue in this case involves a search of Samuels' cell. On September 15, 1999, another member of the Five Percent Nation of Gods and Earths who was involved in the NYTS program was disciplined for allegedly possessing a pamphlet entitled "Awake" or "Awaken" which addressed topics such as racism in the criminal justice system and abuses of the Rockefeller drug laws. *See* Complaint, at 6. On October 19, 1999, the assistant inmate director for the NYTS certificate program was interrogated about the program and why some of its members were also members of the Five Percent Nation of Gods and Earths. At the time, Samuels was housed in the inmate honor block housing Unit and taught a pre-G.E.D. and adult basic education class in the morning and afternoon and taught his theology class in the evening. *See* Complaint, at 6. According to defendants, Sergeant Schwartzman, a member of the prison staff, received a report from a confidential informant that Samuels was a leader of a protest planned to occur around January 1, 2000 ("Y2K protest").[5] On October 20, 1999, Schwartzman ordered correction officers Williams and Kelly to search Samuels' cell. Samuels states that the confiscated materials included Marist College and NYTS course handouts for the certificate program, previously published material from the NYTS and Marist College, notes from newspaper articles, a manuscript Samuels had been working on since first attending the NYTS, and Kairos statements.[6] *See* Complaint, at 7. According to the Cell Search Report, contraband was found which consisted of a "folder of papers containing subversive material." Ex. G. On the same day, an Inmate Misbehavior Report was completed. *See* Ex. H. The rule violations are listed as 104.12 (action detrimental to the order of the facility) and 113.23 (contraband). *See id.* The narrative section of the Inmate Behavior Report states:

On the above date [10/20/99] and time while conducting a cell search on cell D-1-21 which houses inmate Samuels, Maurice 85A0184 the following contraband was found and recovered;

 **\*3** (1) Folder of papers containing subversive material These papers speak about inmate [sic] uniting together to fight against opositions [sic] such as the N.Y. parole system and other dept. of correction [sic] programs.

This material is consistant [sic] with information recieved [sic] that inmate Samuels has been active in urging others to participate in a demonstration on or about Jan. 1, 2000, which led to his cell being searched.

Ex. H. The form is signed by G. Williams, a correction officer, and G. Schwartzman. The documents are not identified, nor is there an explanation of why they were considered "subversive." Samuels repeatedly asked prison authorities to identify the "subversive" documents without success. *See, e.g.,* Exhibits ("Exs.") J, K, M, N, V, 7, 9. Defendants have not furnished the confiscated papers for the Court, and make no representation as to what documents were found in Samuels' cell or why they are considered "subversive." Samuels states that the materials seized by the prison officials is not literature pertaining to the Five Percent Nation of Gods and Earths but Christian ministry materials he used in teaching his class and which had previously been approved by the NYTS and prison authorities. *See* Complaint, at 5. Samuels also states that newspaper clippings and a manuscript he had been working on since 1986 were taken. *See* Affidavit [of Maurice Samuels] in Support of Opposition Motion ("Samuels Aff."), at ¶¶ 7-9.

Samuels was immediately placed in keeplock status pending a hearing on the misbehavior report. *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint ("Motion Brief"), at 3. Under DOCS rules, Samuels was entitled to an employee assistant to assist in his defense of the charges set forth in the misbehavior report.[7] An Assistant Selection Form was provided to Samuels, which instructed Samuels to select three people, one of whom would be assigned to him based on availability. *See* Ex. I. Samuels selected Hanna, Lawrence, and Schwartzman as his three choices. *See id.* Instead, Paul Cecilia was assigned to Samuels. *See* Motion Brief, at 3. Samuels alleges that instead of assisting him in the preparation of his case, Cecilia proceeded to

interrogate Samuels, asking him if he was in contact with Green Party candidate (formerly "Grandpa Munster") Al Lewis, whether he had any letters from him, whether he had any letters from outside organizations involved in prison reform, whether he was involved in any planned Y2K protest, and what the "Kairos" document was. *See* Complaint, at 8. Samuels further alleges that Cecilia did not explain the charges contained in the misbehavior report and failed adequately to conduct an investigation on Samuels' behalf. [8] Cecilia signed an Assistant Form on October 25, 1999, at 12:53 pm, indicating that he had interviewed witnesses, assisted as requested, and reported back to Samuels. *See* Ex. J. However, on October 26, Green Haven officials requested a one-day extension to hold a disciplinary hearing on the basis that the "assistant is trying to speek [sic] to with witiness [sic]." Ex. L. The extension was granted by "Alternate User 999SHURXR for 999SHU." *See id.* The name of the grantor is not listed on the computer printout.

**\*4** The "Tier III" disciplinary hearing was held on October 27, 1999. [9] At the hearing, two inmates and Dr. George W. Webber testified on Samuels' behalf (Webber testified by telephone). Webber is the director of the Certificate Program and president emeritus of the NYTS. Sgt. Schwartzman testified against Samuels. *See* Ex. O. Samuels also submitted a written brief for the hearing. *See* Ex. M. Samuels was found guilty of "demonstration" and "contraband" on November 9, 1999. The hearing officer, Javier Irurre, [10] summarized his findings as follows:

Statement of Evidence Relied Upon: Papers & hand written papers retrieved from your cell show statements inciting revolt and prison unrest. Confidential tape shows similarity between statements made in papers you have written and others in your possession with statements found in written material belonging other [sic] inmates inciting the so called Y2K revolt.
Confidential tape and testimony at the hearing establish a link between the statements in papers found in your cell and phamphlets [sic] circulating among prison population urging to strike in Y2K.

Reason for Disposition: Inciting revolt can not be tolerated in a correctional setting.

Ex. P. Samuels was punished with 180 days of keeplock, 180 days of loss of packages, 180 days of loss of commissary privileges, and 180 days of loss of phone privileges. *See* Ex. P; Complaint, at 11. The hearing officer did not impose special housing unit placement. *See* Ex. P; Complaint, at 11. The Court has not been furnished with a transcript of the hearing or of the "confidential tape" referred to by Irurre.

Samuels alleges that his due process rights were violated at the misbehavior hearing. He alleges that he failed to receive a timely hearing, that he received inadequate assistance from the employee assistant assigned to him (Cecilia), and that Dr. Mar Peter-Raoul was not permitted to testify on Samuels' behalf. *See* Complaint, at 9, 11. Samuels also protests the fact that the misbehavior report never specifies exactly what Samuels did to constitute "demonstration." *See id.* at 11. No written record was apparently made stating the reasons Dr. Peter-Raoul was not permitted to testify. Dr. Peter-Raoul later wrote a lengthy letter addressed to defendants Bliden, McCoy, and Irurre in which she explained the nature of the Kairos documents and stated her desire to serve as a witness for Samuels. *See* Complaint, at 10.

On November 8, 1999 (one day before Irurre found Samuels guilty of demonstration and contraband), Samuels submitted a detailed written brief to First Deputy Superintendent Dennis Bliden and "Jeff Macoy" [sic] on November 8, 1999, requesting that his misbehavior report be dismissed. *See* Ex. N. While waiting for a response to his letter, Samuels was transferred to the Upstate Correctional Facility, a special housing unit facility, where he was housed for 180 days. [11] *See* Complaint, at 11; Motion Brief, at 4; Plaintiffs' [sic] Memorandum of Law in Opposition to Defendants' Motion ("Opposition Brief"), at 27. Neither Samuels nor defendants provides an explanation as to why Samuels was transferred to the special housing unit facility. Jeff McKoy (listed in the caption as Jeffery McCoy) wrote to Samuels on November 12, 1999, advising him that he lacked the authority to overturn a Tier III disposition. *See* Ex. R. Bliden wrote to Samuels on November 18, 1999, stating that any appeal Samuels wished to file had to be directed to the Commissioner in Albany. He stated that "[u]ntil such time as we receive a decision from [Albany], I will not modify the disposition." Ex. U.

**\*5** As per Deputy Superintendent Bliden's instructions, Samuels submitted a seventeen-page letter to Donald Selsky, the Director of the Inmate Disciplinary Program,

in Albany. *See* Ex. V. In the course of his letter to Selsky, Samuels voices his procedurally and substantively-based arguments for dismissing his misbehavior adjudication. Selsky affirmed the November 9, 1999 hearing on January 6, 2000 on behalf of Glenn Goord, the Commissioner. [12] *See* Ex. 6. Samuels filed a request for a "time-cut" from the determination of the Superintendent on February 28, 2000. *See* Ex. 6. Prisoners' Legal Services of New York ("PLS") sent a letter to Selsky on March 2, 2000, asking him to reconsider his decision. On April 27, 2000, PLS sent a supplemental request for reconsideration, this time outlining in detail the legal bases for which Samuels' disciplinary charges should be withdrawn (by this point, Samuels had already served the imposed penalty; the letter asks Selsky to reverse the disciplinary hearing and expunge the disciplinary charges). *See* Ex. 9. Selsky did not alter his January 2000 decision. Samuels then appealed to the New York State Supreme Court, apparently by means of an Article 78 proceeding. The court, Canfield J., concluded that Samuels' appeal raised a substantial evidence question that could not be resolved by "reference to the objections in point of law." Decision and Order dated October 13, 2000. The court then transferred the matter to the Appellate Division, Third Judicial Department pursuant to N.Y. C.P.L.R. 7804(g). [13] *See id.*

Samuels then filed the instant action pursuant to 42 U.S.C. § 1983 based on defendants' alleged violations of his due process, First Amendment, and other constitutional rights, seeking equitable relief as well as compensatory and punitive damages. [14] The defendants move to dismiss the complaint pursuant to FED. R. CIV. P. 12(b)(1) (lack of subject matter jurisdiction) and (6) (failure to state a claim upon which relief can be granted). For the reasons set forth below, defendants' motion is granted in part and denied in part.

## III. Legal Standard

### A. *Pro Se* Complaints

The Second Circuit has repeatedly held that *pro se* complaints must be read more leniently than those prepared by lawyers. Recently, the Second Circuit noted that a "*pro se* complaint should not be dismissed unless 'it appears beyond doubt that the plaintiff[ ] can prove no set of facts in support of [his] claim[s] which would entitle [him] to relief.' " *Weixel v. Board of Educ. of the City of New York,* 287 F.3d 138,

145 (2d Cir.2002) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). Moreover, when considering a motion to dismiss a *pro se* complaint, "courts must construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." *Weixel,* 287 F.3d at 146 (quoting *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (internal quotation marks omitted)). The Second Circuit has also emphasized that a liberal reading of a *pro se* complaint is especially important when the complaint alleges civil rights violations. *See Weixel,* 287 F.3d at 146; *Weinstein v. Albright,* 261 F.3d 127, 132 (2d Cir.2001). Consequently, Samuels' allegations must be read so as to "raise the strongest arguments that they suggest." *Weixel,* 287 F.3d at 146 (quoting *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (internal quotation marks omitted)).

### B. Motions to Dismiss Pursuant to FED. R. CIV. P. 12(b)(1) & (6)

**\*6** Defendants move to dismiss the complaint pursuant to FED. R. CIV. P.12(b)(1) and (6). The standard of review for dismissal on either basis is identical. *See, e.g., Moore v. PaineWebber, Inc.,* 189 F .3d 165, 169 n. 3 (2d Cir.1999); *Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997). In either case, a court must assume as true factual allegations in the complaint and construe the complaint in the light most favorable to the plaintiff. *See, e.g., York v. Association of Bar of City of New York,* 286 F .3d 122, 125 (2d Cir.2002); *Shipping Fin. Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir.1998). While the question of subject matter jurisdiction goes to the power of the court to hear a case, the issue on a motion to dismiss is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *York,* 286 F.3d at 125 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)).

## IV. Legal Analysis

### A. Exhaustion of Administrative Remedies

#### 1. Legal Standards Governing Exhaustion of Administrative Remedies

Lawsuits by prisoners are governed by 42 U.S.C. § 1997e, which holds in part:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal

law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

Under this section, where a prisoner brings an action in a district court before exhausting all available administrative remedies, the action must be dismissed. A unanimous Supreme Court has recently interpreted the term "prison conditions" expansively, requiring an exhaustion of all available administrative remedies whether the inmate suit concerns a general prison condition (i.e., quality of food) or a discrete incident specific to one prisoner (i.e., excessive force). *See Porter v. Nussle,* 122 S.Ct. 983 (2002). The Court also held that the exhaustion requirement applies regardless of whether the administrative remedies are "plain," "speedy," or "effective," and also applies when the prisoner "seeks relief not available in grievance proceedings" such as monetary damages. *Id.* at 988.

As a preliminary matter, defendants concede that Samuels has exhausted all administrative remedies concerning his due process violations. *See* Defendants' Supplemental Memorandum of Law and Reply Memorandum of Law in Further Support of Their Motion to Dismiss ("Reply Brief"), at 9. Defendants' concession is apparently based on DOCS Directive No. 4040, which holds that:

> [T]he individual decisions or dispositions of the following are not grievable: [...] Media Review, disciplinary proceedings, inmate property claims (of any amount) and records review (Freedom of Information Requests, expunction). However, the policies, rules, and procedures of any of these programs or procedures may be the subject of a grievance.

**\*7** As noted above, Samuels unsuccessfully appealed his case within the prison facility and later to defendant Selsky in Albany, who denied it and denied reconsideration thereof.

Defendants argue, however, that "if a claim is incidental to a disciplinary determination [...] the fact that the disciplinary charge itself has been appealed does not excuse the failure to file a grievance." Reply Brief, at 9. Defendants thus seek to sever the alleged due process violations (for which Samuels has exhausted all administrative remedies) from several closely related claims-Samuels' claims protesting the confiscation of his papers, his transfer to the special housing unit, and DOCS policy regarding the Five Percent Nation of Gods and Earths (for which defendants argue Samuels has failed to exhaust all administrative remedies). *See* Reply Brief, at 9.

2. Confiscation of Documents

Defendants allege that the confiscation of the religious material is a matter separate from the underlying disciplinary hearing. While Samuels directly appealed his disciplinary adjudication, he concedes that he did not bring any complaint to the inmate grievance program. *See* Complaint, at 1. Defendants argue that Samuels' claim alleging the confiscation of religious material must therefore be dismissed because he failed to exhaust administrative remedies. *See* Reply Brief, at 9-10. Defendants represent that confiscation of religious documents from a cell is a grievable matter. The Court notes, however, that in similar cases inmates have been told that such confiscations are not grievable. *See, e.g., Allah v. Annucci,* 97 Civ. 607, 1999 U.S. Dist. LEXIS 7171, at \*2-\*3 (W.D.N.Y. Mar. 25, 1999) (plaintiff filed an inmate grievance protesting confiscation of religious material and was told such a seizure was not grievable).

As a preliminary matter, there is considerable confusion regarding exactly which documents were confiscated. Samuels has sought these documents numerous times; defendants have not made the documents available to him or to the Court. Initially, defendants stated that "Plaintiff specifically alleges in his compliant that the defendants confiscated a pamphlet called 'Awake'." Motion Brief, at 8. Later, defendants state that it is "unclear from plaintiff's complaint and response whether the pamphlet 'Awake' was confiscated from him or another." Yet since defendants conducted the search and confiscation of the materials from Samuels' cell, they should know whether "Awake" was confiscated from Samuels' cell. Nonetheless, they claim ignorance. Samuels himself makes his position clear: "material taken from Plaintiff [sic] cell [...] was not [...] Awake." Complaint, at 2. In a later brief, he writes "Complainant NEVER POSSESSED a pamphlet entitled "Awake." Opposition Brief, at 3 (emphasis in original).

In any event, it is clear that certain religiously-oriented documents were confiscated from Samuels' cell. Samuels seeks, *inter alia,* punitive and compensatory damages he claims to have suffered through defendants' alleged violation of his rights, including his First Amendment rights. *See* Complaint, at 13. Defendants argue that Samuels "never appealed any grievance relating to the confiscation of religious material" to the Inmate Grievance Program, citing an affidavit of Thomas G. Eagen ("Eagen Aff."), the Director of DOCS's Inmate Grievance Program, dated March 13, 2002. While this may be true, Samuels did protest the confiscation of documents in his direct appeal to Bliden and McKoy and later to Selsky. *See* Exs. N, V, 9. These appeals were denied.

**\*8** As noted, it is factually unclear whether seizures of religious materials may be grieved through the Inmate Grievance Program. However, even if such seizures are grievable, Samuels' alleged failure to exhaust all administrative remedies as required by 42 U.S .C. § 1997e(a) goes only to the narrow issue of the confiscation *qua* confiscation-the damage Samuels suffered from the loss of his property (such as the property value of the books). The main confiscation issue put forward by Samuels is not the confiscation in and of itself, but the confiscation insofar as it was the basis for the misbehavior adjudication. [15] This issue was already effectively grieved by Samuels through his direct appeal of his misbehavior determination, which *per se* implicated the confiscation of documents. Defendants argue nonetheless that any confiscation that took place is separate from the disciplinary hearing and thus must be separately grieved. The Court does not agree.

Disputes stemming from a disciplinary hearing are properly appealed directly and not through the Inmate Grievance Program. To the extent that the confiscation issue is a constituent element of the misbehavior adjudication, Samuels need not file an administrative grievance because he already sought review of the matter on his direct appeal. The recent case of *Flanagan v. Maly,* 99 Civ. 12336(GEL), 2002 WL 122921 (S.D.N.Y. Jan. 29, 2002), is instructive. In *Flanagan,* the plaintiff brought two separate claims-one stemming from inadequate access to medical and legal resources, and one stemming from an alleged due process violation in a disciplinary hearing. The court found that the plaintiff had not exhausted all administrative remedies with regard to medical and

legal access because he failed to utilize the Inmate Grievance Program. With regard to the disciplinary hearing, however, the court held that utilization of the grievance procedures was unnecessary because the plaintiff had already appealed the issues directly:

> To require [plaintiff] to file an administrative grievance in these circumstances would be absurd, and Congress cannot have intended such a requirement. When an inmate challenges the procedure at a disciplinary hearing that resulted in punishment, he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal. Pursuit of the appellate process that the state provides fulfills all the purposes of the exhaustion requirement of [§ 1997e(a) ] [16], by giving the state an opportunity to correct any errors and avoiding premature federal litigation. Once the alleged deprivation of rights has been approved at the highest level of the state correctional department to which an appeal is authorized, resort to additional internal grievance mechanisms would be pointless.

*Flanagan,* 2002 WL 122921, at *2. While the issue referred to in *Flanagan* was a due process defect in the disciplinary hearing (not at issue here because defendants concede that Samuels exhausted all available administrative remedies), the underlying point, that issues directly tied to the disciplinary hearing which have been directly appealed need not be appealed again collaterally through the Inmate Grievance Program, is applicable to the confiscation issue. Moreover, the confiscation in the instant case is part and parcel of the misbehavior adjudication-unlike the medical claim made in *Flanagan* which was divorced from the due process claim.

**\*9** Defendants rely on a single case in support of their contention that the confiscation issue and the disciplinary hearing issue are wholly separate, *Cherry v. Selsky,* 99

Civ. 4636(HB), 2000 U.S. Dist. LEXIS 9451 (S.D.N.Y. July 7, 2000). It is not completely clear which section of the opinion defendants are citing, because no pinpoint citation is given. In *Cherry,* Judge Baer held that the filing of a false misbehavior report by a corrections officer is a grievable matter. *See id.* at *21. However, *Cherry* is readily distinguishable from the instant case because in *Cherry,* the plaintiff had "not brought a claim with respect to the due process afforded him at his disciplinary hearing [...]." *Id.* at *15. In contrast, Samuels makes this claim. As a consequence, the due process violations, including the allegedly wrongful confiscation (to the extent it led to the misbehavior adjudication) may be appealed directly.

Consequently, while Samuels has not exhausted his administrative remedies with regard to the injuries he suffered from the confiscation *alone,* he has exhausted his administrative remedies with regard to the injuries he suffered from the confiscation inasmuch as the confiscation of the religious materials serves as the basis for the disciplinary hearing. [17]

### 3. Special Housing Unit Confinement

Defendants similarly argue that Samuels' claim of retaliatory confinement in a special housing unit is barred because he failed to exhaust all available administrative remedies. [18] It is not entirely clear whether Samuels is making an argument based on retaliation. On one hand, he states that "Plaintiff [sic] claim is not on issue of retaliation." Samuels Aff., at ¶ 4. Elsewhere, he argues that "Plaintiff should not need to fear imposition of [special housing unit] confinement because they [sic] have engaged in prison litigation and/or prison reform activity [...]." Opposition Brief, at 25. As noted above, after being sentenced, Samuels was apparently transferred to a special housing unit for 180 days, which involves confinement for twenty-three hours per day.

Defendants represent to the Court that confinement to a special housing unit is ordinarily grievable. *See* Reply Brief, at 11. Samuels failed to bring this grievance to the Inmate Grievance Program. However, Samuels argues, and defendants do not contest, that Samuels was transferred to the special housing unit as punishment for his misbehavior adjudication, even though he was sentenced to 180 days of keeplock. Consequently, his appeal of his misbehavior adjudication necessarily implicates his sentence-not only his *de jure* punishment

of 180 days of keeplock, 180 days' loss of telephone, package, and commissary privileges, but also his *de facto* punishment of 180 days of special housing unit confinement. *See Flanagan,* 2002 WL 122921, at *2. The transfer to a special housing unit potentially implicates due process concerns. *See, e.g., Tookes v. Artuz,* 00 Civ. 4969, 2002 WL 1484391, at *3 (S.D.N.Y. July 11, 2002) (noting that in the Second Circuit, confinement in a special housing unit for more than 101 days generally implicates a liberty interest protected by the Due Process Clause).

### 4. DOCS Policy Regarding the Five Percent Nation of Gods & Earths

**\*10** Samuels makes an oblique reference to the fact that DOCS has treated members of the Five Percent Nation of Gods and Earths unfairly and partially. *See* Opposition Brief, at 3. To the extent that Samuels has a claim regarding DOCS's treatment of members of the Five Percent Nation, it is not directly tied to his disciplinary hearing and has not been grieved through the Inmate Grievance Program. Moreover, he has not taken issue with DOCS policies regarding the Five Percent Nation in his appeal. Consequently, this issue is dismissed with prejudice.

### 5. Dismissal of Action

Defendants argue that because Samuels seeks to assert certain unexhausted claims, "the entire action should be dismissed," irrespective of the fact that some claims are (as defendants concede) exhausted. Reply Brief, at 11. Defendants point to no binding precedent in support of this contention. The only New York case cited by defendants is *Radcliffe v. McGinns,* 00 Civ. 4966 (LMM), 2001 U.S. Dist. LEXIS 15528 (S.D.N.Y. Sept. 27, 2001). However, *Radcliffe* does not support defendants assertion that dismissal of some unexhausted claims mandates the dismissal of all claims, because in that case the claims were unexhausted as to *all* defendants. On that basis, the *Radcliffe* court dismissed all claims without prejudice. This Court thus does not find that dismissal of the exhausted claims is warranted.

### B. Due Process

### 1. Samuels Pleads a Valid Due Process Claim

Defendants argue that Samuels does not plead a valid due process claim, claiming that Samuels does not identify

a liberty interest, protected by the Due Process Clause, of which he was deprived. *See* Motion Brief, at 9. Defendants state that "[other] then [sic] allege that he was sentenced to keeplock and transferred to Upstate, plaintiff does not allege any facts that distinguishes [sic] the disciplinary sentence from general prison population conditions." [19] *Id.* at 9. Defendants cite *Walker v. Goord,* 98 Civ. 5217(DC), 2000 U.S. Dist. LEXIS 3501, at *22 (S.D.N.Y. Mar. 22, 2000) for the proposition that a complaint that merely alleges that a plaintiff was housed in a special housing unit does not state a due process claim. *See* Motion Brief, at 10. In fact, *Walker* 's ruling is not so sweeping. In *Walker,* the court held that to establish a liberty interest, a prisoner "must establish that the restraint imposed creates an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Walker,* at *21 (quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)). The court also reiterated the Second Circuit's holding that there is no "bright-line rule regarding the length or type of sanction" necessary. *Walker,* at *21 (citation omitted). The prisoner must also establish that the state has granted its inmates a protected liberty interest in remaining free from that confinement or restraint. *Id.* at *21.

**\*11** Samuels is able to meet this burden. The deprivation of liberty Samuels suffered was onerous. He was moved from the inmate honor block housing unit to keeplock and then to a special housing unit. *See supra* note 11. Moreover, unlike the plaintiff in *Walker,* Samuels identifies the length of time he was punished (180 days). *See Walker,* at *22. In light of these facts, and given the length of his confinement, Samuels has met the *Sandin* test cited above. *See Tookes v. Artuz,* 00 Civ. 4969, 2002 WL 1484391, at *3 (S.D.N.Y. July 11, 2002). Additionally, the requirement of an appealable hearing, with certain procedural safeguards, *see infra,* indicates that the state has granted inmates a protected liberty interest in remaining free from keeplock and special housing unit placement.

Due process requirements for a prison disciplinary hearing are "in many respects less demanding than those for criminal prosecutions." *Espinal v. Goord,* 180 F.Supp.2d 532, 537 (S.D.N.Y.2002) (quoting *Edwards v. Balisok,* 520 U.S. 641, 647 (1997)). At the same time, "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Duamutef v. Hollins,* 297 F.3d 108, 112 (2d Cir.2002) (citation omitted). With

respect to Tier III hearings such as the one at issue here, the Fourteenth Amendment requires that:

(1) the inmate receive at least twenty-four hours written notice of the disciplinary charges against him;

(2) the inmate be permitted to call witnesses and present evidence "when permitting him to do so would not be unduly hazardous to institutional safety or correctional goals";

(3) the inmate be judged by a fair and impartial hearing officer;

(4) the disciplinary conviction be supported by some evidence; and

(5) the inmate be provided with a written statement of fact findings that support the disposition as well as the reasons for the disciplinary action taken.

*Espinal,* 180 F.Supp.2d at 538 (citing *Wolff v. McDonnell,* 418 U.S. 539, 563-69 (1974)) (internal citations omitted)).

2. Whether Samuels Received the Process Due Him
Defendants concede that Samuels was entitled to the aforementioned rights under *Wolff. See* Reply Brief, at 13. They argue, however, that Samuels received all the procedural safeguards due him. Before analyzing defendants points in detail, the Court notes the paucity of the record before it. While Samuels has provided nearly fifty exhibits, defendants have provided only a two-page affidavit by Inmate Grievance Program Director Thomas G. Eagen dated March 13, 2002, attached to which is a nine-line computer printout of what purports to be Samuels' grievance file. Defendants have failed to submit, *inter alia,* a transcript of the disciplinary hearing, a transcript or audio recording of the confidential witness statements, a written basis for the rejection of Samuels' witnesses, or a copy of the documents that were supposedly seized from Samuels' cell. While the Court is cognizant of the fact that the instant motion is not one for summary judgment, without these and other documents, it is difficult for this Court fully to evaluate the merits of the parties' arguments. More troubling is the fact that this is apparently not the first time an inmate has been sentenced to a special housing unit on the basis of evidence which has not been preserved for judicial review. Indeed, in *Cherry v. Selsky,* 99 Civ. 4636, 2000 U.S. Dist. LEXIS 9451, at *9-

*12 (S.D.N.Y. July 7, 2000), a case cited by defendants, the court noted that on more than one occasion, Selsky was forced to reverse his previous decision denying an inmate's appeal because the "record of [the disciplinary] hearing was incomplete and the 'confidential tape' was 'unavailable for judicial review.' " *Id.* at *9 (citation omitted). On the occasion cited by the *Cherry* court, the inmate's record was expunged, but only after the plaintiff had served 125 days in a special housing unit. *See id.* at *9.

### a. Witnesses

**\*12** Samuels argues that his due process rights were violated because he was not permitted to call Dr. Peter-Raoul as a witness at his disciplinary hearing. *See* Complaint, at 9; Ex. V, at 2. Defendants state, without explanation, that "it is clear that the proffered testimony would have been irrelevant and redundant." Motion Brief, at 13. The Court agrees with defendants that the right of an inmate to call witnesses in his defense is not limitless. Nevertheless, prison authorities' failure to allow an inmate to call a witness may be grounds for reversal, where the authorities fail to justify their actions. *See Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998). In this case, Dr. Peter-Raoul was apparently the author of some or all of the "subversive" materials and had close ties to the theological seminary program at the prison. According to Samuels, she also "assisted plaintiff with his course syllabus and provided much of the material utilized" therein. Complaint, at 9. She was therefore in a unique position to explain the appropriateness and relevance of the materials allegedly possessed by Samuels, who had in fact argued that the materials in question were issued to him through the NYTS program with the authorization of prison officials. *See, e.g.,* Complaint, at 5, Ex. V, at 2. The misbehavior hearing record sheet states that, "if any witness is denied [the opportunity to testify,] form 2176 explaining the reason for that determination must be given to the inmate and included as part of the record." Ex. O. No such form was filled out, and nowhere in the record do defendants explain or justify their exclusion of Dr. Peter-Raoul. *See* Ex. Q. Due process rights may be violated where prison authorities fail "without rational explanation" to obtain a witness requested by an inmate during a disciplinary hearing. *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998). Defendants' failure to justify their exclusion of Dr. Peter-Raoul potentially gives rise to a due process violation. [20] Dismissal is therefore inappropriate.

### b. Confidential Informant

Samuels also protests the fact that he was not furnished with statements of the confidential informant, and argues that the record is insufficient to permit an assessment of the reliability of the informant's testimony. The Second Circuit has noted that "even if due process does require a hearing officer to conduct an independent assessment of the informant's credibility, that 'would not entail more than some examination of indicia relevant to credibility rather than wholesale reliance upon a third party's evaluation of that credibility.' " *Espinal v. Goord,* 180 F.Supp.2d 532, 540 (S.D.N.Y.2002) (quoting *Russell v. Scully,* 15 F.3d 219, 223 (2d Cir.1993)). In the instant case, the lack of a full record does not permit the Court to determine whether Irurre, the presiding officer at the Tier III hearing, made the required "examination of indicia relevant to the credibility of the confidential informant[ ], whether by an independent assessment or otherwise." *Espinal,* 180 F.Supp.2d at 540. Consequently, dismissal is inappropriate, because it is uncertain whether Samuels' punishment was supported by constitutionally sufficient evidence.

### c. Assistance Provided by the Employee Assistant

**\*13** Samuels claims that his employee assistant, Cecilia, violated his due process rights by, *inter alia,* failing to explain the charges against Samuels, failing to provide Samuels with documentary evidence relating to the charges in the misbehavior report, failing to make a written record of the questions he asked the interviewees, failing to record the testimony of the witnesses he allegedly interviewed for Samuels, failing to interview the confidential informant on Samuels' behalf, and failing to interview one of the three witnesses requested by Samuels. *See* Complaint, at 9; Opposition Brief, at 22. Samuels also complains that his employee assistant did not assist in his defense but instead interrogated him about his alleged links to prison reform activists. *See* Ex. V, at 5-6.

Defendants concede that inmates have a limited right to assistance in misbehavior proceedings. *See Silva v. Casey,* 992 F .2d 20, 22 (2d Cir.1993) (per curiam). While defendants are correct in asserting that inmates do not have the right to appointed or retained counsel at a misbehavior hearing, *see Wolff v. McDonnell,* 418 U.S. 539, 570 (1974), they do have a right to assistance in "certain circumstances [in which they] will be unable to 'marshal evidence and present a defense' [...]." *Silva,*

992 F.2d at 22. Such situations include where the inmate is confined pending a superintendent's hearing. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.1(a)(4). The Green Haven Notice of Assistance form given to Samuels specifically states that an "inmate shall have the opportunity to pick an employee from established lists of persons who shall assist the inmate when a Misbehavior Report has been issued against the inmate if [...] [t]he inmate is keeplocked or confined to a special housing unit and is unable to prepare his defense." Ex. J. In the instant case, Samuels was entitled to an employee assistant because he was keeplocked immediately after the search of his cell and was unable to prepare his defense.

As noted, Samuels makes broad assertions as to the deficiency of his employee assistant. *See* Ex. V, at 3-8. Based on Samuels' factual assertions, it is possible that employee assistant Cecilia failed to provide even the "limited" assistance to which Samuels is entitled. [21] Such a failure potentially implicates Samuels' due process rights. *See* Ayers v. Ryan, 152 F.3d 77, 80-81 (2d Cir.1998). Because the instant motion requires that the Court accept Samuels' allegations as true, dismissal is inappropriate.

d. Actions of the Hearing Officer

With respect to the hearing officer, Irurre, Samuels makes a variety of claims, including the fact that Irurre prohibited Samuels from calling various witnesses and that he was partial. The Court has not been furnished with a copy of the hearing transcript. Because Samuels' claims potentially implicate constitutional rights, and because any holding on this issue requires that the Court make factual determinations, dismissal is inappropriate.

e. Timeliness of the Hearing

**\*14** Samuels claims that his due process rights were violated because his misbehavior hearing was held eight days after Samuels was confined following the search of his cell. Where an inmate is confined pending a disciplinary hearing (as was the case here), the hearing must be held within seven days of the confinement unless a later date is authorized by the commissioner or his designee. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-5.1(a). In this case, Samuels' rights were not violated. The search took place on October 20, 1999, and the hearing occurred on October 27, 1999. Under § 251-5.1, the date of the incident is generally excluded. *See, e.g.,* Harris v. Goord, 702 N.Y.S.2d 676 (N.Y.App. Div.3d

Dep't 2000) (holding that the fourteen-day period in § 251-5.1(b), which runs from the date of the writing of a misbehavior report, is calculated by excluding the day the report is written). Thus, Samuels' hearing was held within seven days of his detention. Moreover, as Samuels admits, prison officials sought and received permission to begin the hearing on October 27, 1999, as per the requirements of § 251-5.1(a). *See* Ex. L. For these reasons, Samuels' claim with regard to the timeliness of his hearing is dismissed.

f. Notice

Defendants reject Samuels' argument that he received inadequate notice of the charges against him. It is unclear from the record what notice Samuels received, either before or during the disciplinary hearing. While the Court is cognizant of the fact that inmates are entitled to fewer due process rights than other citizens, it is possible to read Samuels' allegations as presenting a valid due process claim. The Court notes, for instance, that inmate rule 104.12 provides that "[i]nmates shall not lead, organize, participate, or urge other inmates to participate in work-stoppages, sit-ins, lock-ins, or other actions which may be detrimental to the order of the facility." N.Y. Comp.Codes R. & Regs. tit. 7, § 270.2(B)(5)(iii). The Appellate Division has held that possession of threatening materials alone does not violate the rule because the inmate must actually lead, organize, participate, or urge other inmates to participate, and not merely intend to do so. *See, e.g.,* Abdur-Raheem v. Goord, 665 N.Y.S.2d 152, 153 (N.Y.App. Div. 4th Dep't 1997). While Samuels may have possessed the documents, it is unclear whether he received any notice of how he allegedly led, organized, or participated in (or urged others to participate in) a prohibited activity. Because the determination hinges on a factual determination, dismissal is inappropriate.

C. Retaliation

Samuels alleges that his misbehavior adjudication was based on the prison authorities' perception that members of the NYTS were behind the planned Y2K protest. *See* Complaint, at 3-6. Samuels alleges that the materials seized were not subversive and were of a Christian nature. Defendants move to dismiss the retaliation argument, arguing that the prison authorities' decision is entitled to deference. While this may be true, such deference is inappropriate on a motion to dismiss, particularly given the paucity of the record. Without, for example,

a transcript of the hearing, a transcript of the testimony of the confidential informant, or a copy of the allegedly subversive documents, the Court cannot blindly defer to the prison authorities. Consequently, dismissal is inappropriate. Defendants also argue that "even if it was improper to discipline plaintiff for possession of contraband, the evidence of plaintiff's involvement in the unauthorized demonstration provided a valid non-retaliatory basis for the disciplinary sanction and transfer." Reply Brief, at 19. This argument is incorrect for two reasons. First, the argument ignores the fact that the contraband documents and testimony of the confidential informant provide the basis for the prison authorities' finding that Samuels was involved in the demonstration. None of these documents is in the record before the Court; thus deference is inappropriate. Second, this argument ignores the fact that Samuels' punishment was ultimately based on the fact that he had violated two rules. His prison file reflects a guilty adjudication on two counts; also, had Samuels been disciplined for violating only one rule, his penalty would likely have been less.

**D. Personal Involvement**
**\*15** Defendants correctly note that liability of supervisory officials under 42 U.S.C. § 1983 may not be premised on the doctrine of *respondeat superior. See, e.g., Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002); *Emblen v. Port Auth. of New York/New Jersey,* 00 Civ. 8877(AGS), 2002 WL 498634, at \*10 (S.D.N.Y., Mar. 29, 2002). Consequently, a defendant's personal involvement in the alleged constitutional violation is required. *See, e.g., Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 690-95 (1978). Such personal involvement may be proven in a number of ways:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates

by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). The Court examines the alleged personal involvement of each defendant in turn.

**1. Donald Selsky**
Defendants concede Donald Selsky, Director, Special Housing/Inmate Disciplinary Program, was personally involved in the alleged due process violations cited by Samuels. The Court notes that Selsky, acting "on behalf of the commissioner," reviewed and affirmed Samuels' superintendent's hearing and denied Samuels' appeal. Ex. 6, V.

**2. Glenn Goord**
Defendants argue that Glenn Goord, DOCS Commissioner, has no personal involvement in this case, and that the only link to him in this action is a newspaper article. *See* Reply Brief, at 20-21. This is incorrect, however, since the denial of Samuels' appeal was written by Selsky on behalf of Goord. As noted, defendants concede Selsky's involvement. Goord had a duty to supervise his subordinate who purportedly acted in his name. [22] Without further evidence, the Court cannot say as a matter of law that Goord was not personally involved, since personal involvement can include gross negligence "in supervising subordinates who committed the wrongful acts." *Colon,* 58 F.3d at 873.

**3. Paul Cecilia**
Defendants concede Paul Cecilia's personal involvement.

**4. Javier Irurre**
Defendants concede Javier Irurre's personal involvement.

**5. Sergeant Schwartzman**
Defendants concede Sergeant Schwartzman's personal involvement.

**6. Dennis Bliden**

Defendants allege that Samuels never argues that Bliden had the ability to remedy the alleged constitutional violation. However, Bliden wrote to Samuels in response to his appeal of the misbehavior adjudication, stating, "You may appeal this hearing to the Commissioner in Albany. Until such time as we receive a decision from this office, *I will not modify the disposition.*" Ex. U (emphasis added). Significantly, Bliden did not state that he *could* not modify the disposition but stated that he *would* not. This provides at least *prima facie* evidence that Bliden had the authority to overturn the disposition. While further facts may reveal this to be untrue, at this stage dismissal is inappropriate.

### 7. Jeffery McKoy

 **\*16** Samuels fails to provide any support for McKoy's personal involvement in this action. Indeed, in responding to one of Samuels' appeals, McKoy wrote that "I do not have the authority to overturn Tier 3 dispositions." Ex. R. McKoy does not appear to have been complicit in any alleged deprivation of Samuels' rights, and, in contrast to Bliden, he plainly lacked the authority to overturn the misbehavior adjudication. Consequently McKoy was not personally involved in the matter and all claims against him are dismissed.

### 8. Christopher P. Artuz

Christopher P. Artuz is Green Haven's Superintendent. Samuels states that his involvement stems from his failure to respond to a note sent to him. Although the note to Artuz does not appear to be in the record before the Court, it is referenced in a note from Bliden to Samuels. *See* Ex. T ("This is in response to your memo of November 12, 1999 to Superintendent Artuz"). Samuels also alleges that Artuz failed to respond when contacted by Dr. Peter-Raoul and Dr. Webber, who sought to intervene on Samuels' behalf. *See* Opposition Brief, at 27. While it is not clear that Artuz was personally involved, the question of Artuz's involvement in this matter is a factual question. In such cases, dismissal should be denied. As the Second Circuit noted in *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986), "even if [the prison superintendent] did not actively affirm the conviction on administrative appeal, we cannot say, on this record, that as Superintendent [of the prison] he was not directly responsible for the conduct of prison disciplinary hearings [...]."

### E. Qualified Immunity

Defendants move to dismiss this action based on the qualified immunity of defendants. As defendants correctly point out, government employees are generally immune from liability for civil damages "when their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Duamutef v. Hollins,* 297 F.3d 108, 111 (2d Cir.2002) (citation omitted). As a preliminary matter, it should be noted that qualified immunity is only a defense to claims for money damages and are not a defense for equitable relief or injunctions. *See, e.g., Charles W. v. Maul,* 214 F.3d 350, 360 (2d Cir.2000). To the extent that Samuels seeks equitable relief, defendants' potential claims of qualified immunity are no bar.

The Court is unable to determine at this time whether the remaining defendants are entitled to qualified immunity in this case. The reason is that without having basic documentary evidence, including a transcript of the disciplinary hearing, a transcript of the testimony of the confidential informant, and the documents allegedly seized from Samuels' cell, the Court cannot determine whether these defendants violated Samuels' clearly established constitutional or statutory rights. Because it is a fact-intensive question, it cannot be disposed of at this stage.

### V. Conclusion

 **\*17** For the reasons set forth above, defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1) and (6) is DENIED with respect to defendants Selsky, Goord, Cecilia, Irurre, Schwartzman, Bliden, and Artuz. Defendants' motion is GRANTED with respect to Jeffery McKoy, and with respect to the issue of DOCS policy regarding the Five Percent Nation of Gods and Earths and with regard to the timeliness of Samuels' misbehavior hearing.

SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2002 WL 31040370

Footnotes

1    Defendants repeatedly state that the events giving rise to this action arose while Samuels was incarcerated at the Great Meadow Correctional Facility. Samuels states that the events in question happened at the Green Haven Correctional Facility. Moreover, Samuels' evidence, including the Inmate Disciplinary Report (Exhibit H), the Disciplinary Hearing Record Sheet (Exhibit O), and the Superintendent Hearing Disposition Report (Exhibit P) all note the Green Haven Correctional Facility. In light of the above, the Court determines that defendants' position that the events occurred at Great Meadow is incorrect. The Green Haven Correctional Facility is located in Dutchess County in the Southern District, while Great Meadow is located in Washington County in the Northern District. Defendants make no argument regarding the Court's jurisdiction with respect to the location of the events in question.

2    Unless otherwise indicated, the facts set forth below are gleaned from Samuels' submissions, because on a FED. R. CIV. P. 12(b)(1) or (6) motion, the adjudicating court must assume as true factual allegations made in the complaint. Defendants concede this fact. *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint, at 4. It should also be noted that Samuels brings this action *pro se.* As such, it is sometimes difficult to understand fully his contentions. Accordingly, the Court reads the (sometimes confusing) factual allegations in the light most favorable to Samuels.

3    The website of the University of Chicago's Divinity School provides a good summary of the beliefs of the adherents of the Five Percent Nation of Gods and Earths, commonly known as the "Five Percenters." *See* Jonathan Moore, *The Five Percenters: Racist Prison Gang or Persecuted Religion?,* SIGHTINGS, May 21, 1999, *available at* http://divinity.uchicago.edu/sightings/archive_1999/sightings-052199.html. The name of the group stems from its belief that only five percent of people are aware of and teach the truth. The term "Gods" refers to black male members; "Earths" refer to black female members. The group was founded by Clarence 13X, who left the Nation of Islam in 1964. According to Moore, "[m]any of the theological accoutrements of Black Muslim belief remain: many read the Qur'an and Elijah Muhammad's writings (especially his "Message to the Black Man"), and they hold to the exclusive divinity of black men." *Id.* (The Moore article, not part of the record, is provided for background purposes only). Samuels has included two pages outlining the differences between the Nation of Gods and Earths and similar black Muslim groups-the Nation of Islam and the Temple of Islam. *See* Exhibit B.

4    *See supra* note 1.

5    While denying a link to the Y2K protest, Samuels provides some background on the matter. According to Samuels, DOCS created a program at Green Haven through the Corcraft Industry Division Program known as the Recreational Cell Building Project ("Project"). The Project initially used inmate volunteers to build Inmate Recreational Cells at recently constructed S-Facilities (special housing institutions). According to Samuels, because of poor working conditions, low wages, and other factors, inmates increasingly refused to volunteer for the Project and sought other work assignments. Samuels alleges that DOCS personnel then began using the disciplinary process to systematically force inmates to work in the Project. *See* Complaint, at 3. Samuels also alleges that prison officials specifically targeted members of the NYTS and the Five Percent Nation of Gods and Earths for compelled work participation in the Project. *See id.* at 4. The planned Y2K protest, in which Samuels claims to have played no role, was intended to protest the program as well as prison conditions generally.

6    The Kairos Statements (referred to by Samuels as "Karios Statements") are critiques of traditional church dogma. The most famous Kairos statement originated as a critique of alleged church complicity in the white *apartheid* regime in South Africa.

7    *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.1 (2002):(a) An inmate shall have the opportunity to pick an employee from an established list of persons who shall assist the inmate when a misbehavior report has been issued against the inmate if [...] (4) the inmate is confined pending a superintendent's hearing [...].

8    Samuels cites a number of failures on Cecilia's behalf: he failed to turn over documentary evidence relating to the charges against Samuels, he failed to provide a written record of the questions he was supposed to ask Samuels' witnesses, he failed to record the testimony of the witnesses interviewed on Samuels' behalf, he failed to explain exactly what material that was confiscated constituted contraband, and he failed to interview the confidential informant to determine his existence or credibility. *See* Complaint, at 9.

9    Tier III hearings are held for "the most serious violations of institutional rules." *Walker v. Bates,* 23 F.3d 652, 654 (2d Cir.1994).

10   The name "Javier Irurre" appears on the Hearing Disposition form. *See* Ex. P. Samuels spells the name "Iurrue," *see* Complaint, at 9, while defendants in turn use two spellings for the name-"Iurre" and "Iurrue *See* Motion Brief, at 3. The

Court uses the "Irurre" spelling found on the Hearing Disposition form, apparently in Javier Irurre's own handwriting, and on the Tier III assignment form signed by Superintendent Artuz. *See* Appendix 7.

11   Placement in a special housing unit involves confinement for twenty-three hours per day. The inmates assigned to special housing units receive virtually no programming, no congregate activities, and very little natural light. Reading materials are severely restricted, as are visits. *See* Ex. 16, at 5-6 (THE NEW YORK STATE SENATE DEMOCRATIC TASK FORCE ON CRIMINAL JUSTICE REFORM, CRIMINAL JUSTICE REFORM: A TIME THAT'S COME (2001)).

12   Prisoners' Legal Services of New York cite the date as January 20, 2000. *See* Ex. 7; Samuels cites the date as January 20, 1999. *See* Ex. 6.

13   No Appellate Division decision on the matter is in the record. However, defendants' argument on the exhaustion of remedies focuses on administrative remedies and not on this potential deficiency.

14   In his complaint, Samuels also alleged an Eighth Amendment violation stemming from his treatment during a trip to and from his brother's funeral. This claim was dismissed by order of Judge Mukasey dated September 4, 2001.

15   The real damage suffered by Samuels was, *inter alia,* his 180 days in keeplock (and later a special housing unit).

16   The district court mistakenly cites the provision as " § 1997a(e)," a nonexistent section.

17   The confiscation of Samuels' documents is not an ancillary issue unrelated to the disciplinary hearing (as was Samuels' Eighth Amendment argument, *see supra* note 14). Instead, the allegedly improper confiscation of materials is part and parcel of the disciplinary proceeding. The primary harm suffered by Samuels of the confiscation was not the value of the documents seized (which is never mentioned by Samuels) but the fact that the confiscation of allegedly harmless materials led to his confinement in keeplock and later in a special housing unit for 180 days.

18   There are two separate retaliation issues at play in this action. The first, discussed here, is Samuels' claim of retaliatory confinement in a special housing unit. The second, discussed below, is Samuels' claim that the misbehavior adjudication itself was a form of retaliation for the NYTS's opposition to the Cell Building Project. *See supra* note 5.

19   As noted *supra,* Samuels was also sentenced to 180 days' loss of packages, telephone, and commissary privileges.

20   Samuels also appears to allege that Cecilia, his employee assistant, was not permitted to testify on Samuels' behalf, and that Schwartzman testified outside Samuels' presence. *See* Ex. V, at 4; Plaintiffs' Supplemental Memorandum of Law and Reply Memorandum of Law in Further Support of Plaintiffs' Motion to Stay Complaint, at 8.

21   By statute, the "assistant's role is to speak with the inmate charged, to explain the charges to the inmate, interview witnesses and to report the results of his efforts to the inmate. He may assist the inmate in obtaining documentary evidence or written statements which may be necessary. The assistant may be required by the hearing officer to be present at the disciplinary or superintendent's hearing." N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.2. While failure to adhere to regulations does not itself give rise to a claim under 42 U.S.C. § 1983, it may constitute evidence of a constitutional deprivation. *See, e.g., Duckett v. Ward,* 458 F.Supp. 624, 627 (S.D.N.Y.1978).

22   Whereas the doctrine of *respondeat superior* involves the legal assignment of liability to a supervisor for the acts of a subordinate, the instant case involves a subordinate who claims to be (and legally is) acting in the name of his supervisor.

End of Document                                                                        © 2016 Thomson Reuters. No claim to original U.S. Government Works.